# EXHIBIT

# 1

 Centers for Disease
Control and Prevention

# Coronavirus Disease 2019

# Cases in the U.S.

Last updated on June 18, 2020

| TOTAL CASES | TOTAL DEATHS |
|---|---|
| **2,155,572** | **117,632** |
| 22,834 New Cases* | 754 New Deaths* |



**Want More Data?**
CDC COVID Data Tracker

## Cases & Deaths by Jurisdiction

38 jurisdictions report more than 10,000 cases of COVID-19.

Tap on the map or the plus (+) sign below the map to see the number of cases and deaths reported by each U.S. state, the District of Columbia, New York City, and other U.S.-affiliated jurisdictions.

[ Add U.S. Map to Your Website ]

### Cases & Deaths by County

Select a state to view the number of cases and deaths by county. This data is courtesy of USAFacts.org ↗

| Select a State ▼ |
|---|

[ View County Data ]

## New Cases by Day

Tap on the blue bars or the plus (+) sign below the chart to see the number of new cases reported each day since the beginning of the outbreak.



Cases

Reset

| View Data | + |
|---|---|

## Cases by Age

Tap on the blue bars or the plus (+) sign below the chart to see the number of cases in each age group.

Data were collected from 1,880,614 people, and age was available for 1,877,743 (99.8%) people.



| View Data | + |
|---|---|

## Cases by Race/Ethnicity

Tap on the blue bars or the plus (+) sign below the chart to see the percentage for each race/ethnicity group. Select from the "Age" dropdown list to see the percentage for each age group.

Data were collected from 1,880,614 people, but race/ethnicity was only available for 897,054 (47.7 %) people.

## Cases & Deaths among Healthcare Personnel

Data were collected from 1,880,613 people, but healthcare personnel status was only available for 402,256 (21.4%) people. For the 80,249 cases of COVID-19 among healthcare personnel, death status was only available for 50,842 (63.4%).

| CASES AMONG HCP | DEATHS AMONG HCP |
|:---:|:---:|
| 80,249 | 446 |

## Previous Data                                                                                                    +

CDC has moved the following information to the Previous U.S. COVID-19 Case Data page.

- Level of community transmission by jurisdiction — last updated May 18, 2020
- Total number of cases by day — last updated April 28, 2020
- Number of cases by source of exposure — last updated April 16, 2020
- Number of cases from Wuhan, China and the Diamond Princess cruise — last updated April 16, 2020
- Number of cases by illness start date — last updated April 15, 2020

## About the Data                                                                                                   +

### Updated Daily

This page is updated daily based on data confirmed at 4:00pm ET the day before.

### Reported by Jurisdiction's Health Department

Data on this page are reported voluntarily to CDC by each jurisdiction's health department. CDC encourages all jurisdictions to report the most complete and accurate information that best represents the current status of the pandemic in their jurisdiction.

### Number of Jurisdictions

There are currently 56 U.S.-affiliated jurisdictions reporting cases of COVID-19. This includes 50 states, District of Columbia, Guam, New York City, the Northern Mariana Islands, Puerto Rico, and the U.S Virgin Islands. New York State's case and death counts do not include New York City's counts as they are separate jurisdictions.

### Confirmed & Probable Counts

As of April 14, 2020, CDC case counts and death counts include both confirmed and probable cases and deaths. This change was made to reflect an interim COVID-19 position statement issued by the Council for State and Territorial Epidemiologists on April 5, 2020. The position statement included a case definition and made

COVID-19 a nationally notifiable disease. Nationally notifiable disease cases are voluntarily reported to CDC by jurisdictions.

A confirmed case or death is defined by meeting confirmatory laboratory evidence for COVID-19.

A probable case or death is defined by one of the following:

- Meeting clinical criteria AND epidemiologic evidence with no confirmatory laboratory testing performed for COVID-19
- Meeting presumptive laboratory evidence AND either clinical criteria OR epidemiologic evidence
- Meeting vital records criteria with no confirmatory laboratory testing performed for COVID19

Not all jurisdictions report confirmed and probable cases and deaths to CDC. When not available to CDC, it is noted as N/A.

### Accuracy of Data

CDC does not know the exact number of COVID-19 illnesses, hospitalizations, and deaths for a variety of reasons. COVID-19 can cause mild illness, symptoms might not appear immediately, there are delays in reporting and testing, not everyone who is infected gets tested or seeks medical care, and there may be differences in how jurisdictions confirm numbers.

### Changes & Fluctuations in Data

Health departments may update case data over time when they receive more complete and accurate information.

The number of new cases reported each day fluctuates. There is generally less reporting on the weekends and holidays.

### Differences between CDC and Jurisdiction Data

If the number of cases or deaths reported by CDC is different from the number reported by jurisdiction health departments, data reported by jurisdictions should be considered the most up to date. The differences may be due to the timing of the reporting and website updates.

## More Information

COVIDView – A Weekly Surveillance Summary of U.S. COVID-19 Activity

Previous U.S. COVID-19 Case Data

FAQ: COVID-19 Data and Surveillance

Testing Data in the U.S.

World Map

Health Departments

Page last reviewed: June 18, 2020

# EXHIBIT 2



# Coronavirus Disease 2019

# Strategies for Optimizing the Supply of N95 Respirators

Updated April 2, 2020

## Summary of Updates as of April 2, 2020:

- Conventional capacity strategies
  - Edited the section on use of airborne infection isolation rooms (AIIRs) for aerosol-generating procedures performed on patients with confirmed or suspected COVID-19 patients.
  - Added language on FDA's Emergency Use Authorization (EUA) authorizing the use of certain NIOSH-approved respirator models in healthcare settings to the section on N95 alternatives.
- Contingency capacity strategies
  - Added a section on temporarily suspending annual fit testing following updated guidance from OSHA
  - Added more details in the extended use section.
- Crisis capacity strategies
  - Added language on the use of respirators approved under international standards and updated the tables.
  - Combined sections on limited re-use of N95 respirators for tuberculosis and then COVID-19 patients. Added more details surrounding limited re-use.

**Audience:** These considerations are intended for use by federal, state, and local public health officials, respiratory protection program managers, leaders in occupational health services and infection prevention and control programs, and other leaders in healthcare settings who are responsible for developing and implementing policies and procedures for preventing pathogen transmission in healthcare settings.

**Purpose:** This document offers a series of strategies or options to optimize supplies of disposable N95 filtering facepiece respirators (commonly called "N95 respirators") in healthcare settings when there is limited supply. It does not address other aspects of pandemic planning; for those, healthcare facilities can refer to COVID-19 preparedness plans. The strategies are also listed in order of priority and preference in the Checklist for Healthcare Facilities: Strategies for Optimizing the Supply of N95 Respirators during the COVID-19 Response in an easy-to-use format for healthcare facilities.



Controlling exposures to occupational hazards is a fundamental way to protect personnel. Conventionally, a hierarchy has been used to achieve feasible and effective controls. Multiple control strategies can be implemented concurrently and or sequentially. This hierarchy can be represented as follows:

- Elimination
- Substitution
- Engineering controls
- Administrative controls
- Personal protective equipment (PPE)

To prevent infectious disease transmission, elimination (physically removing the hazard) and substitution (replacing the hazard) are not typically options for healthcare settings. However, exposures to transmissible respiratory pathogens in healthcare facilities can often be reduced or possibly avoided through engineering and administrative controls and PPE. Prompt detection and effective triage and isolation of potentially infectious patients are essential to prevent unnecessary exposures among patients, healthcare personnel (HCP), and visitors at the facility.

N95 respirators are the PPE most often used to control exposures to infections transmitted via the airborne route, though their effectiveness is highly dependent upon proper fit and use. The optimal way to prevent airborne transmission is to use a combination of interventions from across the hierarchy of controls, not just PPE alone. Applying a combination of controls can provide an additional degree of protection, even if one intervention fails or is not available.

Respirators, when required to protect HCP from airborne contaminants such as some infectious agents, must be used in the context of a comprehensive, written respiratory protection program that meets the requirements of OSHA's Respiratory Protection standard ⧉ . The program should include medical evaluations, training, and fit testing.

Surge capacity refers to the ability to manage a sudden, unexpected increase in patient volume that would otherwise severely challenge or exceed the present capacity of a facility. While there are no commonly accepted measurements or triggers to distinguish surge capacity from daily patient care capacity, surge capacity is a useful framework to approach a decreased supply of N95 respirators during the COVID-19 response. Three general strata have been used to describe surge capacity and can be used to prioritize measures to conserve N95 respirator supplies along the continuum of care.[1]

- Conventional capacity: measures consist of providing patient care without any change in daily contemporary practices. This set of measures, consisting of engineering, administrative, and PPE controls should already be implemented in general infection prevention and control plans in healthcare settings.
- Contingency capacity: measures may change daily standard practices but may not have any significant impact on the care delivered to the patient or the safety of HCP. These practices may be used temporarily during periods of expected N95 respirator shortages.

- Crisis capacity: strategies that are not commensurate with U.S. standards of care. These measures, or a combination of these measures, may need to be considered during periods of known N95 respirator shortages.

# Conventional Capacity Strategies (should be incorporated into everyday practices)

## Engineering Controls

**Engineering controls** reduce exposures for HCP by placing a barrier between the hazard and the HCP. Engineering controls can be very effective as part of a suite of strategies to protect HCP without placing primary responsibility of implementation on them (i.e., they function without HCP having to take an action).

Selective use of airborne infection isolation rooms     +

### Selective use of airborne infection isolation rooms

Aerosol-generating procedures performed on patients with confirmed or suspected COVID-19 patients should take place in an airborne infection isolation room (AIIR). The AIIR should be constructed and maintained in accordance with current guidelines, as recommended in CDC's COVID-19 interim prevention and control recommendations in healthcare settings. Air from these rooms should be exhausted directly to the outside or be filtered through a high-efficiency particulate air (HEPA) filter directly before recirculation. Air from these rooms should be exhausted directly to the outside or be filtered through a high-efficiency particulate air (HEPA) filter directly before recirculation.

Use of physical barriers     +

### Use of physical barriers

Barriers such as glass or plastic windows can be an effective solution for reducing exposures among HCP to potentially infectious patients. This approach can be effective in reception areas (e.g., intake desk at emergency department, triage station, information booth, pharmacy drop-off/pick-up windows) where patients may first report upon arrival to a healthcare facility. Other examples include the use of curtains between patients in shared areas and closed suctioning systems for airway suctioning for intubated patients.

Properly maintained ventilation systems     +

Another cornerstone of engineering controls are ventilation systems that provide air movement from a clean (HCP workstation or area) to contaminated (sick patient) flow direction (along with appropriate filtration, exchange rate) that are installed and properly maintained.

## Administrative Controls

**Administrative controls** are employer-dictated work practices and policies that reduce or prevent hazardous exposures. Their effectiveness depends on employer commitment and HCP acceptance and consistent use of the strategies.

Limit number of patients going to hospital or outpatient settings     +

Develop mechanisms to screen patients for acute respiratory illness prior to their healthcare visits, such as through the appointment reminder system. Postpone and reschedule those with signs and symptoms presenting for non-acute visits.

Telemedicine                                                                                                    +

Nurse advice lines and telemedicine can screen and manage patients with suspected COVID-19 without the need for a face-to-face visit. Promoting the use of these technologies and referral networks can help triage persons to the appropriate level of care, potentially reducing the influx of patients to healthcare facilities and reserving personal protective equipment for when it is needed.

Exclude all HCP not directly involved in patient care                                                           +

CDC guidance recommends that, for COVID-19, only essential personnel enter the patient care area, and that facilities consider caring for these patients with dedicated HCP.  Further limiting the numbers of healthcare personnel and patient contacts to those that are medically essential (e.g., excluding dietary personnel, environmental services) could limit the number of respirators used. The medically essential personnel would assume food delivery and environmental services.

Limit face-to-face HCP encounters with patient                                                                  +

Measures can be explored to limit face-to-face contact encounters between HCP and patients with confirmed or suspected COVID-19. HCP may consider bundling care activities to minimize room entries, and bundling may occur across HCP types (e.g., food trays are delivered by HCP performing other care). Alternative mechanisms for HCP and patient interactions include telephones, video monitoring, and video-call applications on cell phones or tablets.

Exclude visitors to patients with known or suspected COVID-19                                                    +

Restrict visitors from entering the rooms of patients with known COVID-19 or suspected COVID-19, as recommended in CDC's guidance. Alternative mechanisms for patient and visitor interactions, such as video-call applications on cell phones or tablets should be explored. Facilities can consider exceptions based on end-of-life situations or when a visitor is essential for the patient's emotional well-being and care. If visitors must enter the room of a known or suspected COVID-19 patient, facilities should provide instruction, before visitors enter patients' rooms on use of PPE according to current facility policy while in the patient's room.

Source control                                                                                                  +

Identify and assess patients who may be ill with or who may have been exposed to a person with known COVID-19. Patients with symptoms of suspected COVID-19 or other respiratory infection (e.g., fever, cough) presenting for care should use facemasks 🔴 for source control until they can be placed in a private room. Instructions should include how to use facemasks. Patients with these symptoms should not wear N95 respirators. If these patients need to leave their room for services in other areas of the hospital (e.g., radiology), they should also wear facemasks for source control.

+

## Cohorting patients

Cohorting is the practice of grouping together patients who are infected with the same organism to confine their care to one area and prevent contact with other patients. Cohorts are created based on clinical diagnosis, microbiologic confirmation when available, epidemiology, and mode of transmission of the infectious agent. Cohorting has been used extensively for managing outbreaks of multidrug resistant organisms including MRSA, VRE, MDR-ESBLs, *Pseudomonas aeruginosa;* methicillin-susceptible *Staphylococcus aureus*, RSV, adenovirus keratoconjunctivitis, rotavirus, and SARS. When single patient rooms are not available, patients with **confirmed** COVID-19 may be placed in the same room. Cohorting patients could minimize respirator use when extended wear of respirators is implemented.  For more information on cohorting of patients, refer to 2007 Guideline for Isolation  Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings 🔗 .

## Cohorting HCP                                                                                                    +

Assigning designated teams of HCP to provide care for all patients with suspected or confirmed COVID-19 could minimize respirator use when extended wear of respirators is implemented. This strategy can also limit the number of exposed HCP who need to be fit tested.

## Training on indications for use of N95 respirators                                                    +

It is important that HCP be trained on indications for use of N95 respirators. The OSHA Respiratory Protection standard requires employers to provide respirator training to an employee prior to use in the workplace. For example, HCP should be educated on the use of N95 respirators when caring for patients managed with airborne precautions, and other instances for respirator use, such as the performance of aerosol generating procedures.

## Training on use of N95 respirators                                                                        +

Training employees on the proper use of respirators, including putting on and removing them, limitations on their use, and maintenance is essential for effective use of respiratory protection. HCP should be thoroughly trained before they are fit tested to ensure they are comfortable donning the respirator and know how to conduct a user seal check. HCP should be trained on the respirator they are expecting to use at work.

## Just-in-time fit testing                                                                                          +

Just-in-time fit testing refers to the capacity of healthcare facilities to do larger scale evaluation, training, and fit testing of employees when necessary during a pandemic. Facilities may adopt a plan to use the "just-in-time" method for fit testing, which has been incorporated into pandemic plans for many facilities. For large facilities, it may not be feasible to fit test all employees, especially if their job does not typically place them at risk for exposure to airborne infectious diseases such as tuberculosis. If healthcare facilities are expecting to receive COVID-19 patients, they should begin training and start to plan for fit testing now. It is essential to have HCP trained and fit tested prior to receiving patients.

## Limiting respirators during training                                                                       +

In order to conserve the supply of N95 respirators, healthcare facilities should understand which of their HCP need to be in a respiratory protection program and thus medically evaluated, trained, and fit tested. If training

and fit testing are conducted during two separate steps, it is possible to allow limited re-use of N95 respirators used by individual HCP during training and then fit testing. Employees should be fit tested after they are comfortable donning the respirator and have passed a user seal check. The respirator might also be saved and then used for patient care.

### Qualitative fit testing     +

Respirator fit test methods are classified as either qualitative or quantitative, and there are multiple protocols of each classification that are NIOSH-recommended or meet the requirements of OSHA's Respiratory Protection Standard ↗ . A qualitative fit test is a pass/fail test to assess the adequacy of respirator fit that relies on the individual's sensory detection of a test agent. A quantitative fit test numerically measures the effectiveness of the respirator to seal with the wearer's face, without relying on the wearer's voluntary or involuntary response to a test agent. Quantitative fit tests involve adaptation of the respirator to the fit testing equipment, which can involve making holes in the respirator.

Many healthcare systems already use qualitative fit test methods for fit testing HCP. For those using quantitative fit test methods, considerations can be made to use qualitative fit test methods to minimize the destruction of an N95 respirator used in fit testing and allow for the re-use of the same N95 respirator by the HCP. In March 2020, OSHA recommended ↗ healthcare employers consider changing from a quantitative fit testing method to a qualitative fit testing method. Qualitative fit methods may also allow for rapid fit testing of larger numbers of HCP. Any switch in methods should be assessed to ensure proficiency of the fit testers in carrying out the test.

## Personal Protective Equipment: Respiratory Protection

While engineering and administrative controls should be considered first when selecting controls, the use of **personal protective equipment (PPE)** should also be part of a suite of strategies used to protect personnel. Proper use of respiratory protection by HCP requires a comprehensive program (including medical clearance, training, and fit testing) that complies with OSHA's Respiratory Protection Standard ↗ and a high level of HCP involvement and commitment. The program should also include provisions for the cleaning, disinfecting, inspection, repair, and storage of respirators used by HCP on the job according to manufacturer's instructions. Proper storage conditions can maximize shelf life of respirators. The following strategies in this section are traditionally used by some healthcare systems. If not already implemented, these strategies can be considered by healthcare settings in the face of a potential N95 respirator shortage before implementing the contingency strategies that are listed further below.

### N95 respirators     +

N95 respirators include standard and surgical N95 respirators. In the United States, all N95 respirators used in occupational settings are approved by the National Institute for Occupational Safety and Health (NIOSH) and used in accordance with OSHA standards.

A surgical N95 respirator is a NIOSH-approved N95 respirator that has also been cleared by the FDA as a surgical mask. Surgical N95 respirators (sometimes called medical respirators) are recommended only for use by HCP who need protection from both airborne and fluid hazards, such as splashes or sprays. In times of shortage, only HCP who are working in a sterile field or who may be exposed to high-velocity splashes, sprays, or splatters of blood or body fluids should be provided these respirators. Other HCP can use standard N95 respirators. If surgical N95 respirators are not available, and there is a risk that the worker may be exposed to high velocity splashes, sprays, or splatters of blood or body fluids, then a faceshield should be worn over the standard N95 respirator.

+

**Use of alternatives to N95 respirators**

Use NIOSH approved alternatives to N95 respirators 🔗 where feasible. These include other classes of filtering facepiece respirators, elastomeric half-mask and full facepiece air purifying respirators, powered air purifying respirators (PAPRs). All of these alternatives will provide equivalent or higher protection than N95 respirators when properly worn. NIOSH maintains a searchable, online version of the certified equipment list identifying all NIOSH-approved respirators.

Every other NIOSH approved filtering facepiece respirators is at least as protective as the N95. These include N99, N100, P95, P99, P100, R95, R99, and R100. Many filtering facepiece respirators have exhalation valves and should not be used in surgical settings as unfiltered exhaled breath would compromise the sterile field.  On March 2, 2020, FDA issued an Emergency Use Authorization (EUA) 🔗 authorizing the use of certain NIOSH-approved respirator models in healthcare settings.

Elastomeric respirators are half-facepiece, tight-fitting respirators that are made of synthetic or rubber material permitting them to be repeatedly disinfected, cleaned, and reused. They are equipped with replaceable filter cartridges. Similar to N95 respirators, elastomeric respirators require annual fit testing. Elastomeric respirators should not be used in surgical settings due to concerns that air coming out of the exhalation valve may contaminate the sterile field.

PAPRs are reusable respirators that are typically loose-fitting hoods or helmets. These respirators are battery-powered with blower that pulls air through attached filters or cartridges. The filter is typically a high-efficiency particulate air (HEPA) filter. Loose-fitting PAPRs do not require fit-testing and can be worn by people with facial hair. However, PAPRs should not be used in surgical settings due to concerns that the blower exhaust and exhaled air may contaminate the sterile field.

On March 28, 2020, FDA issued an update to address NIOSH-Approved Air Purifying Respirators for Use in Health Care Settings During Response to the COVID-19 Public Health Emergency 🔗 . Facilities using elastomeric respirators and PAPRs should have up-to-date cleaning/disinfection procedures, which are an essential part of use for protection against infectious agents.

## Contingency Capacity Strategies (during expected shortages)

Decisions to implement contingency are based upon these assumptions:

1. Facilities understand their current N95 respirator inventory and supply chain
2. Facilities understand their N95 respirator utilization rate
3. Facilities are in communication with local healthcare coalitions, federal, state, and local public health partners (e.g., public health emergency preparedness and response staff) regarding identification of additional supplies
4. Facilities have already implemented conventional capacity measures
5. Facilities have provided HCP with required education and training, including having them demonstrate competency with donning and doffing, with any PPE ensemble that is used to perform job responsibilities, such as provision of patient care

## Administrative Controls

**Decrease length of hospital stay for medically stable patients with COVID-19**      +

Currently, CDC recommends discharge of patients with confirmed COVID-19 when they are medically stable and have an appropriate home environment to which to return. CDC lists considerations for care at home in: Interim Guidance for Implementing Home Care of People Not Requiring Hospitalization for Coronavirus Disease 2019

(COVID-19). If patients cannot be discharged to home for social rather than medical reasons, public health officials might need to identify alternative non-hospital housing where those patients can convalesce.

## Temporarily suspend annual fit testing      +

Facilities can consider temporarily suspending annual fit testing of HCP in times of expected shortages. In March 2020, OSHA issued new temporary guidance ↗ regarding the enforcement of OSHA's Respiratory Protection Standard. The guidance gave OSHA field offices enforcement discretion concerning the annual fit testing requirement as long as HCP have undergone an initial fit test with the same model, style, and size. Other conditions include explaining to HCP the importance of conducting a user seal check each time the respirator is put on and conducting a fit test if there are visual changes to the employee's physical condition.

## Personal Protective Equipment: Respiratory Protection

### Use of N95 respirators beyond the manufacturer-designated shelf life for training and fit testing      +

In times of shortage, consideration can be made to use N95 respirators beyond the manufacturer-designated shelf life. However, expired respirators might not perform to the requirements for which they were certified. Over time, components such as the strap and material may degrade, which can affect the quality of the fit and seal. Because of this, use of expired respirators could be prioritized for situations where HCP are NOT exposed to pathogens, such as training and fit testing.  As expired respirators can still serve an important purpose, healthcare facilities should retain and reserve all N95 respirators during the pandemic.

### Extended use of N95 respirators      +

Practices allowing extended use of N95 respirators, when acceptable, can also be considered. The decision to implement policies that permit extended use of N95 respirators should be made by the professionals who manage the institution's respiratory protection program, in consultation with their occupational health and infection control departments with input from the state/local public health departments. CDC has recommended guidance on implementation of extended use of N95 respirators in healthcare settings. Extended use has been recommended and widely used as an option for conserving respirators during previous respiratory pathogen outbreaks and pandemics.

Extended use refers to the practice of wearing the same N95 respirator for repeated close contact encounters with several different patients, without removing the respirator between patient encounters. Extended use is well suited to situations wherein multiple patients with the same infectious disease diagnosis, whose care requires use of a respirator, are cohorted (e.g., housed on the same hospital unit). It can also be considered to be used for care of patients with tuberculosis, varicella, and measles, other infectious diseases where use of an N95 respirator or higher is recommended. When practicing extended use of N95 respirators, the maximum recommended extended use period is 8–12 hours. Respirators should not be worn for multiple work shifts and should not be reused after extended use. N95 respirators should be removed (doffed) and discarded before activities such as meals and restroom breaks.

## Crisis Capacity Strategies (during known shortages)

Decisions to implement crisis strategies are based upon these assumptions:

1. Facilities understand their current N95 respirator inventory and supply chain
2. Facilities understand their N95 respirator utilization rate
3. Facilities are in communication with local healthcare coalitions, federal, state, and local public health partners (e.g., public health emergency preparedness and response staff) regarding identification of additional supplies
4. Facilities have already implemented contingency capacity measures
5. Facilities have provided HCP with required education and training, including having them demonstrate competency with donning and doffing, with any PPE ensemble that is used to perform job responsibilities, such as provision of patient care

## When N95 Supplies are Running Low

## Personal Protective Equipment: Respiratory Protection and Facemasks

**Use of respirators beyond the manufacturer-designated shelf life for healthcare delivery**　　　　　+

Consideration can be made to use N95 respirators beyond the manufacturer-designated shelf life for care of patients with COVID-19, tuberculosis, measles, and varicella. However, respirators beyond the manufacturer-designated shelf life may not perform to the requirements for which they were certified. Over time, components such as the straps and nose bridge material may degrade, which can affect the quality of the fit and seal. Many models found in U.S. stockpiles and stockpiles of healthcare facilities have been found to continue to perform in accordance with NIOSH performance standards. However, fluid resistance and flammability were not assessed. Use of the N95 respirators recommended in *Release of Stockpiled N95 Filtering Facepiece Respirators Beyond the Manufacturer-Designated Shelf Life: Considerations for the COVID-19 Response* can be considered. It is optimal to use these respirators in the context of a respiratory protection program that includes medical evaluation, training, and fit testing. If used in healthcare delivery, it is particularly important that HCP perform the expected seal check, prior to entering a patient care area. CDC does not recommend using N95s beyond the manufacturer-designated shelf life in surgical settings. On March 2, 2020, FDA issued an Emergency Use Authorization (EUA) authorizing the use of certain NIOSH-approved respirator models in healthcare settings. This EUA includes respirator units that are past their designated shelf life.

**Use of respirators approved under standards used in other countries that are similar to NIOSH-approved respirators**　　　　　+

Other countries approve respirators for occupational use according to country-specific standards. These products are evaluated using some methods that are similar to those used by NIOSH. Some methods are different but are expected to provide protection similar to NIOSH-approved filtering facepiece and elastomeric respirators. Devices supplied by current NIOSH-approval holders producing respirators under the standards authorized in the listed countries are expected to provide the protection indicated, given that a proper fit is achieved. Therefore, they are considered to be suitable alternatives to provide protection during the COVID-19 response when supplies are short. Within the following tables, the country, conformity assessment standards, standards and guidance documents, acceptable product classification, and NIOSH classification are provided in alphabetical order. All of these respirators have protection factors of at least 10 in the countries listed below, as outlined in the standards and guidance documents specified. Non-NIOSH approved products developed by manufacturers who are not NIOSH approval holders are expected to meet the performance requirements if they have been issued a certificate of approval by an authorized test laboratory indicating they conform to the standards below. Non-NIOSH-approved products developed by manufacturers who are not NIOSH approval holders, including only products approved by and received from China, should only be used in crisis situations when no other NIOSH-approved N95 respirator (or a listed device from one of the other countries identified within the FDA EAU) is available; they should not be used during aerosol generating medical procedures unless the alternative is a loose-fitting surgical mask or improvised device. On April 3, 2020, FDA issued an update to

the Non-NIOSH Approved Respirator Emergency Use Authorization (EUA) 🔗 concerning non-NIOSH-approved respirators that have been approved in other countries. Visit the NIOSH Science Blog for additional information on understanding the use of imported Non-NIOSH-approved respirators.

## Respirators Approved Under Standards Used in Other Countries That Are Similar to NIOSH-Approved N95 Filtering Facepiece Respirators

| Country | Performance Standard | Acceptable Product Classification | May Be Used in Lieu of NIOSH-Certified Products Classified as |
|---------|---------------------|-----------------------------------|--------------------------------------------------------------|
| Australia | AS/NZS 1716:2012 | P2 | N95 |
| | | P3 | N99 or lower |
| Brazil | ABNT/NBR 13698:2011 | PFF2 | N95 |
| | | PFF3 | N99 or lower |

| Show More |
|:---:|
| Show More |

## Respirator-Cartridge Units Approved Under Standards Used in Other Countries That Are Similar to NIOSH-Approved Elastomeric Half-Facepiece Respirators

| Show More |
|:---:|

**Limited re-use of N95 respirators**       +

Re-use refers to the practice of using the same N95 respirator by one HCP for multiple encounters with different patients but removing it (i.e. doffing) after each encounter. This practice is often referred to as "limited reuse" because restrictions are in place to limit the number of times the same respirator is reused. It is important to consult with the respirator manufacturer regarding the maximum number of donnings or uses they recommend for the N95 respirator model. If no manufacturer guidance is available, data suggest limiting the number of reuses to no more than five uses per device to ensure an adequate safety margin.[1] N95 and other disposable respirators should not be shared by multiple HCP. CDC has recommended guidance on implementation of limited re-use of N95 respirators in healthcare settings.

For pathogens for which contact transmission is not a concern, routine limited reuse of single-use disposable respirators has been practiced for decades. For example, for tuberculosis prevention, a respirator classified as disposable can be reused by the same provider as long as the respirator maintains its structural and functional integrity. If reuse must be implemented in times of shortages, HCP could be encouraged to reuse their N95 respirators when caring for patients with tuberculosis disease first.

Limited re-use of N95 respirators when caring for patients with COVID-19 might also become necessary. However, it is unknown what the potential contribution of contact transmission is for SARS-CoV-2, and caution should be used. Re-use should be implemented according to CDC guidance. Re-use has been recommended as an option for conserving respirators during previous respiratory pathogen outbreaks and pandemics. It may also be necessary to re-use N95 respirators when caring for patients with varicella or measles, although contact

transmission poses a risk to HCP who implement this practice. Ideally, N95 respirators should not be re-used by HCP who care for patients with COVID-19 then care for other patients with varicella, measles, and tuberculosis, and vice versa.

Respirators grossly contaminated with blood, respiratory or nasal secretions, or other bodily fluids from patients should be discarded. HCP can consider using a face shield or facemask over the respirator to reduce/prevent contamination of the N95 respirator. HCP re-using an N95 respirators should use a clean pair of gloves when donning or adjusting a previously worn N95 respirator. It is important to discard gloves and perform hand hygiene after the N95 respirator is donned or adjusted.

The surfaces of a properly donned and functioning NIOSH-approved N95 respirator will become contaminated with pathogens while filtering the inhalation air of the wearer during exposures to pathogen laden aerosols. The pathogens on the filter materials of the respirator may be transferred to the wearer upon contact with the respirator during activities such as adjusting the respirator, improper doffing of the respirator, or when performing a user-seal check when redonning a previously worn respirator. One effective strategy to mitigate the contact transfer of pathogens from the respirator to the wearer could be to issue each HCP who may be exposed to COVID-19 patients a minimum of five respirators. Each respirator will be used on a particular day and stored in a breathable paper bag until the next week. This will result in each worker requiring a minimum of five N95 respirators if they put on, take off, care for them, and store them properly each day.  This amount of time in between uses should exceed the 72 hour expected survival time for SARS-CoV2 (the virus that caused COVID-19).[3] HCP should still treat the respirator as though it is still contaminated and follow the precautions outlined in CDC's re-use recommendations.

Respirator manufacturers may provide guidance for respirator decontamination. At present, there are no generally approved methods for N95 and other disposable respirator decontamination prior to re-use. Additional guidance on potential methods may be found here.

## Use of additional respirators beyond the manufacturer-designated shelf life for healthcare delivery that have not been evaluated by NIOSH                                                                            +

Use of additional N95 respirators beyond the manufacturer-designated shelf life for care of patients with COVID-19, tuberculosis, measles, and varicella can be considered. However, respirators beyond the manufacturer-designated shelf life may not perform to the requirements for which they were certified. Over time, components such as the straps and nose bridge material may degrade, which can affect the quality of the fit and seal. Some models have been found NOT to perform in accordance with NIOSH performances standards, and consideration may be given to use these respirators as identified in *Release of Stockpiled N95 Filtering Facepiece Respirators Beyond the Manufacturer-Designated Shelf Life: Considerations for the COVID-19 Response*. In addition, consideration can be given to use N95 respirators that have not been evaluated by NIOSH beyond the manufacturer-designated shelf life. These respirators should ideally be used in the context of a respiratory protection program that includes medical evaluation, training, and fit testing. It is particularly important that HCP perform the expected seal check, prior to entering a patient care area.

## Prioritize the use of N95 respirators and facemasks by activity type                                                                            +

The number of infectious particles required to cause an infection (infectious dose) is often uncertain or unknown for respiratory pathogens. Further, there is often uncertainty about the influence of factors such as exposure duration and nature of clinical symptoms on the likelihood of infection transmission from person-to-person. When facemasks must be used by HCP entering a patient care area, source control (i.e. masking of symptomatic patients) and maintaining distance from the patient are particularly important to reduce the risk of transmission.

This prioritization approach to conservation is intended to be used when N95 respirators are so limited that routinely practiced standards of care for all HCP wearing N95 respirators when caring for a COVID-19 patient are no longer possible. N95 respirators beyond their manufacture-designated shelf life, when available, are preferable to use of facemasks. The use of N95s or elastomeric respirators or PAPRs should be prioritized for HCP with the highest potential exposures including being present in the room during aerosol generating procedures performed on symptomatic persons.

Suggested facemask or respirator use, based upon distance from a patient with suspected or known COVID-19 and use of source control*

<div style="background:teal;color:white;text-align:center;padding:8px">Show More</div>

## When No Respirators are Left

### Administrative Controls

**Exclude HCP at higher risk for severe illness from COVID-19 from contact with known or suspected COVID-19 patients**                    +

During severe resource limitations, consider excluding HCP who may be at higher risk for severe illness from COVID-19, such as those of older age, those with chronic medical conditions, or those who may be pregnant, from caring for patients with confirmed or suspected COVID-19 infection.

**Designate convalescent HCP for provision of care to known or suspected COVID-19 patients**                    +

It may be possible to designate HCP who have clinically recovered from COVID-19 to preferentially provide care for additional patients with COVID-19. Individuals who have recovered from COVID-19 infection may have developed some protective immunity, but this has not yet been proven.

### Engineering Controls

**Expedient patient isolation rooms for risk-reduction**                    +

Portable fan devices with high-efficiency particulate air (HEPA) filtration that are carefully placed can increase the effective air changes per hour of clean air to the patient room, reducing risk to individuals entering the room without respiratory protection. NIOSH has developed guidance for using portable HEPA filtration systems to create expedient patient isolation rooms. The expedient patient isolation room approach involves establishing a high-ventilation-rate, negative pressure, inner isolation zone that sits within a "clean" larger ventilated zone. In the absence of any remaining supply of N95 respirators, it may be possible to use this technology in conjunction with HCP wearing facemasks.

**Ventilated Headboards**                    +

NIOSH has developed the ventilated headboard that draws exhaled air from a patient in bed into a HEPA filter, decreasing risk of HCP exposure to patient-generated aerosol. This technology consists of lightweight, sturdy, and adjustable aluminum framing with a retractable plastic canopy. The ventilated headboard can be deployed in combination with HEPA fan/filter units to provide surge isolation capacity within a variety of environments, from traditional patient rooms to triage stations, and emergency medical shelters. In the absence of any remaining supply of N95 respirators, it may be possible to use this technology in conjunction with HCP and/or patients wearing facemasks.

# References

- [1] Hick JL, Barbera JA, Kelen GD. Refining surge capacity: conventional, contingency, and crisis capacity. Disaster Med Public Health Prep. 2009;3(2 Suppl): S59-67.

- [2] Bergman, MS, Viscusi DJ, Zhuang Z, Palmiero AJ, Powell JB, Shaffer RE. Impact of multiple consecutive donnings on filtering facepiece respirator fit. Am J Infect Control. 2012;40(4): 375-380.

- [3] van Doremalen N, Bushmaker T, Morris DH. Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1. N Engl J Med. 2020 Mar 17.

- [4] Dato, VM, Hostler, D, and Hahn, ME. Simple Respiratory Mask, Emerg Infect Dis. 2006; 12(6): 1033–1034

- [5] Rengasamy S, Eimer B, and Shaffer R. Simple respiratory protection-evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles, Ann Occup Hyg. ↗ 2010;54(7):789-98.

Page last reviewed: April 22, 2020

# EXHIBIT
# 3



Centers for Disease
Control and Prevention

# Coronavirus Disease 2019

# Cases in the U.S.

Last updated on June 18, 2020

| TOTAL CASES | TOTAL DEATHS |
|:---:|:---:|
| **2,155,572** | **117,632** |
| 22,834 New Cases* | 754 New Deaths* |



**Want More Data?**
CDC COVID Data Tracker

## Cases & Deaths by Jurisdiction

38 jurisdictions report more than 10,000 cases of COVID-19.

Tap on the map or the plus (+) sign below the map to see the number of cases and deaths reported by each U.S. state, the District of Columbia, New York City, and other U.S.-affiliated jurisdictions.

**Add U.S. Map to Your Website**

### Cases & Deaths by County

Select a state to view the number of cases and deaths by county. This data is courtesy of USAFacts.org ⧉

| Select a State ▼ |
|---|

**View County Data**

## New Cases by Day

Tap on the blue bars or the plus (+) sign below the chart to see the number of new cases reported each day since the beginning of the outbreak.



☐ Cases    Reset

| View Data | + |

## Cases by Age

Tap on the blue bars or the plus (+) sign below the chart to see the number of cases in each age group.

Data were collected from 1,880,614 people, and age was available for 1,877,743 (99.8%) people.



| View Data | + |

## Cases by Race/Ethnicity

Tap on the blue bars or the plus (+) sign below the chart to see the percentage for each race/ethnicity group. Select from the "Age" dropdown list to see the percentage for each age group.

Data were collected from 1,880,614 people, but race/ethnicity was only available for 897,054 (47.7 %) people.

## Cases & Deaths among Healthcare Personnel

Data were collected from 1,880,613 people, but healthcare personnel status was only available for 402,256 (21.4%) people. For the 80,249 cases of COVID-19 among healthcare personnel, death status was only available for 50,842 (63.4%).

| CASES AMONG HCP | DEATHS AMONG HCP |
|:---:|:---:|
| 80,249 | 446 |

## Previous Data    +

CDC has moved the following information to the Previous U.S. COVID-19 Case Data page.

- Level of community transmission by jurisdiction — last updated May 18, 2020
- Total number of cases by day — last updated April 28, 2020
- Number of cases by source of exposure — last updated April 16, 2020
- Number of cases from Wuhan, China and the Diamond Princess cruise — last updated April 16, 2020
- Number of cases by illness start date — last updated April 15, 2020

## About the Data    +

### Updated Daily

This page is updated daily based on data confirmed at 4:00pm ET the day before.

### Reported by Jurisdiction's Health Department

Data on this page are reported voluntarily to CDC by each jurisdiction's health department. CDC encourages all jurisdictions to report the most complete and accurate information that best represents the current status of the pandemic in their jurisdiction.

### Number of Jurisdictions

There are currently 56 U.S.-affiliated jurisdictions reporting cases of COVID-19. This includes 50 states, District of Columbia, Guam, New York City, the Northern Mariana Islands, Puerto Rico, and the U.S Virgin Islands. New York State's case and death counts do not include New York City's counts as they are separate jurisdictions.

### Confirmed & Probable Counts

As of April 14, 2020, CDC case counts and death counts include both confirmed and probable cases and deaths. This change was made to reflect an interim COVID-19 position statement issued by the Council for State and Territorial Epidemiologists on April 5, 2020. The position statement included a case definition and made

COVID-19 a nationally notifiable disease. Nationally notifiable disease cases are voluntarily reported to CDC by jurisdictions.

A confirmed case or death is defined by meeting confirmatory laboratory evidence for COVID-19.

A probable case or death is defined by one of the following:

- Meeting clinical criteria AND epidemiologic evidence with no confirmatory laboratory testing performed for COVID-19
- Meeting presumptive laboratory evidence AND either clinical criteria OR epidemiologic evidence
- Meeting vital records criteria with no confirmatory laboratory testing performed for COVID19

Not all jurisdictions report confirmed and probable cases and deaths to CDC. When not available to CDC, it is noted as N/A.

### Accuracy of Data

CDC does not know the exact number of COVID-19 illnesses, hospitalizations, and deaths for a variety of reasons. COVID-19 can cause mild illness, symptoms might not appear immediately, there are delays in reporting and testing, not everyone who is infected gets tested or seeks medical care, and there may be differences in how jurisdictions confirm numbers.

### Changes & Fluctuations in Data

Health departments may update case data over time when they receive more complete and accurate information.

The number of new cases reported each day fluctuates. There is generally less reporting on the weekends and holidays.

### Differences between CDC and Jurisdiction Data

If the number of cases or deaths reported by CDC is different from the number reported by jurisdiction health departments, data reported by jurisdictions should be considered the most up to date. The differences may be due to the timing of the reporting and website updates.

## More Information

COVIDView – A Weekly Surveillance Summary of U.S. COVID-19 Activity

Previous U.S. COVID-19 Case Data

FAQ: COVID-19 Data and Surveillance

Testing Data in the U.S.

World Map

Health Departments

Page last reviewed: June 18, 2020

# EXHIBIT
# 4

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/3m-ceo-on-n95-masks-demand-exceeds-our-production-capacity-11585842928

◆ WSJ NEWS EXCLUSIVE | BUSINESS

# 3M CEO on N95 Masks: 'Demand Exceeds Our Production Capacity'

As coronavirus crisis mounts, manufacturers ramp up to meet huge demand for protective equipment



An N95 respiration mask underwent tests at a 3M lab last month.
**PHOTO:** NICHOLAS PFOSI/REUTERS

*By* *Austen Hufford*
Updated April 2, 2020 9:22 pm ET

American manufacturers say it will be months before they meet demand for high-quality masks, part of a broader breakdown in the effort to supply <u>enough protective gear</u> and lifesaving equipment to fight the coronavirus pandemic.

3M Co. MMM **2.00%** ▲ and a half dozen smaller competitors are making about 50 million of N95 masks—which block 95% of very small particles—in the U.S. each month. That is far short of the 300 million N95 masks the Department of Health and Human Services estimated in March that U.S. health-care workers would need monthly to fight a pandemic. U.S. hospitals that previously purchased masks from abroad have turned to overburdened domestic suppliers after many countries blocked exports to fight the virus within their own borders.

Case 1:20-cv-01097   Document 12-1   Filed 07/02/20   Page 29 of 118

"The demand we have exceeds our production capacity," 3M Chief Executive Mike Roman said in an interview.

3M has doubled mask production since January. President Trump on Thursday invoked the Defense Production Act against 3M, which gives the federal government more control over a company's operations. 3M didn't immediately respond to a request for comment on the move.

Other companies said they are racing to add machines and hire staff to make tens of millions more masks each month. The domestic production boom is a reversal after three decades that manufacturers spent moving production of masks and other medical gear to China and elsewhere, amid the broader shift of industrial capacity to lower-cost countries. Hospital buyers supported a strategy that kept down costs for critical equipment.

## Falling Behind

Manufacturers say it will be months before they can meet the demand for masks.

**Shortfall in U.S. production of N95 masks**



Estimated monthly demand in a pandemic

290 million

Estimated monthly production

Prestige Ameritech
**2 million**

Moldex-Metric
**8**

Honeywell*
**20**

3M†
**50**

*By May †By June
Sources: HHS (Estimated demand; the companies (estimated production)

But the coronavirus pandemic has overwhelmed that scattered supply chain. Hospitals and public officials are competing for all the available N95 masks, as well as less-sophisticated surgical masks <u>and ventilators</u>.

To fill that gap, car makers including <u>Ford Motor</u> Co. F **1.69%** ▲ and <u>General Motors</u> Co. GM **3.43%** ▲ are <u>planning to build ventilators</u> and clothing makers are sewing surgical and cotton masks, which are less protective than N95 masks. Public-health authorities in the U.S. <u>are reviewing</u> whether to encourage people to wear such masks in public to help contain the pandemic.

3M's N95 masks are considered the gold standard by medical workers and public-health officials. The Minnesota-based company developed the first modern disposable face

masks in the 1960s, and kept making millions of masks each month in the U.S. even after competitors moved most of their output overseas.

Before the pandemic took hold this year, most of the 50 million N95 masks that 3M made globally each month were used to protect factory workers from metal shavings and other hazards, Mr. Roman said. That level of production was enough to meet demand from both medical and factory workers. Now, he said, 90% of the masks that 3M sells are going to medical workers.

3M began ramping up mask production after the World Health Organization on Jan. 11 reported the first deaths from Covid-19, the disease caused by the coronavirus. By mid-March 3M had doubled its output to nearly 100 million masks a month globally, and 35 million a month in the U.S., at plants in South Dakota and Nebraska. the company also has said it would import 10 million masks this month from its factory in China, which earlier this year was restricted from sending goods abroad.

Mr. Roman said 3M wants to double its global mask production over the next year. That plus more domestic mask production that Honeywell International Inc. and other companies plan to add in the months ahead would meet the domestic demand the pandemic has created, officials and manufacturers said.

"The first step was ramping up our idle capacity. The second step is expanding it," Mr. Roman said.

Smaller manufacturers Moldex-Metric Inc. and Prestige Ameritech Ltd. make about 10 million N95 masks each month combined, according to the companies. Their output plus 3M's mask production represents the bulk of current U.S. capacity, according to industry leaders, augmented by smaller quantities from companies including Alpha Pro Tech Ltd. and Louis M. Gerson Co.

HHS has urged manufacturers for years to add domestic mask-making capacity in case of an emergency. "Supplies will be short during a pandemic," the federal agency said in a 2007 presentation to manufacturers reviewed by The Wall Street Journal.

The agency in March ordered 600 million N95 masks from five companies to distribute to hospitals and augment the national medical-supply stockpile over the next 18 months. The purchase includes orders for 190 million masks each from 3M and Honeywell and 130

million from medical-supplies company <u>Owens & Minor</u> Inc., OMI **5.26%** ▲ the agency said in an email.

Honeywell, which primarily made masks outside the U.S. before the pandemic, said it plans to hire 1,000 workers to make 20 million N95 masks a month by May at plants in Rhode Island and Phoenix. 3M said it will be making 50 million masks a month in the U.S. by June.

Moldex-Metric said it is making eight million N95 masks a month, and Prestige Ameritech said it is making two million masks a month. Dozens of smaller manufacturers are also buying equipment <u>to start making masks</u>.

But many of their new machines won't be installed for months, manufacturers said. Some mask components, including a filtering material called polypropylene, are also <u>in tight supply</u>.

Total Petrochemicals USA, a division of France's Total SA, is a major supplier of polypropylene to manufacturers including 3M, according to a person familiar with 3M's supply chain. Total said it has boosted global production of polypropylene to meet rising demand.

"It has been exponential and we expect it to double again," said Paul Colonna, Total's head of polymers in the Americas.

Strong Manufacturers, a medical-equipment distributor, recently installed three mask-making machines at a factory in North Carolina, but can't find enough raw materials to use them. The machines need a hard-to-find shape of elastic band, said Charles Fatora, the company's head of global procurement.



Personnel aboard the USNS Comfort were instructed on how to wear an N95 mask as the hospital ship prepared to admit patients this week in New York.

PHOTO: SARA ESHLEMAN/AGENCE FRANCE-PRESSE/GETTY IMAGES

"I have a gun on the front line. I just need some ammo," he said.

Medicom Group, a Montreal-based mask maker, said it is opening a factory in Canada to make N95 and surgical masks after signing a supply agreement with the Canadian government. The company wants a similar commitment from officials in the U.S., where Medicom operates a surgical-mask plant, to buy its masks even after the pandemic ends.

"If we do not have a long-term agreement, how can we invest more and more dollars into equipment that is going to sit and rot," said Medicom Chief Executive Ronald Reuben.

Imports of N95 masks from China, the world's top producer of medical gear, have resumed after a weekslong export stoppage as officials diverted production to fight the outbreak in the country where it began.

Lloyd Soong, chief executive of Singapore-based Pasture Pharma Pte, which makes one million N95 masks a day in China and other Asian countries, said raw material shortages have made it hard to boost output. A chunk of his output is still being requisitioned by government entities in China, leaving him with limited supply for eager customers in the U.S.

"We used to ship containers to customers. Now we are shipping by pallets," he said.

STAY INFORMED

Get a coronavirus briefing six days a week, and a weekly Health newsletter once the crisis abates: Sign up here.

**Write to** Austen Hufford at austen.hufford@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT

# 5

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    3M COMPANY,                              No.  1:20-cv-0523-NONE-SAB

12               Plaintiff,

13        v.                                   ORDER GRANTING MOTION FOR
                                               TEMPORARY RESTRAINING ORDER;
14    RX2LIVE, LLC, and RX2LIVE, INC.,         AND ORDERING DEFENDANTS TO SHOW
                                               CAUSE RE PRELIMINARY INJUNCTION
15               Defendants.
                                               (Doc. No. 14)
16

17

18

19         On April 10, 2020, plaintiff 3M Company ("3M") filed a complaint against defendant

20    RX2Live, LLC.  (Doc. No. 1.)  On April 19, 2020, plaintiff filed an amended complaint, adding

21    RX2Live, Inc. as a defendant.  (Doc. No. 8.)  On April 27, 2020, plaintiff filed a motion for a

22    temporary restraining order ("TRO") and preliminary injunction as to its federal and state claims

23    for trademark infringement and dilution, unfair competition, false endorsement, false association,

24    false designation of origin, and unlawful, unfair, and fraudulent business acts and practices.

25    (Doc. No. 14-1.)  3M seeks temporary injunctive and preliminary relief to prevent defendants

26    RX2Live, LLC and RX2Live, Inc. from using 3M's trademarks in connection with defendants'

27    promotion of goods or services, including plaintiff's 3M-brand N95 respirators.  (*Id.*)  As of the

28    date and time of entry of this order, no defendant has filed an opposition to the pending motion or

otherwise attempted to communicate with the court.[1]  Having reviewed the record and the

relevant authorities, the court grants the motion for a TRO and orders defendants to show cause

why a preliminary injunction should not issue.

**IT IS HEREBY ORDERED** that 3M's Motion for a TRO is **GRANTED** in its entirety.

It is hereby further **ORDERED** that:

1.      Defendants appear before The Honorable Dale A. Drozd, District Judge, United

States District Court for the Eastern District of California, on **Tuesday, May 12, 2020, at 10:00**

**a.m. (Pacific Time),** via telephone conference pursuant to General Order No. 612 issued on

March 16, 2020, and show cause (the "Show Cause Hearing") as to why the court should not

enter an Order, pursuant to Federal Rule of Civil Procedure 65(a), that:

a.      Preliminarily enjoins defendants, their agents, servants, employees, officers and all

persons and entities in active concert and participation with them from using the "3M" trademarks

(the "3M Marks") and any other word, name, symbol, device, or combination thereof that is

confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture,

distribution, advertising, promoting, offering for sale, and/or sale of any goods or services,

including, without limitation, plaintiff's 3M-brand N95 respirators, during the pendency of this

action, and

b.      Preliminarily enjoins defendants, their agents, servants, employees, officers and all

persons and entities in active concert and participation with them from engaging in any false,

misleading, and/or deceptive conduct in connection with 3M and its products, including, without

limitation, representing themselves as being authorized distributors, vendors, agents,

---

[1]  The court finds that plaintiff has made reasonable attempts to provide defendant notice of its motion for a TRO and this court's April 28, 2020 minute order via telephone, e-mail, and overnight delivery.  (Doc. No. 14-2 at 2–3; Doc. No. 14-3 at 2; Doc. Nos. 16, 17.)  Plaintiff indicates that all relevant documents were delivered on April 27 and April 29, 2020 to the home of defendants' CEO Brian Hazelgren in Mesa, Arizona (Doc. No. 14-2; Doc. No. 14-41; Doc. No. 17), the same address where plaintiff personally served its Complaint, First Amended Complaint, and summons upon defendant.  (Doc. No. 15.)  The court notes that defendants did not retain attorney Joe Lipari of The Sultzer Law Group as counsel and that plaintiff has been diligent in attempting to determine whether defendants have retained counsel and whether defendants would stipulate to a resolution of plaintiff's motions.  (Doc. No. 17.)

2

1  representatives, retailers, and/or licensees of 3M and/or any of 3M's products (including, without

2  limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation

3  with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; falsely

4  representing that 3M has increased the price(s) of its 3M-brand N95 respirators; and offering to

5  sell any of 3M's products at a price and/or in a manner that would constitute a violation

6  California Penal Code § 396 and/or California Business and Professions Code §§ 17200 *et seq.*,

7  during the pendency of this action.

8        2.     Sufficient reason having been shown therefor, from the date of this Order, through

9  and including the date of the Show Cause Hearing, Defendants, their agents, servants, employees,

10  officers and all persons and entities in active concert and participation with them, are hereby

11  temporarily restrained, pursuant to Federal Rule of Civil Procedure 65(b), from engaging in any

12  of the acts and/or conduct described in Paragraphs 1(a) and 1(b) of this Order.

13        3.     Pursuant to this court's equitable powers and discretion, 3M need not post a bond.

14        4.     3M and/or its authorized representative(s) shall serve defendants with copies of

15  this Order and all pleadings and other papers in support of the Order on or before **Monday, May**

16  **4, 2020**, by overnight courier service with verification of receipt.

17        5.     Defendants shall file an Opposition, if any, to the Order to Show Cause on or

18  before **Thursday, May 7, 2020**.  Defendants are forewarned that failure to timely file an

19  opposition waives any right to be heard in opposition at the hearing on the pending motion for

20  preliminary injunction and may result in the hearing being vacated and the matter submitted for

21  decision on the papers.  *See* Local Rule 230(c); *see also Goldberg v. Barreca*, 720 F. App'x 877,

22  878 (9th Cir. 2018) (holding district court did not abuse its discretion by failing to hold

23  evidentiary hearing when initially ruling on preliminary injunction motion because it did not need

24  to resolve any factual disputes).[2]

25        6.     Plaintiff shall file and serve its reply to defendant's opposition, if any, on or before

26  **Friday, May 8, 2020**.

27
28  [2]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

7.     Defendants are further notified of their right to apply to the court for modification or dissolution of this Temporary Restraining Order on two (2) days' notice or such shorter notice as the court may allow.  *See* Fed. R. Civ. P. 65(b) and Local Rule 231(c)(8).

This court shall retain jurisdiction to hear and determine all matters arising out of, relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

IT IS SO ORDERED.

Dated:   **April 30, 2020**        _____

UNITED STATES DISTRICT JUDGE

4

EXHIBIT
6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 3M COMPANY, | |
| Plaintiff, | Case No.: 1:20-cv-02949 (LAP)(KNF) |
| -against- | **Jury Trial Demand** |
| PERFORMANCE SUPPLY, LLC, | |
| Defendant. | |

## [~~PROPOSED~~] ORDER
## TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION AGAINST PERFORMANCE SUPPLY, LLC

**WHEREAS**, the Court, having considered Plaintiff 3M Company's ("3M") Memorandum of Law Support in Support of its Application for a Temporary Restraining Order and Preliminary Injunction (the "Application") against Defendant Performance Supply, LLC ("Defendant"), together with the supporting Declarations of Charles Stobbie, David A. Crist, and A. John P. Mancini (collectively, the "Declarations"), as well as the record and proceedings to date in the above-captioned action.

**IT IS HEREBY ORDERED** that 3M's Application is **GRANTED** in its entirety. It is hereby further **ORDERED** that:

1.      Defendant appear before The Honorable _Loretta A. Preska_ District Judge, United States District Court for the Southern District of New York, on ~~April~~ _May 4_ 2020, at _11:00_ am/~~pm~~, _by telephone at a dial-in number to be provided_ ~~in the United States Courthouse, 500 Pearl Street/40 Foley Square, New York, New York 10013;~~ and show cause (the "Show Cause Hearing") as to why the Court should not enter an Order, pursuant to FED. R. CIV. P. 65(a), that:

        a.   Preliminarily enjoins Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the "3M" trademarks

(the "3M Marks"), the slogan "3M. Science Applied to Life" (the "3M Slogan"), and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks and/or the 3M Slogan, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, during the pendency of this action, and

      b. Preliminarily enjoins Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators; and offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of NEW YORK GENERAL BUSINESS LAW § 369-R, during the pendency of this action.

    2.    Sufficient reason having been shown therefor, from the date of this Order, through and including the date of the Show Cause Hearing, Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them, are hereby temporarily restrained, pursuant to FED. R. CIV. P. 65(b), from engaging in any of the acts and/or conduct described in Paragraphs 1(a) and 1(b) of this Order. *because of its financial situation*

    3.    Pursuant to this Court's equitable powers and discretion, 3M need not post a bond.

    4.    3M and/or its authorized representative(s) must serve a copy of this Order, together with 3M's Memorandum of Law, and the Declarations, in Support of 3M's Application, on

Defendant and/or Defendant's registered agent via personal service and/or ~~First Class Mail~~ *overnight courier or mail* at 3
Westbrook Way, Manalapan, New Jersey 07726, on or before April 25, 2020 ~~at _____ am/pm~~
*delivered 5:00pm*

The foregoing shall constitute proper service and notice of this Order.

5.      This Court shall retain jurisdiction to hear and determine all matters arising out of,

relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

**SO ORDERED** this __24th__ day of April, 2020. *at 11:45 am*

*Loretta A. Preska*
United States District Judge

*6. Opposition papers shall be filed no later than noon on April 30; reply papers, if any, shall be filed no later than noon on May 2.*

3

# EXHIBIT
# 7

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 3M COMPANY, | |
| Plaintiff, | Case No.: 1:20-cv-02949 (LAP)(KNF) |
| -against- | |
| PERFORMANCE SUPPLY, LLC, | |
| Defendant. | |

### ORDER ON PLAINTIFF 3M COMPANY'S
### APPLICATION FOR A PRELIMINARY INJUNCTION
### AGAINST DEFENDANT PERFORMANCE SUPPLY, LLC

**WHEREAS**, the Court, having considered Plaintiff 3M Company's ("3M") Memorandum of Law Support in Support of its Application for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 13) against Defendant Performance Supply, LLC ("Defendant"), together with the supporting Declarations of Charles Stobbie (Dkt. No. 14), David A. Crist (Dkt. No. 15), and A. John P. Mancini (Dkt. No. 16), as well as the record and proceedings to date in the above-captioned action, hereby finds as follows:

1.     Defendant is not an authorized distributor, vendor, agent, or representative of 3M. Defendant also is not authorized to solicit orders of any size for 3M's N95 respirators (or any other goods or services). Nonetheless, on or about March 30, 2020, Defendant sent a Formal Quote to New York City's Office of Citywide Procurement, offering to sell seven million of 3M's N95 respirators for 500% more than 3M's list price. To deceive New York City's procurement officers into believing that Defendant was authorized to solicit orders on 3M's behalf, Defendant, *inter alia*, reproduced the standard-character "3M" mark and 3M design mark **3M** (the "3M Marks"), and the slogan "3M Science. Applied to Life" (the "3M Slogan"), throughout the Formal Quote.

2. 3M cannot control the quality of the products that Defendant is purporting to sell under the 3M Marks or 3M Slogan. Additionally, the harm to 3M's reputation and the 3M brand of being associated with price-gouging and/or raising the prices of its N95 respirators during the global COVID-19 pandemic is immeasurable.

3. Based on the foregoing, 3M is likely to suffer irreparable harm in the absence of a preliminary injunction.

4. 3M owns incontestable federal trademark registrations for its 3M Marks, as well as a federal trademark registration for its 3M Slogan. Accordingly, 3M is likely to establish the validity of its 3M Marks and 3M Slogan.

5. 3M also is likely to establish that Defendant's use of the 3M Marks and 3M Slogan creates a likelihood of confusion about the source and/or quality of the products that Defendant is offering to sell, and/or whether Defendant has an association or affiliation with 3M. 3M has been using its 3M Marks and 3M Slogan for decades. During this period, 3M has invested hundreds of millions of dollars into advertising and promoting a vast array of goods and services under its 3M Marks and 3M Slogan, including its N95 respirators. Defendant is trading off the widespread commercial recognition and goodwill of the 3M Marks and 3M Slogan in connection with offering to sell products that 3M is widely known for manufacturing and selling, namely, N95 respirators. Accordingly, it is no surprise that Defendant actually confused New York City procurement officials into believing that Defendant was an authorized vendor of 3M-brand N95 respirators.

6. Based on the foregoing, 3M is likely to succeed on the merits of its claims for federal trademark infringement, unfair competition, false association, false endorsement, and

false designation of origin under Sections 32 and 43(a)(1)(A) of the Lanham Act, as well as its claims for trademark infringement, and unfair competition, under New York common law.

7.     Defendant cannot be heard to complain about having to refrain from engaging in trademark infringement, unfair competition, and price-gouging.  3M, on the other hand, faces irreparable harm if Defendant's conduct continues.

8.     Based on the foregoing, the balance of hardships favors 3M.

9.     The public has an interest in avoiding confusion about the source and quality of goods and services.  This is especially true during the global COVID-19 pandemic, when consumers, including experienced governmental procurement officials, are relying on the 3M Marks and 3M Slogan to indicate that goods and services offered thereunder originate from 3M, and are of the same quality that consumers have come to expect of the 3M brand.

10.    Based on the foregoing, the issuance of a preliminary injunction would benefit the public.

**BASED ON THE FOREGOING**, the Court hereby **GRANTS** 3M's Application for a preliminary injunction against Defendant in its entirety, and **ORDERS** as follows:

1.     Pursuant to FED. R. CIV. P. 65(a):

a.     Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them, are enjoined during the pendency of this action from using the 3M Marks and 3M Slogan, and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks and/or the 3M Slogan, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

b.  Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them, are also enjoined during the pendency of this action from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators; and offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of NEW YORK GENERAL BUSINESS LAW § 369-R.

2.    Pursuant to this Court's equitable powers and discretion, because of 3M's financial situation, it need not post a bond.

3.    3M and/or its authorized representative(s) must serve a copy of this Order on Defendant and/or Defendant's registered agent via overnight mail or courier and/or personal service at 3 Westbrook Way, Manalapan, New Jersey 07726, delivered on or before 5:00 pm on May 6, 2020.  The foregoing shall constitute proper service and notice of this Order.

4.    This Court shall retain jurisdiction to hear and determine all matters arising out of, relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

5.    The Temporary Restraining Order entered against Defendant in this action on April 24, 2020 (Dkt. No. 17) is vacated and superseded by this Order.

6.      Counsel shall inform the Court by letter no later than June 4, 2020 of the status of

the action.

**SO ORDERED** this 4 day of May, 2020.

_____
The Honorable Loretta A. Preska
United States District Judge

# EXHIBIT
# 8

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**3M COMPANY,**

          **Plaintiff,**

**v.**                                       **Case No:  6:20-cv-648-Orl-41GJK**

**GEFTICO, LLC,**

          **Defendant.**

_____/

### ORDER

THIS CAUSE is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 11). As set forth below, a temporary restraining order ("TRO") will be granted, and ruling on the preliminary injunction will be deferred.

### I.    BACKGROUND

Plaintiff produces, among other things, medical devices and personal protective equipment ("PPE") including their 3M-brand N95 respirators. (Compl., Doc 1, ¶ 4; Crist Decl., Doc 13, at 2–3). Plaintiff has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products under the standard character mark "3M." (Doc. 1 ¶ 24; Doc. 13 at 3). Plaintiff has also obtained numerous federal trademark registrations for its 3M Marks that are valid, in effect, and incontestable. (Doc. 1 ¶¶ 28–30; Doc. 13 at 3–4; U.S. Trademark Registration No. 3,398,329 ("'329 Registration"), Doc. 13-4, at 2–3; '329 Registration Notice of Acceptance and Acknowledgment, Doc. 13-5, at 2); U.S. Trademark Registration No. 2,793,534 ("'534 Registration"), Doc. 13-6, at 2–3; '534 Registration Notice of Acceptance and Acknowledgment, Doc. 13-7, at 2; U.S. Trademark Registration No. 5,469,903 ("'903 Registration"), Doc. 13-8, at

2–3). At issue here, is the unauthorized use of Plaintiff's 3M Marks in connection with Plaintiff's product, the N95 respirator mask. (*See generally* Doc. 1).

Plaintiff alleges that Defendant, during the current COVID-19 global pandemic,[1] has unlawfully and in violation of Plaintiff's Marks attempted to sell to the Center for Disease Control ("CDC") 3M-brand N95 respirator masks that either do not exist or are fraudulently made and that Defendant is doing so at elevated prices, constituting price gouging. (*Id.* ¶¶ 40–50). In Defendant's attempt to sell masks to the CDC, "Defendant sent a PowerPoint presentation titled *masks*" to the CDC, which offered to sell to the CDC 3M-brand N95 masks and which contained the Technical Data Sheet for the 3M-brand masks with Plaintiff's 3M Mark and slogan. (Doc. 1 ¶ 40; Doc. 13 at 5–6; *see generally* Mar. 31, 2020 Email and Presentation from Def. to CDC, Doc. 12-7). Defendants also sent several emails falsely claiming to have 3M masks for sale and that 3M had changed its prices. (Doc. 12-7 at 1; Apr. 6, 2020 Email from Def. to CDC, Doc. 12-8, at 2–3; Apr. 8, 2020 Email from Def. to CDC, Doc. 12-11, at 2; *see* Stobbie Decl., Doc. 12, ¶ 4 (stating "3M has **not** increased the prices" of the 3M N95 respirator masks during this pandemic) (emphasis in original)). Plaintiff alleges that it has no relationship with Defendant nor is Defendant an authorized distributor or vendor of Plaintiff's products. (Doc. 1 ¶ 43; Doc. 13 at 6). Thus, Plaintiff alleges that Defendant is not only violating its trademarks unlawfully but is also attempting to defraud the CDC as well as the American public. (Doc. 11 at 8–9, 21). Plaintiff alleges that this conduct harms Plaintiff's goodwill in the midst of this global pandemic and is a threat to public

---

[1] "Coronavirus disease 2019 (COVID-19) is a respiratory illness that can spread from person to person." Centers for Disease Control and Prevention, CS 314937-A, *What you need to know about coronavirus disease 2019 (COVID-19),* https://www.cdc.gov/coronavirus/2019-ncov/communication/factsheets.html (Mar. 20, 2020). *See also In re: Coronavirus Public Emergency,* No. 6:20-cv-17 (M.D. Fla. Mar. 18, 2020) (citing COVID-19 and outlining response procedures for Court proceedings in the Middle District of Florida); Orlando Division Protocol for Proceedings During COVID-19 Directives (M.D. Fla. Mar. 18, 2020) (same).

health agencies should they, or anyone else, purchase a product that may be counterfeit and below quality control standards. (Doc. 1 ¶ 54; Doc. 11 at 9; Doc. 13 at 9).

Plaintiff seeks a TRO as well as a preliminary injunction that would enjoin Defendant from: (1) "using any of the 3M Marks . . . in commerce;" (2) "holding itself out to consumers and/or the public as an authorized distributor or vendor of the 3M-brand products, or holding itself out as having any affiliation, connection, or association with 3M in any way;" (3) falsely representing that 3M has increased the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis or that 3M has required or authorized others to increase the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis;" and (4) "offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of § 501.160(2), Florida Statutes." (Doc. 11 at 1).

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 65(b), a district court may issue a temporary restraining order "without written or oral notice to the adverse party" if the requesting party provides "specific facts . . . [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." To obtain a temporary restraining order, the movant must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005). Additionally, the moving party must establish that a temporary restraining order is necessary "to maintain the status quo until the requisite notice may be given and an opportunity is afforded to opposing parties to respond to the application for a preliminary

injunction." M.D. Fla. R. 4.05(a). "[Temporary restraining] orders will be entered only in emergency cases." *Id.*

### III.   ANALYSIS

Plaintiff has established that it is entitled to the entry of the requested TRO.

The Complaint brings various claims against Defendant related to Defendant's alleged trademark infringement, false endorsement, trademark dilution, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as claims for alleged violation of Florida's Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, dilution and trademark infringement under Florida's Trademarks Act, Fla. Stat. § 495.001 *et seq.*, and unfair competition under Florida common law. (*See generally* Doc. 1). Based on the evidence discussed above, Plaintiff has established a likelihood of success on the merits. Also based on those filings, it is clear that irreparable injury will be suffered if Plaintiff's goodwill is injured due to Defendant's price gouging and sale of either fraudulent PPE that is either below industry quality standards or that does not exist. Further, the Court places specific importance on the fact that if these fraudulent masks are sold, the public—likely healthcare workers—may be given PPE that is faulty, and therefore, expose them to COVID-19 and put their lives at risk. That potential harm obviously constitutes irreparable harm to 3M's goodwill, but especially to the public. And, keeping that possibility from occurring, at least until the Court has the opportunity to further address these issues, outweighs any potential harm to Defendant and is certainly serving the public interest.

The Court notes that it does have certain misgivings about whether Plaintiff met its burden regarding the propriety of ex parte relief here. The TRO's argument regarding ex parte relief constitutes only one paragraph and contains no explanation as to why notice and a hearing would be impractical. M.D. Fla. R. 4.05(b)(2) (noting that to obtain such emergency, ex parte relief,

Plaintiff must explain why notice and a hearing would be "impractical if not impossible."). However, in light of the COVID-19 global pandemic and the harm that could occur should fraudulent masks be introduced by Defendant into the public, the Court finds that a TRO is necessary here. Accordingly, while the Court concludes that a TRO in this case is permissible, the Court will set an expedited schedule regarding service and the preliminary injunction hearing to ensure sufficient ability for Defendant to be heard on the matter.

Additionally, given the short timeframe that the TRO will be in place before the Defendant is able to be heard, the Court will only require a $10,000.00 bond at this time.

## IV. CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 11) is **GRANTED in part** and **DEFERRED in part**. To the Extent that Plaintiff seeks a Temporary Restraining Order, the Motion is granted; the Court defers ruling on the request for preliminary injunction.

2. Defendant and all persons acting on behalf of Defendant are hereby **IMMEDIATELY ENJOINED** from using any of the 3M Marks in commerce.

3. Defendant and all persons acting on behalf of Defendant are hereby **IMMEDIATELY ENJOINED** from holding themselves out to consumers and/or the public as authorized distributors or vendors of 3M-brand products, or holding themselves out as having any affiliation, connection, or association with 3M in any way.

4. Defendant and all persons acting on behalf of Defendant are hereby **IMMEDIATELY ENJOINED** from falsely representing that 3M has increased

the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis or that 3M has required or authorized others to increase the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis.

5. Defendant and all persons acting on behalf of Defendant are hereby **IMMEDIATELY ENJOINED** from offering to sell any of 3M's products at a price and/or in an unfair or deceptive manner.

6. **On or before May 4, 2020**, Plaintiff shall serve Defendants with the Complaint, the Motion for Temporary Restraining Order and Preliminary Injunction, and this Order.

7. Plaintiff and Defendant shall appear for an evidentiary hearing on the Motion for Preliminary Injunction on **May 7, 2020, at 1:30 p.m.** in Courtroom 5B, George C. Young United States Courthouse Annex, 401 W. Central Boulevard, Orlando, Florida before the Honorable Carlos E Mendoza. Defendant need not file a written response to the Motion and may rely on oral argument. **Defendant is on notice that failure to appear at the hearing may result in the imposition of a preliminary injunction without further notice**.

8. This Order is conditioned on the posting by Plaintiffs of a surety bond in the sum of $10,000.00, **on or before 2 PM, Monday, May 4, 2020**.

9. This Order shall remain in effect for fourteen days unless dissolved or extended for good cause by this Court.

**DONE** and **ORDERED** in Orlando, Florida on April 30, 2020.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

# EXHIBIT
# 9

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

3M COMPANY,

      **Plaintiff,**

v.                               **Case No: 8:20-cv-1003-T-35CPT**

TAC2 GLOBAL LLC,

      **Defendant.**

_____

### ORDER

    **THIS CAUSE** comes before the Court for consideration of the Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff 3M Company. (Dkt. 8) Upon consideration of all relevant filings, case law, and being otherwise fully advised, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.

    The Eleventh Circuit has made clear that the standard for determining whether to grant a temporary restraining order or a preliminary injunction are the same. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225 (11th Cir. 2005). Namely, a movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." Id. at 1225–26. Before addressing whether these four factors have been met when a Temporary Restraining Order is sought without notice, the Court must first determine whether Plaintiff has sufficiently justified its failure to give notice to Defendant.

Under Federal Rule of Civil Procedure 65(b), a court may issue a temporary restraining order without notice to the adverse party only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; **and**
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1)(emphasis added). Notably, an "*ex parte* temporary restraining order is an extreme remedy to be used only with the utmost caution." Levine v. Comcoa Ltd., 70 F.3d 1191, 1194 (11th Cir. 1995) (Hill, C.J., concurring). With regard to the first requirement of Rule 65(b)(1), the Court concludes that Plaintiff has set forth specific facts that clearly show how it will suffer immediate and irreparable harm "before [Defendant] can be heard in opposition." FED. R. CIV. P. 65(B)(1)(A). However, in regard to the second requirement, the one-sentence certification statement provided by Plaintiff's counsel states that "no efforts were made to give notice to Defendant of this Motion for Temporary Restraining Order; and, for the reasons stated above, no such notice should be required." (Dkt. 8 at 25) The Motion is entirely devoid of any explanation for why notice should be excused here, as required under Rule 65(b)(1)(B). Ultimately, Plaintiff's arguments in favor of an *ex parte* temporary restraining order appear to rest solely on the merits of the underlying claims. "A plaintiff, however, cannot obtain an *ex parte* restraining order by merely pointing to the merits of its claims." Emerging Vision, Inc. v. Glachman, No. 10-80734-CIV, 2010 U.S. Dist. LEXIS 81165, at *20 (S.D. Fla. June 29, 2010) (internal citations and quotations omitted).

Plaintiff's "failure to provide the information required under Rule 65(b)(1)(B) is fatal to its request for [a temporary restraining order] without notice." Id. (internal citations

omitted). Moreover, the record in this case does not indicate that Defendant has been provided with the requisite notice of this action. Although a summons was issued in regard to the Complaint, (Dkt. 4), there is no evidence on the record that service has been perfected on Defendant. Additionally, Plaintiff does not point to any cease and desist letters that have gone unheeded or any other facts tending to show that Defendant should not be afforded notice. Indeed, the Court is not aware of whether Plaintiff knows if the Defendant is represented by counsel in this or any other similar litigation. Consequently, Plaintiff has failed to satisfy the very limited requirements of this aspect of Rule 65(b)(1). See Granny Goose Foods, Inc. v. Bhd. of Teamsters, 415 U.S. 423, 438, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974). Since "[a]n ex parte temporary restraining order is an extreme remedy to be used only with the utmost caution," the Court is unwilling to grant such relief in light of this deficiency. Levine, 70 F.3d at 1194.

Accordingly, it is hereby **ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, (Dkt. 8), is **DENIED WITHOUT PREJUDICE.** Plaintiff **SHALL** file a certification statement expressly addressing **whether notice can be given to Defendant in this case and, if not, why notice is impractical or is otherwise inappropriate.** The statement **SHALL** specify whether Plaintiff has knowledge regarding whether Defendant has retained counsel and whether the Parties have engaged in any communications or conversations — i.e., a cease and desist letter — related to this action.

**DONE** and **ORDERED** in Tampa, Florida, this 7th day of May, 2020.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
**PLAINTIFF'S COUNSEL ONLY**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

3M COMPANY,

      Plaintiff,

v.                                 **Case No: 8:20-cv-1003-T-35CPT**

TAC2 GLOBAL LLC,

      Defendant.

_____

## ORDER

    **THIS CAUSE** comes before the Court for consideration of the Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff 3M Company. (Dkt. 8) Therein, Plaintiff requests a hearing on the Motion.

    Accordingly, the Court hereby **ORDERS** as follows:

1. This case is set for a **telephonic hearing on Tuesday, May 12, 2020, at 10:00 a.m.**, before the Honorable Mary S. Scriven. The Court has set aside **two (2) hours** for this hearing. The Parties should be advised that the matter may be reset for a Zoom hearing if the facilities are available to do so. **The Court will notify the Parties of the hearing format no later than Monday, May 11, 2020**.

2. Upon receipt of this Order, Plaintiff is **DIRECTED to send a copy to the Defendant via email** and **attempt to secure a phone number for Defendant.**

3. Defendant is **DIRECTED to provide the Court with the name and telephone number for its counsel on or before Monday, May 11, 2020.**

    **DONE** and **ORDERED** in Tampa, Florida, this 8th day of May, 2020.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person

# EXHIBIT 10

Case 1:20-cv-01087-MSS-CPT   Document 12-1   Filed 07/02/20   Page 66 of 118

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**3M COMPANY,**

      **Plaintiff,**

**v.**                              **Case No.: No. 8:20-cv-1003-T-35CPT**

**TAC2 GLOBAL LLC,**

      **Defendant.**

_____/

## ORDER GRANTING PLAINTIFF 3M COMPANY'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

**THIS CAUSE** comes before the Court upon Plaintiff 3M Company's ("Plaintiff" or "3M") Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (the "Motion") (Dkt. 8). As set forth below and for the reasons stated on the record, Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART**. (Dkt. 23)

### Background

On May 6, 2020, Plaintiff 3M Company filed the Motion, seeking to enjoin Defendant from (1) using any of the 3M Marks (as defined in Plaintiff's Complaint) in commerce; (2) holding itself out to consumers and/or the public as an authorized distributor or vendor of 3M-brand products, or holding itself out as having any affiliation, connection, or association with 3M in any way; (3) falsely representing that 3M has increased the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis or that 3M has required or authorized others to increase the prices of 3M-brand N95 respirators as a result of the COVID-19 crisis; and (4) offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of § 501.160(2), Florida

Statutes. 3M further requested that Defendant be required to file an affidavit detailing and confirming its compliance with the Court's orders.

### Legal Standard

To obtain a TRO, a movant must show: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction or TRO is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction or TRO would cause the other litigants; and (4) that the preliminary injunction or TRO would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1035 (11th Cir. 2001).

Plaintiff has demonstrated a likelihood of success on the merits of one of its claims brought in the Complaint. The Court finds that Plaintiff would be irreparably harmed if Defendant continues to represent to potential buyers of personal protective equipment that Defendant has been contractually authorized by 3M to serve as its distributor. The harm to Plaintiff to prevent any such affiliation by Defendant is not outweighed by any interest to the public.

Plaintiff 3M has not demonstrated that the Defendant has knowingly used or attempted to use 3M's trademarks to sell counterfeit or non-existent 3M-brand products. Plaintiff 3M has not demonstrated that Defendant has engaged in any price gouging or that Defendant has claimed that 3M has engaged in price gouging. Hence, no injunction is proper on either of these assertions.

Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiff's Motion for Temporary Restraining Order, (Dkt. 8), is **GRANTED IN PART and DENIED IN PART** as follows:

1.     Defendant and all persons acting on behalf of TAC2 Global are hereby temporarily restrained from holding themselves out to consumers and/or the public as having been authorized by 3M as an approved or contracted distributor of 3M-brand products. This does not prevent Defendant from representing to potential customers that it has a supplier of 3M brand products that has represented and warranted to Defendant that the products are genuine.

2.     During the pendency of this TRO Order, 3M shall have the right to inspect, in person, any purported 3M-brand products to confirm and certify such products' authenticity and safety prior to Defendant's distribution to its customers. Defendant shall give 3M 24 hours advance notice as to the location and other logistic information of where the purported 3M-brand products will be delivered, in order to conduct an inspection of an agreed upon reasonable number of examplars of the purported 3M-brand products. 3M shall have 24 hours from the time of delivery identified in the notice to conduct its inspection prior to Defendant's delivering the product to its customer. The Parties shall bear their own individual costs and expenses associated with any such inspection. 3M shall notify, within the 24 hour inspection period provided to 3M, Defendant's counsel, in writing, its determination as to whether the products in question are genuine 3M-brand products and the basis for such finding. If, for any reason, 3M is unable to conduct an inspection within the 24 period provided, 3M forfeits its opportunity to inspect the shipment of products for which it was notified, and it may not thereafter interfere with the distribution and sale of such products by Defendant to a third party. In the event 3M determines that the product is not a legitimate 3M product, Defendant may not transfer the product to the buyer without informing said buyer, in writing, that the product was inspected by 3M

agents and was determined not to be a 3M product. This Order shall not prevent the Defendant from representing to others that, pursuant to a Court order, 3M was given, under certain conditions and limitations, the opportunity to inspect the product prior to delivery. 3M shall not disclose the location of the shipment to any other entity or person without a prior order or directive of this Court.

3.    The Parties have agreed that in order to maximize the possibility that a hearing may be held in person on the Motion to convert the TRO into a Preliminary Injunction, this TRO shall remain in effect until at least June 3, 2020, on which date this Court will hold a hearing on Plaintiff's Motion for Preliminary Injunction. The hearing will be held on **Wednesday, June 3, 2020, at 10:00 a.m.**, in the Sam Gibbons United States Courthouse, Courtroom 7A, 801 North Florida Ave., Tampa, FL 33602, before the Honorable Mary S. Scriven. (Dkt. 24) **Lead Counsel shall appear in person and a Corporate Representative with full settlement authority for each Party shall also appear in person at that hearing.**

4.    In accordance with Fed. R. Civ. P. 65(c), 3M shall post with the Clerk of this Court a cash or surety bond of $500,000.00 to insure against any costs and damages that may be sustained by Defendant if it is found to have been wrongfully enjoined or restrained.

5.    The Parties shall be permitted to engage in limited discovery related to Plaintiff's Motion for Preliminary Injunction.

**DONE** and **ORDERED** in Tampa, Florida, this 13th day of May, 2020.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Case 1:20-cv-01087-NYW   Document 12-1   Filed 07/02/20   Page 70 of 118

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person

# EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**3M COMPANY,**

    **Plaintiff,**

**v.**                                  **Case No. 4:20-cv-225-AW-MAF**

**1 IGNITE CAPITAL, LLC a/k/a 1**
**IGNITE CAPITAL PARTNERS;**
**INSTITUTIONAL FINANCIAL SALES,**
**LLC; and AUTA LOPES, an individual,**

    **Defendants.**

_____/

## ORDER DENYING TRO AND SETTING PROCEDURES

This order follows today's telephonic hearing on Plaintiff 3M Company's motion for a temporary restraining order and preliminary injunction. ECF No. 7. The request for a TRO is denied for the reasons stated on the record. I will defer ruling on the request for a preliminary injunction.

The parties must confer regarding the schedule for resolving the preliminary injunction motion. They must file a report by May 15 indicating whether they have reached agreement, and there will be a telephonic status conference on May 18 at 10 a.m. But if the parties' report indicates a status conference is no longer necessary— and if I agree—I will cancel the hearing.

Counsel for plaintiff must promptly email a copy of this order to Ms. Lopes.

SO ORDERED on May 7, 2020.

s/ *Allen Winsor*
United States District Judge

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

3M COMPANY,

              Plaintiff,

    vs.

ZACHARY PUZNAK,
ZENGER LLC d/b/a
ZEROAQUA, and
JOHN DOE 1 THROUGH 10,
all of whose true names are unknown.

              Defendants.

**CASE NO. 1:20-cv-1287-RLY-TAB**

**STIPULATED ORDER ON PLAINTIFF 3M COMPANY'S**
**APPLICATION FOR A PRELIMINARY INJUNCTION AGAINST DEFENDANT**
**ZACHARY PUZNAK**

    Plaintiff 3M Company's ("3M") has moved pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction.  Defendant Zachary Puznak ("Defendant") has stipulated and agreed to an entry of a preliminary injunction order (this "Order") pending resolution of this matter on the merits or otherwise.

    3M and Defendant having agreed and the Court being duly advised in the premises, the Court hereby finds that an Agreed Order for Preliminary Injunction, upon the terms and conditions set forth herein, is granted.  The parties specifically waive the requirement for findings of fact and conclusions of law, as this is an agreed order.

    **BASED ON THE FOREGOING**, the Court hereby **ORDERS** as follows:

    1.      Pursuant to Fed. R. Civ. P. 65(a):

        a.  Defendant, his agents, servants, employees, officers and all persons and entities in active concert and participation with him, are enjoined during the pendency of this action from using the famous standard character "3M" mark and 3M design mark **3M** (the "3M Marks"), and

any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

      b.    Defendant, his agents, servants, employees, officers and all persons and entities in active concert and participation with him, are also enjoined during the pendency of this action from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators.

      2.    Pursuant to this Court's equitable powers and discretion (and the agreement of the parties), because of 3M's financial situation, it need not post a bond.

      3.    Defendant shall, within seven days of service of this Order, submit to the Court a sworn statement confirming and detailing compliance with this Order.

      4.    This Court shall retain jurisdiction to hear and determine all matters arising out of, relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

      5.    This injunction shall remain in effect until further notice of this Court.

SO ORDERED this 19th day of May 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

2

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Kathy L. Osborn*
Kathy L. Osborn, #21927-53
Kathy.osborn@faegredrinker.com
Louis T. Perry, #25736-49
Louis.perry@faegredrinker.com
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
(317) -237-0300

and

Kerry L. Bundy (to be admitted *pro hac vice*)
Kerry.bundy@faegredrinker.com
John W. Ursu (to be admitted *pro hac vice*)
John.ursu@faegredrinker.com
Isaac B. Hall (to be admitted *pro hac vice*)
Isaac.hall@faegredrinker.com
Kiera K. Murphy (to be admitted *pro hac vice*)
Kiera.murphy@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

*Attorneys for Plaintiff 3M Company*

DocuSigned by:

*Zachary Puznak*    5/18/2020
5202A948F1104AD...

Zachary Puznak
Pro Se Defendant

3

# EXHIBIT 13

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

3M COMPANY,

         Plaintiff,

   vs.

ZACHARY PUZNAK,
ZENGER LLC d/b/a
ZEROAQUA, and
JOHN DOE 1 THROUGH 10,
all of whose true names are unknown.

        Defendants.

**CASE NO. 1:20-cv-1287-RLY-TAB**

## ORDER ON PLAINTIFF 3M COMPANY'S APPLICATION
## FOR A TEMPORARY RESTRAINING ORDER AGAINST DEFENDANT
## ZENGER, LLC d/b/a ZEROAQUA

**WHEREAS**, the Court, having (i) considered Plaintiff 3M Company's ("3M") Memorandum of Law Support in Support of its Application for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 14) against Defendant Zenger LLC d/b/a ZeroAqua ("Defendant"), together with the supporting Declarations of Charles Stobbie, David A. Crist, Kathy L. Osborn, and Luke Bosso; (ii) held a hearing on Monday, May 18, 2020 at which no counsel appeared for Defendant[1]; and (iii) having considered the record and proceedings to date in the above-captioned action, hereby **ORDERS** as follows:

1.    Defendant shall appear before The Honorable Richard L. Young, District Judge, United States District Court for the Southern District of Indiana on **JUNE 1, 2020, at 2:00 p.m.**,

---

[1] Mr. Zachary Puznak, a principal of Zenger, did appear at the hearing in his personal capacity.

and show cause (the "Show Cause Hearing") as to why the Court should not enter an Order pursuant to Fed. R. Civ. P. 65(a) that:

      a.    Preliminarily enjoins Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with it, during the pendency of this action, from using the standard character "3M" mark and 3M design mark **3M** (the "3M Marks"), and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

      b.    Preliminarily enjoins Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with it, during the pendency of this action, from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators.

    2.    Sufficient reason having been shown therefor, for a period beginning on the date of this order and ending at the conclusion of the 14th day thereafter, Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with it, are hereby temporarily restrained, pursuant Fed. R. Civ. P. 65(b), from engaging in any of the acts and/or conduct described in Paragraphs 1(a) and 1(b) of this Order.

3.      Pursuant to this Court's equitable powers and discretion, 3M need not post a bond.

4.      3M and/or its authorized representative(s) must serve a copy of this Order on (i) Zenger, LLC or Zenger, LLC's registered agent via overnight mail or courier and/or personal service at 401 Ryland St., Suite 200-A Reno, NV 89502 on or before May 21, 2020.  The foregoing shall constitute proper service and notice of this Order.

5.      Opposition papers shall be filed no later than May 26, 2020; reply papers, if any, shall be filed no later than May 29, 2020.

6.      This Court shall retain jurisdiction to hear and determine all matters arising out of, relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

**SO ORDERED** this 19th day of May 2020.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record

# EXHIBIT
# 14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| 3M COMPANY,<br><br>        Plaintiff,<br><br>  vs.<br><br>ZACHARY PUZNAK,<br>ZENGER LLC d/b/a<br>ZEROAQUA, and<br>JOHN DOE 1 THROUGH 10,<br>all of whose true names are unknown.<br><br>        Defendants. | **CASE NO. 1:20-cv-1287-RLY-TAB** |

**ORDER ON PLAINTIFF 3M COMPANY'S**
**APPLICATION FOR A PRELIMINARY INJUNCTION AGAINST DEFENDANT**
**ZENGER LLC d/b/a ZEROAQUA**

      **WHEREAS**, the Court, having considered Plaintiff 3M Company's ("3M") Memorandum of Law Support in Support of its Application for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 15) against Defendant Zenger LLC d/b/a ZeroAqua ("Defendant"), together with the supporting Declarations of Charles Stobbie, David A. Crist, Kathy L. Osborn, and Luke Bosso, as well as the record and proceedings to date in the above-captioned action, hereby finds as follows:

      1.     Defendant is not an authorized distributor, vendor, agent, or representative of 3M. Defendant is also not authorized to solicit orders of any size for 3M's N95 respirators (or any other goods or services). Nonetheless, on or about April 14, 2020, Defendant wrote Earl Goode, Indiana Governor Eric Holcomb's Chief of Staff, offering "a nice Easter gift for you and the State of Indiana" in the form of 3M N95 respirators at more than double the posted list price. Defendant stated that it would sell the respirators for $2.82 (later raised to $2.85 in an April 24, 2020

communication) per "mask" (respirator) with a minimum 100 million unit order. In communications with the State of Indiana, Defendant repeatedly represented that it was affiliated with 3M. It falsely indicated that, via a complicated escrow transaction, the purchase price would be transferred to "3M directly". It stated that the offer was "forwarded thru [sic] two different 3M reps." It reproduced the famous standard character "3M" mark and 3M design mark **3M** (the "3M Marks") on ZeroAqua website's "order" page. And, when procurement officials became suspicious, Defendant claimed that 3M executives instructed it not to move forward with the transaction due to those officials' "paranoid irrationality". Though the State of Indiana ultimately declined to enter into a business relationship with Defendant, Defendant's communications indicated that it was working with the States of Michigan, Connecticut, New York, and Massachusetts on similar deals.

2.      3M cannot control the quality of the products that Defendant purports to sell under the 3M Marks. Additionally, the harm to 3M's reputation and the 3M brand of being associated with price-gouging and/or raising the prices of its N95 respirators during the global COVID-19 pandemic is immeasurable.

3.      Based on the foregoing, 3M is likely to suffer irreparable harm in the absence of a preliminary injunction. Additionally, given Defendant's actions, it is appropriate to require sworn compliance with this Order.

4.      3M owns incontestable federal trademark registrations for its 3M Marks. Accordingly, 3M is likely to establish the validity of its 3M Marks.

5.      3M also is likely to establish that Defendant's use of the 3M Marks creates a likelihood of confusion about the source and/or quality of the products that Defendant is offering to sell, and/or whether Defendant has an association or affiliation with 3M. 3M has been using its

3M Marks for decades. During this period, 3M has invested hundreds of millions of dollars into advertising and promoting a vast array of goods and services under its 3M Marks, including its N95 respirators. Defendant is trading off the widespread commercial recognition and goodwill of the 3M Marks in connection with offering to sell products that 3M is widely known for manufacturing and selling, namely, N95 respirators. Accordingly, it is no surprise that Defendant caused Indiana government procurement officials confusion regarding its affiliation with 3M.

6.      Based on the foregoing, 3M is likely to succeed on the merits of its claims for federal trademark infringement, unfair competition, false association, false endorsement, and false designation of origin under Sections 32 and 43(a)(1)(A) of the Lanham Act, as well as its claims for trademark infringement, and unfair competition, under Indiana state and common law.

7.      Defendant cannot be heard to complain about having to refrain from engaging in trademark infringement, unfair competition, and price-gouging. 3M, on the other hand, faces irreparable harm if Defendant's conduct continues.

8.      Based on the foregoing, the balance of hardships favors 3M.

9.      The public has an interest in avoiding confusion about the source and quality of goods and services. This is especially true during the global COVID-19 pandemic, when consumers, including experienced governmental procurement officials, are relying on the 3M Marks to indicate that goods and services offered thereunder originate from 3M, and are of the same quality that consumers have come to expect of the 3M brand.

10.     Based on the foregoing, the issuance of a preliminary injunction would benefit the public.

**BASED ON THE FOREGOING**, the Court hereby **GRANTS** 3M's Application for a preliminary injunction against Defendant in its entirety, and **ORDERS** as follows:

1.      Pursuant to FED. R. CIV. P. 65(a):

        a.   Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with it, are enjoined during the pendency of this action from using the 3M Marks, and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

        b.   Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with it, are also enjoined during the pendency of this action from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators.

2.      Pursuant to this Court's equitable powers and discretion, because of 3M's financial situation, it need not post a bond.

3.      3M and/or its authorized representative(s) must serve a copy of this Order on (i) Zenger, LLC or Zenger, LLC's registered agent via overnight mail or courier and/or personal service at 401 Ryland St., Suite 200-A Reno, NV 89502.  The foregoing shall constitute proper service and notice of this Order.

4.      Defendant shall, within seven days of service of this Order, submit to the Court a sworn statement confirming and detailing compliance with this Order.

5.      This Court shall retain jurisdiction to hear and determine all matters arising out of, relating to, and/or otherwise concerning the interpretation and/or enforcement of this Order.

6.      The Temporary Restraining Order entered against Defendant in this action on May 19, 2020 (Dkt. No. 29) is vacated and superseded by this Order.


**SO ORDERED** this 5th day of June 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of
Record Distribution to Defendank Puznak by email

# EXHIBIT
# 15

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M Company,<br><br>       Plaintiff,<br><br>v.<br><br>Matthew Starsiak, et al.,<br><br>       Defendants. | Case No. 20-cv-1314 (SRN/TNL)<br><br><br>**ORDER ON PLAINTIFF'S MOTION<br>FOR A TRO** |

John Ursu, David Gomez, Isaac B. Hall, Kerry L. Bundy, Michael M. Sawers, and Peter Routhier, Faegre Drinker Biddle & Reath, LLP, 2200 Wells Fargo Center, 90 S. 7th St., Minneapolis, MN 55402, and Peter W. Baldwin, Faegre Drinker Biddle & Reath, LLP, 1177 Avenue of the Americas, Ste. 41st Floor, New York, NY 10036, for Plaintiff

Timothy Schupp and Robert William Vaccaro, Meagher & Geer, PLLP, 33 S. 6th St., Ste. 4400, Minneapolis, MN 55402, for Defendants

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on the Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction [Doc. No. 8] filed by Plaintiff 3M Company ("3M"). The parties appeared for a hearing by teleconference on June 25, 2020 before the undersigned judge. For the reasons set forth below, the Court grants Plaintiff's request for a TRO, and defers ruling on its request for a preliminary injunction.

# I.    BACKGROUND

## A. Procedural Background

On June 5, 2020 Plaintiff filed this trademark infringement lawsuit against Defendants Matthew Starsiak, AMK Energy Services LLC, and John Does 1 through 10. Plaintiff alleges that Defendants have falsely claimed to represent 3M, and have used 3M's name and trademarks without authorization in a false and deceptive scheme to sell 3M N95 respirators to unwitting customers and consumers during the global COVID-19 pandemic. (Compl. [Doc. No. 1] ¶ 1.)  As a result, Plaintiff asserts that Defendants have violated multiple provisions of the Lanham Act, as well as Minnesota state law regarding unlawful trade practices, trademark infringement, trademark dilution, and false advertising. (*Id.* ¶¶ 70–139.)

On June 22, 2020, Plaintiff filed the instant motion for a TRO, seeking to enjoin Defendants from using 3M marks, and any other confusingly similar word, name or symbol, in connection with the sale of goods or services, including 3M-brand N-95 respirators. (*See* Pl.'s Mem. [Doc. No. 10].)  They further seek to enjoin Defendants from engaging in any false, misleading, or deceptive conduct in connection with 3M and its products, including representing themselves as an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M or any of 3M's products; falsely representing to be associated or affiliated with or sponsored by 3M or any of 3M's products; and falsely representing that 3M has increased the prices of its 3M-brand N95 respirators. (*Id.*)  Along with their motion, memorandum, and reply memorandum [Doc. No. 35], 3M filed the Declaration of David A. Crist [Doc. No. 11], the Declaration of Charles Stobbie [Doc. No.

12], the Declaration of Haley Schaffer [Doc. No. 13], the Declaration of Ivan Fong [Doc. No. 14], the Declaration of John Ursu [Doc. No. 15], the Declaration of Matthew Hise [Doc. No. 16], the Supplemental Declaration of Haley Schaffer [Doc. No. 36], and supporting exhibits.

Separately, on June 24, 2020, Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) [Doc. No. 27], for lack of specific personal jurisdiction. The hearing on Defendants' motion is scheduled for August 5, 2020. (Notice of Hr'g [Doc. No. 28].)

In opposition to Plaintiff's TRO motion, Defendants also argue that the Court lacks specific personal jurisdiction over them, and accordingly a TRO cannot issue. (*See* Defs.' Opp'n [Doc. No. 33] at 2.) In addition, Defendants argue that 3M does not satisfy the elements necessary for injunctive relief. (*Id.* at 2–6.) Plaintiff responds that the Court has specific personal jurisdiction[1] over Defendants pursuant to the *Calder* "effects test," set forth in *Calder v. Jones*, 465 U.S. 783, 790 (1984). (Pl.'s Reply at 2–4.)

## B. Factual Background

3M is a Delaware corporation, with its principal place of business in St. Paul, Minnesota. (Compl. ⁋ 19.) It is a provider of personal protective equipment ("PPE") for healthcare professionals, industry workers, and the public. (Stobbie Decl. ⁋ 4.) In particular, it is a leading manufacturer of N95 respirators, which have been sold under the

---

[1] Plaintiff does not assert that the Court has general personal jurisdiction over Defendants.

3

3M brand name for many years. (*Id.*; Crist Decl. ¶ 10.) During the global COVID-19 pandemic, the general public has become familiar with 3M as a manufacturer of N95 respirators. (Crist Decl. ¶ 16; Stobbie Decl. ¶ 14.)

3M contends that it has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers, using the standard-character mark "3M" and the 3M design mark **3M** (together, the "3M Marks"). (Crist Decl. ¶ 10.) 3M has obtained numerous federal trademark registrations for the 3M Marks. (*Id.*, Exs. 5, 7.)

Since the outbreak of COVID-19, 3M has increased its production of 3M-brand respirators to ensure that an adequate supply is available to governments and healthcare personnel, as well as to workers in the food, energy, and pharmaceutical industries. (Stobbie Decl. ¶¶ 8, 9, Exs. 1–3.) In the United States alone, 3M plans to produce 50 million respirators per month in June 2020. (*Id.* ¶ 11, Exs. 1, 3.) More than 90 percent of 3M's respirators are slated for healthcare and public health users. (*Id.*) The Federal Emergency Management Agency is coordinating the distribution of these respirators in the United States, basing its allocation decisions on the most urgent needs. (*Id.* ¶ 13.) Despite the heightened demand and need for PPE at this time, 3M has pledged to not increase prices of its N95 respirators in authorized sales, and will work to eliminate fraud and price-gouging by third parties in the midst of this public health crisis. (Stobbie Decl. ¶ 12, Ex. 3, *see also id.* ¶¶ 14–16, Exs. 4, 5.) It believes that these efforts will protect the public from defective or inferior products and grossly inflated pricing. (*Id.*)

Defendant Matthew Starsiak is a resident of Bountiful, Utah. (Compl. ¶ 20.) He is the president of Defendant AMK Energy Services, LLC ("AMK Energy"). (*Id.*) AMK

Energy is a Utah limited liability company, with a Bountiful, Utah address listed with the Utah Secretary of State. (*Id.* ¶ 21.) Plaintiff also alleges that John Does 1 through 10 worked in concert with Defendants in connection with their fraudulent scheme. (*Id.* ¶ 22.)

On May 1, 2020, a prospective buyer of a billion 3M N95 respirators contacted the Paris office of the international law firm Dentons. (Schaffer Decl. ¶ 13, Ex. 2.) The buyer stated that AMK Energy's operations chief Mark Wright had advised him to correspond with Dentons about the possible purchase of 3M respirators. (*Id.*) In addition, the buyer attached a letter of intent for 3M, "via AmkGOV . . . which is providing access to 3M . . . ." (*Id.*) Plaintiff alleges that the purchase of one billion respirators would account for roughly a year's worth of 3M's current total production of all models of N95 respirators. (Compl. ¶ 68.) It further alleges that Defendants had no ability to "provide access to 3M." (*Id.*) Moreover, 3M was unaware of any circumstances by which Defendants could legitimately offer to provide "access to 3M." (Schaffer Decl. ¶ 14.)

On May 10, 2020, Ivan Fong, 3M's Senior Vice President, General Counsel & Secretary, and a Minnesota resident, received an email from Eric S. Schuster, an attorney at Funk & Bolton, PA. (Fong Decl. ¶¶ 1–3.) Schuster requested "10 minutes" of Mr. Fong's time, and asked that he read an attached email "from my close contact who is trying to close a deal for a well known charity to send hundreds of billions of 3M masks to Africa." (*Id.*, Ex. 1.) The "close contact" to whom Schuster referred was Defendant Starsiak, President of AMK Energy. (*Id.*) In the attached email from Starsiak to Schuster, Starsiak claimed to be "getting the run around by 3M escrow attorneys." (*Id.*) Starsiak referred to a "very influential client" who sought to donate 100 billion 3M masks to Africa,

but whose efforts were being hampered by the inability to reach a 3M attorney in order to transfer funds.  (*Id.*)  Starsiak asked for Schuster's assistance to schedule a phone call with "a legitimate 3M attorney" to move the transaction along, and stated that "the buyers I'm bringing to 3M are some of the richest, most powerful people in the world that want to remain anonymous except to the 3M attorneys of course."  (*Id.*)

Mr. Fong replied via email, stating that he was unable to speak with Starsiak at that time, but asked Schuster to send the name of the 3M attorney with whom Starsiak had been dealing.  (*Id.*, Ex. 2.)  Alternatively, Fong offered to ask one of his direct reports to speak with Starsiak.  (*Id.*, Ex. 2.)

The following day, May 11, 2020, Haley Schaffer, Senior Counsel at 3M, and a Minnesota resident, spoke with Starsiak on the phone.  (Schaffer Decl. ¶¶ 1, 3.)  Schaffer attests that she was located in Minnesota at the time she received all communications with Defendants that are described in her two declarations.  (Supp'l Schaffer Decl. ¶ 3.)  At the outset of the May 11 call, Starsiak stated that he had served in the Marine Corps for 24 years, running a counter-drug initiative in Latin America, and having played a large role in Iraq.  (Schaffer Decl. ¶ 3.)  He also stated that he was presently working for Sir Richard Branson, founder of the Virgin Group, and the Gates Foundation.  (*Id.*)  In addition, Starsiak claimed that Branson and the Gates Foundation wished to purchase 900 billion respirators for underserved populations in the world.  (*Id.* ¶ 4.)

In response to Starsiak's request for a subsequent call that day with additional members of his team, including Mark Wright, AMK Energy's operations chief, Schaffer invited two other 3M employees to join the call, Michael Gannon, Senior Trademark

Counsel, and Joel Van Heyst, a former FBI agent who works for 3M Corporate Security. (*Id.* ¶¶ 5–6.) After the second call on May 11, Schaffer called Mr. Schuster, the attorney who had first reached out to 3M's Senior Vice President and General Counsel, to verify Starsiak's "bona fides." (*Id.* ¶ 7.) Schuster assured Schaffer that he had known Starsiak for five years and would not connect someone with Mr. Fong who "wasn't kosher." (*Id.*)

The next day, Schaffer declined Starsiak's request on behalf of 3M. (*Id.*, Ex. 1.) She stated that due to the unprecedented health crisis, the vast majority of 3M's respirator capacity was spoken for, based on existing commitments for government emergency response and healthcare orders. (*Id.*)

Subsequently, 3M's Director of Global Security contacted the Gates Foundation to ask if Starsiak or his company had any connection with the Gates Foundation. (*Id.* ¶ 10.) He was informed that the Gates Foundation had never heard of either of them. (*Id.*)

While Defendants were trying to purchase billions of 3M-branded N95 respirators from 3M, they were simultaneously trying to find buyers willing to purchase them at a higher price. (Pl.'s Mem. at 18.) In May 2020, Starsiak had a series of calls with Star Brands Group, a New York-based PPE supplier dedicated to the ethical sourcing and supply of PPE for medical professionals. (Hise Decl. ¶¶ 2, 6.) Star Brands Group's Matthew Hise, a New York resident, attests that Defendants identified themselves as 3M's "number one sales team" and as a "3M authorized distributor," claiming to have "hundreds of millions of [N95 respirator] stock available." (*Id.* ¶¶ 1, 7, Ex. 1.) Hise was initially confused by these representations and believed that AMK Energy was an authorized 3M dealer. (*Id.* ¶ 7.) Hise states that Defendants pushed Star Brands Group to quickly close

the deal, and Defendants always conveyed a sense of urgency. (*Id.* ¶ 6.) Further, Hise contends that "AMK people told me that I needed to provide letters of intent from my clients that included terms such as bank account information that, in my experience, are not typical terms for procurement letters of intent. The proposed transactions also include[d] consummating the transaction by depositing monies into escrow accounts." (*Id.* ¶ 8.)

In addition, during their conversations, Defendants claimed to have access to 3M attorneys, identifying Fong and Schaffer, by name. (*Id.* ¶ 9.) Defendants provided Star Brands Group with "AMK Procedures for 3M SPOT/Production Contract with Client," detailing how Star Brands Group was to send money to AMK's Swiss escrow account. (*Id.* ¶ 8, Ex. 1.) In that document, Defendants stated that they would provide letters of intent to the "3M Team, who then provides 3M Attorney information for the region." (*Id.*, Ex. 1.) AMK's Swiss escrow agent would then "confirm with 3M Attorney that [proof of funds] . . . had been provided and verified." (*Id.*)

During the course of Hise's conversations with Defendants, he grew concerned that AMK Energy did not have the affiliation with 3M that they claimed, (*id.* ¶ 10), prompting him to record some of the conversations with Defendants. (*Id.* ¶ 12, Ex. 2.) During the May 20, 2020 call, Starsiak explained Defendants' involvement with 3M, stating, "So how we go into this with the PPE is . . . 3M needed some government contractors to do bidding because there was many buyers [sic] who were trying to purchase." (*Id.*, Ex. 2.) He stated, "3M doesn't have any patience. We'll call them once, a 3M attorney, it all goes to their attorney." (*Id.*) When Hise asked Starsiak for documentation of the link between

8

Defendants and 3M, Starsiak stated that was "not a problem," and emphasized his connections with 3M attorneys Fong and Schaffer, again, by name. (*Id.*) Referring to his alleged deal on behalf of the Gates Foundation, Richard Branson, and others, Starsiak stated, "the top attorneys for 3M did come on the line with them." (*Id.*) When Hise insisted that Defendants produce documents confirming Defendants' affiliation with 3M, Starsiak eventually hung up the phone. (*Id.*) Hise then reported Starsiak's suspicious conduct, along with the phone recording, on 3M's fraud prevention website. (*Id.*, Ex. 1.)

## II. DISCUSSION

### A. Specific Personal Jurisdiction

Defendants first argue that the Court lacks specific personal jurisdiction over them, and therefore, a temporary restraining order cannot issue. (See Defs.' Opp'n at 2.) Plaintiff responds that the Court has specific personal jurisdiction over Defendants pursuant to the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783, 790 (1984).

At the pleading stage, a " 'plaintiff must make a prima facie showing that personal jurisdiction exists.' " *Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 875 (D. Minn. 2019) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011)). This showing requires that the Plaintiff "plead 'sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.' " *Id.* (citation omitted). The evidence "must be tested by affidavits and exhibits supporting or opposing the motion, and not by the pleadings alone[,]" but in any event, the showing required is "minimal[.]" *Id.* at 875–876 (citation omitted). When deciding whether Plaintiff has made the necessary prima facie showing, the Court views "the evidence in the

Case 0:20-cv-01297-JSN-DTS Document 12-1 Filed 07/02/20 Page 99 of 118

light most favorable to the plaintiff and resolves all factual conflicts in the plaintiff's favor." *Id.* at 876 (citing *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996)).[2]

Under the *Calder* effects test, "[a] defendant's tortious conduct can be a basis for personal jurisdiction." *Id.* at 878 (citing *Calder*, 465 U.S. at 790). To establish specific personal jurisdiction under the intentional tort theory set forth in *Calder*, "a plaintiff must make a prima facie showing that 'the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—there.' " *Id.* (quoting *Zumbro, Inc. v. Cal. Nat. Prods.*, 861 F. Supp. 773, 782–83 (D. Minn. 1994)).

However, the *Calder* effects test is not sufficient on its own for the exercise of specific personal jurisdiction. The Eighth Circuit considers it in conjunction with its normal five-factor analysis used to evaluate specific personal jurisdiction. *See Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010) (noting that "the *Calder* test [is] merely as an *additional factor to consider* when evaluating a defendant's relevant contacts with a forum state" and reaffirming prior case "declin[ing] to grant personal jurisdiction solely on the basis of forum state effects from an intentional tort" (citation omitted)); *see also Regenexx, LLC v. Regenex Health LLC*, ___ F. Supp. 3d ___, 2020 WL 1269790, at *5 (S.D. Iowa

---

[2]     The Court notes that federal courts follow state law when determining the bounds of the federal court's personal jurisdiction, and that because Minnesota's long-arm statute extends jurisdiction to the maximum limit permitted by due process, Minnesota federal courts need only determine whether its exercise of personal jurisdiction comports with due process. *Paisley Park Enters.*, 361 F. Supp. 3d at 876 (citations omitted).

Mar. 17, 2020) ("Ultimately, a court 'must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination.' ") (quoting *Johnson*, 614 F.3d at 794).

The Eighth Circuit considers five factors in evaluating the sufficiency of a defendant's contacts with the forum state: "(1) the nature and quality of contacts, (2) the quantity of contacts, (3) the relation of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience of the parties." *Paisley Park Enters.*, 361 F. Supp. 3d at 876 (citing *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983)). It has also observed that the first three factors of the test are "primary" in terms of importance, while the last two are of "secondary" importance. *Johnson*, 614 F.3d at 794.

At this early stage of the proceedings, and assuming the facts alleged in the Complaint and supporting declarations as true, Plaintiff has made a prima facie case of specific personal jurisdiction, under both the *Calder* effects test and the regular five-factor test. Plaintiff appears to initially meet the *Calder* effects test, as it has shown that Defendants directed allegedly fraudulent statements aimed at the forum state, and caused harm to 3M's reputation and goodwill in Minnesota, which Defendants knew was likely to be felt there. *Paisley Park Enters.*, 361 F. Supp. 3d at 878 (citing *Calder*, 465 U.S. at 790). Defendants intentionally represented to third parties, such as Star Brands Group, that they had unique contacts with Minnesota, claiming to be 3M's "number one sales team," with "hundreds of millions of [N95 respirator] stock available." (Hise Decl. ¶ 7, Ex. 1.) In his recorded conversation with Hise, Starsiak referred to the "process" of submitting

paperwork to 3M to create a reference number. (*Id.*, Ex. 2.) To reassure Hise, Starsiak further stated, "I have Ivan Fong that I go to regularly." (*Id.*)

Under the regular five-factor test for minimum contacts, *Paisley Park Enters.*, 361 F. Supp. 3d at 878, the nature and quality of contacts with Minnesota consist of Defendants' specific, back-and-forth communications with Ms. Schaffer and her colleagues, as well as Defendants' frequent representations to third parties of doing systematic and continuous business with 3M, as its "number one sales team," with "hundreds of millions of [N95 respirator] stock available," (Hise Decl. ¶ 7, Exs. 1, 2). *See St. Jude Med. Inc. v. Lifecare Int'l*, 250 F.3d 587, 591–92 (8th Cir. 2001) (finding personal jurisdiction established, in part, by the parties' communications leading up to a contract negotiation that involved the distribution of goods manufactured in Minnesota, as well as their continued communications after the contract was established).

The contacts here, as documented by Plaintiff, were neither random nor fortuitous, but were directly related to the causes of action in this suit. Through these contacts, defendants gained information from 3M regarding the identity of its Minnesota legal counsel, and traded upon those contacts in subsequent efforts to attempt to sell allegedly 3M-authorized goods. Certainly, Minnesota has an interest in providing a forum for its resident businesses, and while Minnesota is convenient for 3M, the Court acknowledges that it is inconvenient for Defendants. At this time, the Court finds that these elements are sufficiently met.

While the Court finds that Plaintiff has adequately met the elements of specific personal jurisdiction for purposes of this TRO, it recognizes that Defendants present valid

arguments to the contrary, and the record on the issue of specific personal jurisdiction is quite undeveloped at this time. Furthermore, as noted, the reach of *Calder* is limited, and the act of promoting and soliciting customers at the expense of competitors will not alone be sufficient to confer specific personal jurisdiction. *Paisley Park Enters.*, 361 F. Supp. at 878 (citing *Hicklin Eng'g, Inc. v. Aidco, Inc.,* 959 F.2d 738, 739 (8th Cir. 1992)). Accordingly, as discussed at the hearing on the instant motion, the Court will explore the question of specific personal jurisdiction in greater detail in connection with Defendants' Motion to Dismiss and Plaintiff's Motion for a Preliminary Injunction, both of which will be heard on August 5, 2020. Limited jurisdictional discovery will provide necessary information to inform the Court as to whether the exercise of specific personal jurisdiction is proper, going forward.

Accordingly, the parties are ordered to meet and confer to address whether, and to what extent, limited jurisdictional discovery, on a mutual basis, will occur. They shall also meet and confer regarding the briefing schedule applicable to their respective motions, and advise the Court by letter, within one week, about both the extent of discovery and the agreed-upon briefing schedule.

### B. TRO

This Court must consider four factors to determine whether injunctive relief, in the form of a TRO, is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en

banc); *accord Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (quoting *Dataphase*). To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). The burden of establishing the four *Dataphase* factors lies with the party seeking injunctive relief. *Watkins*, 346 F.3d at 844.

### 1. Likelihood of Success on the Merits

As to Plaintiff's likelihood of success on the merits, to succeed on its trademark and unfair competition claims, 3M must establish the following: (1) that its 3M Marks are valid and entitled to protection; and (2) that Defendants are using the 3M Marks in a manner that is likely to create consumer confusion. *Roederer v. J. Garcia Carrión, S.A.*, 732 F. Supp. 2d 836, 863 (D. Minn. 2010) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009)); *see also Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 756 (D. Minn. 2009) (finding claims under the Lanham Act and state common law and state deceptive trade practices statutory claims were "coextensive," involving the same standards), *adhered to*, 711 F. Supp. 2d 991 (D. Minn. 2010); *aff'd*, 650 F.3d 1139 (8th Cir. 2011).

As to the likelihood of confusion in trademark cases, courts consider the factors set forth in *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980): (1) the strength of the plaintiff's marks; (2) the similarity of the marks; (3) the degree to which the allegedly infringing goods or services compete with the plaintiff's goods or services; (4) the alleged infringer's intent to confuse or deceive the public; (5) evidence of actual confusion, if any;

and (6) the conditions of purchase. No one factor controls. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011).

Plaintiff appears likely to succeed on its Lanham Act and related state law claims, given the evidence of the validity and strength of 3M's trademarked name and marks. Moreover, 3M has presented evidence showing that Defendants used the characters "3M," holding themselves out as 3M authorized distributors for the sale of identical goods, and falsely represented an affiliation and association with 3M, including representations about the role of 3M's attorneys in their dealings, such that Defendants' actions in representing the ability to sell 3M-branded respirators caused buyer confusion on the part of Mr. Hise of Star Brands Group. Accordingly, the likelihood of success on the merits weighs in 3M's favor.

### 2. Irreparable Harm

Traditionally, a showing of trademark infringement gives rise to a presumption of irreparable harm. *See Cmty. of Christ*, 634 F.3d at 1012 ("in trademark law, injury is presumed once a likelihood of confusion has been established."). 3M has presented evidence of confusion in the marketplace from Mr. Hise of Star Brands Group, who initially believed that Defendants were authorized 3M dealers. 3M has also shown that it has heavily invested in advertising and marketing its products under the 3M Marks, and adheres to rigorous quality-control standards for its products. (Crist Decl. ¶¶ 9–10.)

While Defendants argue that 3M only alleges a single solicitation to Star Brands Group, which did not result in a sale, (Def.'s Opp'n at 3), 3M has presented evidence,

sufficient for the issuance of a TRO, that Defendants attempted to gain information from 3M, and then profit from a false association with 3M's quality products and an association with 3M's counsel, creating a threat of irreparable harm to 3M's reputation and goodwill. *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Ptrs., LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011) (finding that to allow defendants to continue operating restaurants with plaintiffs' marks while holding themselves out as franchises posed a significant threat of irreparable harm to plaintiff's reputation and goodwill); *Gold's Gym Licensing, LLC v. K-Pro Mktg. Grp., Inc.*, No. 09-cv-1211 (PJS/RLE), 2009 WL 2253247, at *2 (D. Minn. July 28, 2009) (finding it reasonable to presume that defendant's use of identical marks created risk of irreparable harm to plaintiff's goodwill and favorable reputation). Absent a TRO, there is no assurance that Defendants will stop representing a false association with 3M. Accordingly, the Court finds that Plaintiff has sufficiently established the existence of irreparable harm.

### 3. Remaining *Dataphase* Factors

Regarding the balance of harms, the issuance of a TRO appears unlikely to harm Defendants, who have no affiliation with 3M, and therefore are not authorized to sell 3M products. *See Buffalo Wild Wings*, 829 F. Supp. 2d at 846 (finding that defendants brought any harm upon themselves through non-payment and infringement). On the other hand, 3M will suffer harm to its reputation and goodwill, absent a TRO, as discussed above. Accordingly, consideration of the balance of harms weighs in 3M's favor.

Finally, as to the public interest, the Court finds that it also weighs in 3M's favor. There is a strong public interest in protecting trademarks, *see id.* at 847, whereas Defendants identify no public interest that would be advanced if a TRO were denied.

Accordingly, Plaintiff's Motion for a TRO is granted. However, as the Court stated at the hearing on this motion, it will revisit the question of specific personal jurisdiction, and whether a preliminary injunction should issue, after the parties have had the opportunity to conduct limited jurisdictional discovery, in preparation for the August 5, 2020 hearing on Defendants' Motion to Dismiss and Plaintiff's Motion for a Preliminary Injunction.

In light of the Court's ruling on the TRO, Defendants agreed to extend the duration of the TRO through the August 5, 2020 hearing. The Court therefore issues the following TRO:

1. Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them, are temporarily restrained from using the standard character "3M" mark and 3M design mark **3M** (the "3M Marks"), and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, and

2. Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them, are temporarily restrained

17

from engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing themselves as being authorized distributors, vendors, agents, representatives, retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators.

3. Sufficient reason having been shown therefor, for a period beginning on the date of this order and ending at the conclusion of the August 5, 2020 hearing on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss Pursuant to Rule 12(b)(2), Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with it, are hereby temporarily restrained, pursuant Fed. R. Civ. P. 65(b), from engaging in any of the acts and/or conduct described in Paragraphs 1 and 2, above.

4. Pursuant to this Court's equitable powers and discretion, 3M need not post a bond.

## IV. ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

Case 1:20-cv-01077-LY Document 12-1 Filed 07/03/20 Page 107 of 118

1. Plaintiff 3M Company's Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. No. 8] is **GRANTED** as to its request for a TRO, subject to the terms set forth above, and the Court defers ruling on its request for a preliminary injunction.

2. The parties shall meet and confer to address whether, and to what extent, limited jurisdictional discovery, on a mutual basis, will occur. They shall also meet and confer regarding the briefing schedule applicable to their respective motions, and advise the Court by letter, within one week, about both the extent of discovery and the agreed-upon briefing schedule.

.

Dated: June 26, 2020                                        s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge

# EXHIBIT
# 16



NEXUS
MEDICAL

Home   Products   About   Executive Team   FDA Approval

CONTACT



# Your partners in medical supply.

We are working with our manufacturing and supply chain partners, as well as global health organizations, to provide much needed medical supplies around the US.

Learn More



Home    Products    About    Executive Team    FDA Approval

**CONTACT**

# Products

## Product Summaries











### 4 ply N95 Surgical Mask

**Product ID: PRM-95**

Our PRM-95 is a 4 Ply filter mask with a carbon layer with more filtration and highly comparable to the N95 filters in the marketplace.

### KN95 Respirator Face Mask

**Product ID: KN95**

Multilayer protection: Filters out 95% of air born pollutants. Adjustable nose bridge and elastic ear loop for a tight seal

### NIOSH Particulate Respirator Mask

**Product ID: N95**

Niosh Particulate Respirator Mask Filters out 95% of air born pollutants. Meets CDC guidelines for exposure control

### FFP3 Surgical Mask 3 Ply

**Product ID: SM-3 Ply**

SM-3 Ply is a disposable medical device that reduces wearers exposure to particles.

### 3M 1860 Respirator Mask

**Product ID: 3M 1860**

3M 1860 Respirator Mask FDA Cleared for use as surgical mask, >99% BFE (Bacterial Filtration Efficiency) according to ASTM F2101 and Fluid resistant according to ASTM F1862

NEXUS
MEDICAL

Home    Products    About    Executive Team    FDA Approval

CONTACT

## About Nexus Medical

The principals behind Nexus Medical are involved in International business transactions as well as long time executives with United Nations Non-Governmental Organizations (NGO). Through their international business partnerships, they were asked by government and certain healthcare related clients if they could facilitate PPE products that would protect health care workers and first responders from the Corona Virus. Our manufactures are located in Vietnam and China through their strategic affiliates and partnerships.



Solutions in a global pandemic.

# NEXUS MEDICAL

Home   Products   About   Executive Team   FDA Approval   **CONTACT**

# Executive Team



### Dr Eddie Richardson

#### Chief Medical Officer

Dr. Eddie Richardson, Jr. is a native of Echols County and a graduate of Echols County High School. He is the son of the late Mr. Eddie & Laverne Richardson of Howell, GA. After graduating from Echols County High, Dr. Richardson went onto earn his BS in Chemistry with a minor in Math from Valdosta State University. Upon completion of his degree, he then joined the United States Marine Corps. While in the Marine Corps, he was meritoriously promoted twice, served in the Gulf War, and received the Navy Medal of Achievement for his outstanding service. Dr. Richardson returned to civilian life to attend Clark Atlanta University where he received a Master's in Biochemistry. He went on to medical school at Morehouse School of Medicine in Atlanta, GA. He did his residency in Family Medicine at the Medical Center in Columbus, GA.

After completing his residency, Dr. Richardson further served his country as a National Health Service Corps Scholar where he practiced medicine in underserved communities for over 4 years. Upon completion of his National Health Service Corps commitment, Dr. Richardson furthered his training by completing a fellowship in Geriatric and Palliative medicine at the Medical Center of Central Georgia in Macon, GA.

He now serves in several leadership positions to include: Medical Director & CEO of Lake Oconee Urgent & Primary Care Center and Lake Oconee Concierge Medicine in Eatonton, GA; AXIS Occupational Health, LLC of Covington, GA. He is the Medical Director of Putnam General Hospitalist Program, Amedisys Home Health Agency, Peaceful Purpose, Bright & Harmony Hospices. He is the Chief Medical Officer of AXIS RISK Services, LLC., and the Laboratory Clinical Consultant for Med-Lake Laboratory LLC. He is an Assistant Professor at Georgia Regency Health School of Medicine, and Morehouse School of Medicine as well as serves on the faculty for two Nurse Practitioner schools.

He is currently the Chief of Staff at Putnam General Hospital, and Immediate Past President & Chair of the Board for his state physician organization, the Georgia Academy of Family Physicians. He frequently appears as an expert witness on the TV shows "Paternity Court" & "Personal Injury Court." He has also presented on several topics on the Medical Association of Georgia's Top Doc Radio. He is also a graduate of the MAG Georgia Physicians Leadership Academy. Dr. Richardson currently serves the Vice President of the Georgia Healthy Family Alliance of the GAFP. He served as Student Board member to American Academy of Family Physicians and was one of the First National FMIG Leaders. He also co-authored the FMIG leadership manual for the AAFP which is still in use today. He served as a Board member on the Putnam County Chamber of Commerce, and the Putnam County School Board. He was voted the "Best Doctor in the Lake Country"; and Most recently he was selected as the "2018 Family Physician of the Year" for the Georgia Academy of Family Physicians, and one of the finalist for the AAFP National Family Physician of the Year for 2019. He was also selected as the "2018 Distinguished Alumni of the Year" for Valdosta State University for the second time in less than 10 years.





## Major General Freddie Valenzuela

### President, Nexus Medical

Major General Freddie Valenzuela has served thirty-three years in the US Army and was highly decorated for heroism and valor. He served in three combat corps and six Infantry Divisions all over the world including Peru, Korea, Colombia, Turkey, Haiti, Puerto Rico, Kuwait, Grenada, Panama, Germany, El Salvador, and Somalia, as well as numerous years in interagency assignments. He commanded in the Cold War and Gulf War eras, and was awarded the two highest peacetime awards upon his retirement, the Defense and Army Distinguished Service Medals. After retirement, he continued his public service by creating an educational foundation for at-risk children and for the families of soldiers killed in the line of duty. He has or now sits on several community boards of directors; Boy Scouts of America, Family Service Association, Boys and Girls Club, Communities in School and Haven for Hope. He is an Eagle Scout himself and was inducted into the Boys and Girls Hall of Fame. He sits on the National Board of Directors for St. Mary's University, Tomas Rivera Policy Institute, National Recreation Board of America. He is a senior consultant to the Center of Terrorism at St. Mary's University School of Law, where he was recently named a Distinguished Alumnus. A former San Antonio Housing Authority President/CEO; he also served as Executive Director to the Housing Authority of Bexar County. He is President/CEO of M.C. Valens; a service disabled veteran owned business. His company previously advised the senior Mexican leadership on the War on Drugs. He is a motivational speaker, and supports the US Army in the arena of recruiting, retention & diversity issues. Hispanic Business Magazine has named him one of the 100 most influential Hispanics in the U.S. The Valenzuela Family's published book entitled "No Greater Love: The Lives and Times of Hispanic Soldiers" has won numerous awards and all proceeds go to the families of the 21 Soldiers he buried from the Iraq and Afghanistan wars. He is the Executive Director of the Minnie Miracle Foundation and is a Consultant/Board of Director for Rush Group, LLC, Detroit, Michigan. He recently served as a Board of Director of USAA Federal Savings for 11 years, (risk/trust and credit committees), USAA USB Bank (Credit card bank/risk/compensation committees). He was also recently appointed by the President of the United States to the WWI Centennial Commission.







### Burl Outlaw

#### Managing Partner, Nexus Medical LLC

Burl Outlaw is a successful, lifelong entrepreneur with 37 plus years of industry diverse marketing, public relations, and promotional experience. Mr. Outlaw is a Founder of Stone Canyon Developments, which is developing the Edgewater Springs resort destination in Fredericksburg, Texas.

In 1997, Mr. Outlaw entered the motorsports industry. He created and merged a company with a motorsports team and procured funding for an Indy Racing League

(IRL) team for 4 years, and then funding for a NASCAR Winston cup team for 2 years. Mr. Outlaw became well known in the racing industry during this time for his enthusiasm and ability to develop relationships with sponsors that included Tabasco and First Plus. For the first decade of the 21st century, Mr. Outlaw consulted for several start-up companies assisting with raising capital for operations and initial public offerings, such as Cycle Country Accessories (American Stock Exchange symbol: ATC), Targus Fly Fishing, and Cinsay.

More recently, in 2017, Mr. Outlaw became owner and CEO of Rocky Ridge Trucks, an up-fitter for auto manufacturers that provided lifts and modifications on new vehicles while being able to maintain the manufacturer warranties. Mr. Outlaw sold Rock Ridge Trucks in 2019

### Dr Tony E.H. Serna

#### Director of Manufacturing

Dr. Serna is a serial entrepreneur with broad experience in the Medical, Energy, and Technology sectors. He is currently serving on various corporate and non-profit boards, including his Chapter Director role as VP of Strategic Partnerships for the National Hispanic Christian Leadership Conference (NHCLC.org). His 30+ year business experience as a business owner and investor, coupled with a vast relational rolodex of decision makers continues to position our company for high speed strategic growth. His knowledge and experience with government, corporate, and religious business dealings allow us to look at every opportunity from different perspectives. Dr. Serna served our country honorably as a Gunnery Sergeant in the United States Marine Corps and his philosophy of Recon before any hasty moves, organize the best team for the mission, be prepared for the unexpected, and execute on time, continues to pave his successful life.





NEXUS MEDICAL

Home    Products    About    Executive Team    FDA Approval    **CONTACT**



# Contact Us

### When you need it now.

Name

Email

Message

Submit

108 E Trailmoor Dr #6
View larger map

108 East Trailmoor Drive #6

---

**About Us**
Our Mission

**Resources**
Covid-19 Updates
Product Circulars

**Contact Us**
1-800-470-6850
info@nexusmedicalproducts.com

© 2019

# EXHIBIT 17

# NORTON ROSE FULBRIGHT

July 2, 2020

**Via Email**

Norton Rose Fulbright US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas  78205
United States

VinAsia Che Tao LLC
Mario Gasca
30 N. Gould Street, Suite 9364
Sheridan, Wyoming 82801
EAS@VinAsiaCheTao.com
Mario.Gasca@VinAsiaCheTao.com

**Michael W. O'Donnell**
**Partner-in-Charge, San Antonio**
Direct line +1 210 270 7145
mike.odonnell@nortonrosefulbright.com

Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
info@nexusmedicalproducts.com

Tel +1 210 224 5575
Fax +1 210 270 7205
nortonrosefulbright.com

Jim Fultz
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
jim@nexusmedicalproducts.com

David Schiller
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
david@nexusmedicalproducts.com
davids1071@yahoo.com

Vicky Lynn Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
vicky.burl@gmail.com
vicky.outlaw1@gmail.com
vicky.outlaw@yahoo.com
vickyjohnson2@aol.com
burloutlaw@aol.com

George Burl Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
burloutlaw@gmail.com

Re:    *3M Company v. Nexus Medical LLC, VinAsia Che Tao LLC, and Does 1-10*; Civil Action
       No. 1:20-cv-00697-LY

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

July 2, 2020
Page 2

NORTON ROSE FULBRIGHT

To whom it may concern:

Our law firm represents 3M Company ("3M") in a federal lawsuit filed in the Austin Division of the Western District of Texas against Nexus Medical LLC ("Nexus Medical") and VinAsia Che Tao LLC ("VinAsia").  We write to you because your name and contact information is associated with Nexus Medical and/or VinAsia. Upon those entities retention of counsel, we ask that you inform us so that we can direct our communications to counsel.

We enclose a copy of the Complaint in the lawsuit and 3M's Application for Temporary Restraining Order and Expedited Discovery ("Application").  In the Application, 3M has requested relief from the Court on an emergency basis.  Please contact us and inform us who to notify in the event the Court elects to conduct a prompt hearing on the Application.  If Nexus Medical and VinAsia do not promptly retain counsel, the Court may elect to rule on the Application on an *ex parte* basis.

We appreciate your immediate attention to this matter.

Very truly yours,


*/s/ Michael W. O'Donnell*
Michael W. O'Donnell

MWO/cas
Enclosures

cc:     Paul Trahan (Firm)

        Aimee Vidaurri (Firm)