**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| 3M COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 1:20-cv-00697-LY |
| NEXUS MEDICAL LLC, | § | |
| VINASIA CHE TAO LLC, and | § | |
| DOES 1-10 | § | |
| | § | |
| Defendants. | § | |

---

**APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTION AND MOTION FOR EXPEDITED DISCOVERY**

---

**NORTON ROSE FULBRIGHT US LLP**

Michael W. O'Donnell
State Bar No. 24002705
mike.odonnell@nortonrosefulbright.com
Aimeé Vidaurri
State Bar No. 24098550
aimee.vidaurri@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Paul Trahan
State Bar No. 24003075
Paul.trahan@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone:  (512) 536-5288
Facsimile:  (512) 536-4598

*Attorneys for Plaintiff 3M Company*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 5

II.    FACTUAL BACKGROUND .............................................................................. 7

    A.    The Current COVID-19 Crisis ............................................................... 7

    B.    3M's Famous Brand and Trademarks ..................................................... 8

    C.    3M's Production and Sale of N95 Respirators During COVID-19 ........ 9

    D.    Defendants and Their Fraudulent Scheme ........................................... 10

    E.    Nexus Medical and VinAsia's Formation ............................................ 11

    F.    Defendants Fabricate a Relationship with 3M to Develop Business .... 11

    G.    Defendants' Calculated Scheme to Defraud Consumers Using 3M's Name ...... 12

III.    ARGUMENT AND AUTHORITIES ................................................................ 13

    A.    Application for Temporary Restraining Order and Temporary Injunction ........ 13

    B.    3M Can Demonstrate Substantial Likelihood of Success on the Merits ............ 14

        1.    3M will establish the validity of the 3M Trademarks .............................. 15

        2.    Defendants' Use of the 3M Trademarks is Likely to Cause Confusion ......... 15

        3.    The "Digits of Confusion" Strongly Favor 3M ....................... 17

            (a)    The Strength of 3M's Mark is Undisputable; ............... 18

            (b)    The Similarity Between the Two Marks. Here, the Marks Used are Identical; ........ 18

            (c)    The Similarity of the Products or Services; ................... 19

            (d)    The Identity of Retail Outlets and Purchasers; ........... 19

            (e)    The Identity of the Advertising Media Used; ............. 20

            (f)    The Defendant's Intent; .............................................. 20

            (g)    There is Ample Evidence of Actual Confusion. .......... 21

    C.    3M Will Suffer Irreparable Harm if Preliminary Injunctive Relief is Not Granted ...... 22

    D.    Defendant Will Suffer No Harm if This Motion is Granted .............................. 25

    E.    The Public Interest Weighs in Favor of Preliminary Relief .......................... 25

    F.    3M Should Not Be Required to Post a Bond ........................................ 26

IV.    MOTION FOR EXPEDITED DISCOVERY .................................................... 27

    A.    The Court Has Authority to Grant 3M's Motion. ............................... 28

**TABLE OF CONTENTS**
(continued)

**Page**

B.    3M Has Made a Necessary Showing of Good Cause for the Need to
Conduct Expedited Discovery ............................................................... 29

C.    Time is of the Essence ................................................................... 32

D.    Discovery Sought from Defendants ............................................... 34

E.    Discovery Sought from Third-Parties ............................................ 36

V.    PRAYER ................................................................................................. 36

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC,*
  2020 WL 2115070 (S.D.N.Y. May 4, 2020) ...........................................................................6

*3M Company v. Geftico, LLC,*
  No. 6:20-cv-648, ECF No. 16 (M.D. Fla. Apr. 30, 2020) (Ex. 8) ......................................6, 23

*3M Company v. Matthew Starsiak, et al.,*
  Case No. 20-cv-1314, ECF No. 37 (D. Minn. June 26, 2020) (Ex. 15)...................................23

*3M Company v. Performance Supply, LLC,*
  No. 1:20-cv-02949, ECF No. 12 (S.D.N.Y. April 24, 2020) (Ex. 6)..................................6, 23

*3M Company v. RX2Live, LLC and RX2Live, Inc.,*
  No. 1:20-cv-00523, ECF No. 18 (E.D. Cal. Apr. 30, 2020) (Ex. 5)...................................6, 23

*American Auto. Ass'n v. AAA Ins. Agency, Inc.,*
  618 F. Supp. 787 (W.D. Tex. 1985)........................................................................................17

*American Dairy Queen Corp. v. New Line Productions, Inc.,*
  35 F. Supp. 2d 727 (D. Minn. 1998)......................................................................................25

*American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n,*
  532 F. Supp. 1376 (S.D. Tex. 1982), *aff'd,* 701 F.2d 408 (5th Cir. 1983) ............................23

*Amstar Corp. v. Domino's Pizza, Inc.,*
  615 F.2d 252 (5th Cir. 1980) ...................................................................................17, 20, 21

*Ayyash v. Bank Al–Madina,*
  233 F.R.D. 325 (S.D. N.Y. 2005) ...........................................................................................29

*Benham Jewelry Corp. v. Aron Basha Corp.,*
  1997 WL 639037 (S.D. N.Y. 1997).........................................................................................31

*Board of Supervisors for La. State Univ. v. Smack Apparel Co.,*
  550 F.3d 465 (5th Cir. 2008) ..................................................................................................20

*Brookfield Communications v. West Coast Entertainment,*
  174 F.3d 1036 (9th Cir. 1999) ....................................................................................15, 16, 20

*Canal Auth. of the State of Florida v. Callaway,*
  489 F.2d 567 (5th Cir. 1974) ..................................................................................................13

*Chemlawn Servs. Corp. v. GNC Pumps, Inc.,*
  690 F. Supp. 1560 (S.D. Tex. 1988), *aff'd,* 856 F.2d 202 (Fed. Cir. 1988).......................23, 24

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
  636 F.2d 1084 (5th Cir. 1981) ................................................................................................27

*Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*,
  719 F. Supp. 725 (N.D. Ill. 1989) ...................................................................25

*Conan Props., Inc. v. Conans Pizza, Inc.*,
  752 F.2d 145 (5th Cir. 1985) ........................................................................20

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600 (1st Cir. 1988) .........................................................................23

*Corrigan Dispatch Company v. Casa Guzman*,
  569 F.2d 300 (5th Cir. 1978) ........................................................................26

*In re Countrywide Fin. Corp.*,
  542 F. Supp. 2d 1160 (C.D. Cal. 2008) ........................................................30

*Crawford-El v. Britt*on,
  523 U.S. 574 (1998) ......................................................................................28

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ........................................................................14

*Dimension Data N. Am., Inc. v. Netstar–1, Inc.*,
  226 F.R.D. 528 (E.D. N.C. 2005) .................................................................29

*El Pollo Loco S.A. de C.V. v. El Pollo Loco, Inc.*,
  244 F. Supp. 2d 986 (S.D. Tex. 2004) .....................................................27, 30

*Elvis Presley Enterprises, Inc. v. Capece*,
  141 F.3d 188 (5th Cir. 1998) ....................................................15, 17, 18, 21

*Energy Prod. Corp. v. Northfield Ins. Co.*,
  2010 WL 3184232 (E.D. La. 2010) .........................................................29, 30

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
  754 F.2d 591 (5th Cir. 1985) ..................................................................15, 16, 20

*Healthpoint Ltd. v. Stratus Pharms., Inc.*,
  273 F. Supp. 2d 769 (W.D. Tex. 2001) .........................................................27

*Horseshoe Bay v. Lake Lyndon B. Johnson*,
  53 S.W.3d 799 (Tex. App. 2001) .............................................................15, 16

*Intel Corp. v. Rais*,
  No. 1:19-CV-20-RP, 2019 WL 164958 (W.D. Tex. Jan. 10, 2019) .................28, 29

*Interscope Records v. Does 1-14*,
  No. 07-4107-RD, 2007 WL 2900210 (D. Kan. 2007) ....................................32

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ........................................................................14

*Joy Mfg. Co. v. CGM Valve & Gauge Co.*,
  730 F. Supp. 1387 (S.D. Tex. 1989) .............................................................23

*Kaepa, Inc. v. Achilles Corp.*,
  76 F. 3d 624 (5th Cir. 1996) ........................................................................26

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir. 1991) ...............................................................13, 23

*Living Scriptures v. Doe(s)*,
  No. 10-cv-0182-DB, 2010 WL 4687679 (D. Utah 2010)..................................32

*Long John Silver's, Inc. v. Washington Franchise, Inc.*,
  1980 U.S. Dist. LEXIS 16635 (E.D. Va. 1980)............................................25

*Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. O'Connor*,
  194 F.R.D. 618 (N.D. Ill. 2000)..................................................................29

*Miss. Power & Light Co. v. United Gas Pipeline*,
  760 F.2d 618 (5th Cir. 1985) ......................................................................13

*Pebble Beach. Co. v. Tour 18 I Ltd.*,
  155 F.3d 526 (5th Cir. 1998) ..............................................................16, 17

*Pro Hardware, Inc. v. Home Ctrs. of Am., Inc.*,
  607 F. Supp. 146 (S.D. Tex. 1984) ..........................................................23, 24

*Quantum Fitness Corp. v. Quantum Lifestyle Centers*,
  83 F. Supp. 2d 810 (S.D. Tex. 1999)....................................................23, 24, 25

*The Scott Fetzer Co. v. House of Vacuums Inc.*,
  382 F.3d 477 (5th Cir. 2004) .............................................................15, 16, 20

*Semitool, Inc. v. Tokyo Electron America, Inc.*,
  208 F.R.D. 273 (N.D. Cal. 2002)...........................................................29, 31

*Service Merch. Co. v. Service Jewelry Stores, Inc.*,
  737 F. Supp. 983 (S.D. Tex. 1990) ...........................................................22

*Shakespeare Co. v. Silstar Corp. of America*,
  110 F.3d 234 (4th Cir. 1997) ..................................................................15, 20

*Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*,
  912 F.3d 805 (5th Cir. 2019) ....................................................................14

*St. Louis Grp., Inc. v. Metals & Additives Corp.*,
  275 F.R.D. 236 (S.D. Tex. 2011)................................................................29

*Streamline Prod. Sys. v. Streamline Mfg.*,
  851 F.3d 440, 454–55 (5th Cir. 2017) ....................................................18, 20

*Sunbeam Prods., Inc. v. West Bend Co.*,
  123 F.3d 246 (5th Cir. 1997), *overruled in part on other grounds*, *TrafFix*
  *Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).............................25

*Teledyne Indus., Inc. v. Windmere Prods., Inc.*,
  433 F. Supp. 710 (S.D. Fla. 1977) ...........................................................25

*Trak. Inc. v. Benner Ski KG,*
    475 F. Supp. 1076 (D. Mass. 1979) ....................................................................33

*Viacom Int'l v. IJR Capital Investments, L.L.C.,*
    891 F.3d 178 (5th Cir. 2018) ....................................................................17, 18, 19

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.,*
    576 F.3d 221 (5th Cir. 2009) ....................................................................18, 19

**Rules and Statutes**

15 U.S.C. § 1065 ....................................................................................................8, 15

15 U.S.C. § 1114(1) ....................................................................................................15

15 U.S.C. § 1115(b) ....................................................................................................15

15 U.S.C.§ 1125(a)(1)(A) ....................................................................................................15

Fed. R. Civ. P. 16(b)(3)(B) ....................................................................................................27, 28

Fed. R. Civ. P. 16(c)(2)(F) ....................................................................................................27, 28

Fed. R. Civ. P. 26(b)(1) ....................................................................................................28

Fed. R. Civ. P. 26(d) ....................................................................................................27, 28

Fed. R. Civ. P 26(d)(1) ....................................................................................................27, 30

Fed. R. Civ. P. 26(f) ....................................................................................................7, 29, 30, 31, 35, 36

Fed. R. Civ. P. 34(a)(1)(A) ....................................................................................................28

Fed. R. Civ. P. 65 ....................................................................................................13

Fed. R. Civ. P. 65(c) ....................................................................................................26

**Other Authorities**

8A Charles Alan Wright et al., <u>Federal Practice and Procedure: Civil</u> § 2046 .1
    (3d ed. 1994) ....................................................................................................27

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff 3M Company ("3M") files this its Application for Temporary Restraining Order, Preliminary Injunction and Motion for Expedited Discovery.

## I.    **INTRODUCTION**

Defendants are running a scam designed to exploit the high demand for personal protective equipment ("PPE") during one of the largest public health crises in modern history. As part of this scam, Defendants are purporting to offer authentic 3M-brand N95 respirators for sale (*which they do not have*) and supporting their efforts to do so by claiming an affiliation and contractual relationship with 3M (*which does not exist*). 3M brings this motion for a temporary restraining order to stop this scam and to prevent Defendants from causing any further irreparable harm to 3M's brand and trademarks.

The declarations and exhibits submitted herewith detail Defendants' scheme, which thus far has included false statements regarding Defendants' access to 3M-brand PPE; fraudulent representations that Defendants have contractual relationships with 3M; attempts to sell 3M-brand N95 respirators at exorbitant markups; and preposterous claims that Defendants are holding over $6 billion in escrow for the purchase of 3M-brand N95 respirators. Defendants have no connection to 3M whatsoever and have no access to authentic 3M-brand respirators in such quantities. Nonetheless, Defendants have used—and continue to use—3M's brand and trademarks, and their false claims of affiliation with 3M, to further a scheme calculated to defraud hospitals and other entities in desperate need of PPE.

Defendants' ongoing conduct will cause irreparable harm to the strong and positive reputation associated with 3M's trademarks. 3M is entitled to ensure that these marks are not used in connection with an unlawful scheme to defraud—and it brings this motion to stop Defendants' ongoing misconduct in its tracks.

Unfortunately, this case is just one of the many fraudulent schemes seeking to capitalize on the huge demand for respirators in the current pandemic by alleging a false affiliation with 3M. 3M has aggressively sought to stop these frauds, and in the last several months, federal courts have granted five motions by 3M for a temporary restraining order in similar circumstances, including just last week in the District of Minnesota on similar facts. In addition, the Southern District of New York has granted 3M's motion for a preliminary injunction, holding as follows:

> [P]recious public resources should not be squandered on needless inquiries and investigations into the truth and the legality of basic commercial terms and representations made in the procurement process. If the market (and the participants in the market) cannot be trusted, procurement will grind to a halt. When lives are at stake and time is of the essence, as is clearly the case in this crisis, the public interest demands accountability.

*3M Co. v. Performance Supply, LLC*, 2020 WL 2115070, at *14 (S.D.N.Y. May 4, 2020).  Federal courts have issued three other preliminary injunctions as well. [1]

In this time of national emergency, 3M requests that this Court stop the incalculable harm caused by Defendants' misconduct in connection with their fraudulent claims of affiliation with 3M and claimed offers to sell 3M-brand N95 respirators. For these reasons and the reasons below, 3M moves the Court for a temporary restraining order as soon as possible.

In connection with its request for a Temporary Restraining Order, 3M seeks leave of this Court to serve limited, immediate discovery on Defendants, Nexus Medical LLC ("Nexus Medical") and VinAsia Che Tao LLC ("VinAsia"), their officers, and on third parties to determine the extent of Defendants' fraudulent scheme. 3M seeks to issue expedited discovery to Defendants

---

[1] *3M Company v. RX2Live, LLC and RX2Live, Inc.*, No. 1:20-cv-00523, ECF No. 18 (E.D. Cal. Apr. 30, 2020) (Ex. 5); *3M Company v. Performance Supply, LLC*, No. 1:20-cv-02949, ECF No. 12 (S.D.N.Y. April 24, 2020) (Ex. 6); *3M Company v. Performance Supply, LLC*, No. 1:20-cv-02949, ECF No. 22 (S.D.N.Y. May 4, 2020) (Ex. 7). Only one court has denied a motion for preliminary relief. A judge in the Middle District of Florida, without a written opinion, denied 3M's motion for a temporary restraining order because the case only involved a single solicitation and therefore did not, in the Court's view, pose a risk of ongoing harm. *3M Company v. Geftico, LLC*, No. 6:20-cv-648, ECF No. 16 (M.D. Fla. Apr. 30, 2020) (Ex. 8).

in preparation for a hearing on a preliminary injunction which 3M seeks and permit an exception to the Rule 26 (f) requirement for third party discovery that will identify the extent of Defendants' fraudulent scheme, consumer victims and additional defendants in this action, including: name, current (and permanent) address, telephone number, and e-mail address of others participating in concert with Defendants. The Court should grant this motion because 3M has a demonstrated a need for expedited discovery, the request is fair, the relief requested is proper under the circumstances.

3M further moves that the restraining order establish a date and time for a hearing where Defendants are required to appear and show cause why a preliminary injunction should not be issued enjoining Defendants from using 3M's name and trademarks, and otherwise making false, deceptive and misleading communications concerning 3M, until the time of final trial.

## II.    FACTUAL BACKGROUND

### A.    The Current COVID-19 Crisis

Over the last several months, the world has seen an outbreak of a highly contagious virus, COVID-19, creating an international state of emergency. The virus is believed to pass from person-to-person via airborne particles and liquids. *See* O'Donnell Decl. at ¶ 5, Ex. 1.

Current guidelines recommend that healthcare personnel wear respiratory protection, like 3M's N95 respirator, when interacting with infected patients in order to minimize the workers' risk of exposure to the virus. *See* O'Donnell Decl. at ¶ 6, Ex. 2. N95 respirators can help prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose. *See* Stobbie Decl. at ¶ 5. The 3M-brand N95 respirators are one of three respirator levels that meet the National Institute of Occupational Safety and Health standards for minimum filtration efficiency levels as prescribed by regulation 42 C.F.R. Part 84. *Id.*

### B.    3M's Famous Brand and Trademarks

For decades, 3M has been a leading provider of PPE for healthcare professionals, industry workers, and the public. *See* Stobbie Decl. at ¶ 4. 3M is a leading manufacturer of N95 respirators (*id*.) and has sold N95 respirators in the United States under the 3M brand name for decades. *See* Crist Decl. at ¶ 10. Since the outbreak began, the public has become familiar with 3M as a manufacturer of the N95 respirators and other equipment essential to protecting healthcare personnel and workers from exposure to airborne particles, including viruses like COVID-19. *See id*. at ¶ 17; Stobbie Decl. at ¶ 14.

Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world under its standard-character mark "3M" and 3M design mark **3M** (together, the "3M Trademarks"). *See* Crist Decl. at ¶ 10. During this period, 3M's goods and services offered under its 3M Trademarks have been the subject of widespread, unsolicited media coverage and critical acclaim. *Id*. at ¶ 11. Goods and services offered under 3M Trademarks also enjoy enormous commercial success, with annual revenues exceeding hundreds of millions of dollars. *Id*. at ¶ 12.

To protect its rights in the 3M Trademarks, 3M has obtained numerous federal trademark registrations for the marks, including without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M Trademarks for, *inter alia*, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark for, *inter alia*, respirators (the "'534 Registration"). These Registrations are "incontestable" within the meaning of 15 U.S.C. § 1065. *See* Crist Decl. at Exs. 4, 6, 8.

C.    <u>3M's Production and Sale of N95 Respirators During COVID-19</u>

Medical professionals and first responders throughout the world are wearing extensive PPE as they place their health and safety on the line in the battle against COVID-19. As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers."



3M is providing the individuals on the front lines of the battle against COVID-19 with 3M-brand N95 respirators, which "are considered the gold standard by medical workers and public-health officials." *See* O'Donnell Decl. at ¶ 8, Ex. 4. Since the outbreak of COVID-19 in early 2020, 3M began increasing its production of 3M-brand respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month, to ensure that an adequate supply of its respirators is available to governments and healthcare personnel, as well as to workers in other critical industries, including food, energy, and pharmaceuticals. *See* Stobbie Decl. at ¶¶ 8, 9, Exs. 1-3. This includes 50 million per month being manufactured and distributed in the United States, or well more than 1 million respirators per day produced in the United States for use in the fight against COVID-19. *Id*. at ¶ 9, Ex. 1. 3M is also investing in the capital and resources necessary to enable it to double its current global production of 1.1 billion 3M-brand N95 respirators per year to 2 billion per year globally before the end of 2020. *See id*. at ¶ 11, Exs. 1, 3. In the United States, 3M intends to grow its production to more than 95 million per month by October 2020. *Id.* And to

supplement its U.S. production, 3M also has worked with the Federal Emergency Management Agency ("FEMA") to import 166.5 million 3M-brand respirators from 3M's production facilities overseas. *See* Stobbie Decl. at ¶ 9, Ex. 2. In the U.S., the substantial majority of 3M's respirators are going to healthcare and public health users, with the remaining deployed to other critical industries such as energy, food and pharmaceuticals. *See* Stobbie Decl. at ¶ 13. The U.S.'s distribution of 3M-brand respirators is being coordinated with FEMA, which is basing allocation decisions on the most urgent needs. *Id.*

Notwithstanding the surging demand and public need for PPE during COVID-19, 3M has confirmed publicly that it will not increase prices of its 3M-brand N95 respirators in authorized sales and will work to eliminate fraud and price-gouging by third-parties in the midst of this crisis. *See* Stobbie Decl. at ¶ 12, Ex. 3; *see also id.* at ¶¶ 14-16, Exs. 4, 5. These efforts protect the public from defective and/or inferior products and outrageous and unwarranted price inflation. *Id.*

### D.      Defendants and Their Fraudulent Scheme

Despite 3M's extensive measures to combat price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices concerning its 3M-brand N95 respirators, illicit activities by bad actors continue. Defendants are a prime example of this unlawful behavior, which is damaging to the 3M brand, as well as to public health and safety in a time of unprecedented crisis.

Defendants seek to benefit from the good reputation of others in an effort to dupe unsuspecting individuals to pay money, into escrow or otherwise, for 3M-brand N95 respirators that Defendants cannot deliver. 3M has filed suit to ask this Court to put a stop to Defendants' unlawful and unethical activities, to protect the public from this fraud, and to protect 3M's name and reputation from being associated with Defendants' scam. There is no reason to believe Defendants intend to discontinue their unauthorized use of the 3M Trademarks.

### E.    Nexus Medical and VinAsia's Formation

Defendant Nexus Medical was formed on March 30, 2020 to profit from the COVID-19 pandemic. *See* Ex. A. Defendant VinAsia was also formed with the intent to profit from the COVID-19 pandemic—April 13, 2020. *See* Ex. B. In their effort to lure in customers and to legitimize their fraudulent operations, Defendants have borrowed the credibility of an array of different persons and entities that, upon information and belief, are not currently associated with Defendants, including 3M, Thompson & Knight, Ernst &Young, Chicago Title, Plains Capital Bank, and many reputable and/or famous individuals. *See* Compl. at ¶ 2.

### F.    Defendants Fabricate a Relationship with 3M to Develop Business

3M has been notified that, on at least three separate occasions, Defendants caused a Thompson & Knight LLP attorney to prepare sham "proof of funds" correspondence to 3M wherein Nexus Medical falsely claimed to have escrowed a total of over ***six billion dollars*** for the purchase of 3M-brand respirators. *See* Exs. 1-3, Childs Decl. at ¶ 6. Nexus Medical falsely claimed to have issued "Purchase Orders" to 3M tied to the enormous sums escrowed. *See* Childs Decl. at Ex. 1 (May 3, 2020 Letter). The letters further represented Nexus Medical had "been asked by State Governments, Hospital Groups and First Responder organizations to source masks for their PPE needs. One such example is the State of California."  This is false. While Nexus Medical represented to the State of California it had 50 million 3M respirators available at $ 3.27 per mask, and dangerously  close to deceiving the State of California into "closing" on this sham transaction, this was reported through 3M's fraud reporting channels. *See* Ex. 6, Childs Decl. at ¶ 11. To provide reassurance concerning the legitimacy of an escrow arrangement, the letter asserted that a Thompson & Knight attorney was overseeing the transaction and represented there were escrow accounts at Plains Capital Bank administered by Chicago Title. This correspondence, while not

directly delivered to 3M, was used by Defendants to build a false history of Defendants purported dealings with 3M in an attempt to lure consumers into sham transactions.[2]

Utilizing an attorney in Florida, Nexus Medical further falsely represented it placed "Purchase Order 2004241" for "100,000,000 3M 1860 respirators" for the State of California Division of General Services. *See* Ex. 5, Childs Decl. at ¶ 10.

### G.    Defendants' Calculated Scheme to Defraud Consumers Using 3M's Name

Defendant Nexus Medical also caused Thompson & Knight to prepare correspondence dated May 7, 2020 and dubbed "Proof of contractual relationship with 3M." This letter asserted that Defendant Nexus Medical "has contractual relationships directly with 3M" and "***has placed*** and can place order for production of 3M 1860 masks in the One Hundred Million mask allotments or more." *See* Ex. 7, Childs Decl. at ¶ 12.  The letter further links the Defendants stating that: "Nexus Medical and VinAsia Che Tao, LLC and Instadose have an agreement to provide access to 3M production for their clients." Each of the statements contained in the Thompson & Knight LLP letter is false. These entities have no contractual relationship with 3M, have never placed an order with 3M, and cannot fulfill any order for 3M products because they are not an authorized distributor of 3M products. 3M has no agreement with Nexus Medical, VinAsia or Instadose to provide access to 3M production. *See* Ex. 7, Childs Decl. at ¶ 12. Upon information and belief Thompson & Knight also disclaimed the statements of this correspondence.

Defendant VinAsia has further falsely represented itself as a "3M Authorized Sub-Distributor" and stated it had secured "the production of your 50 Million N95 1860 protection mask purchase order for your customer Shlomot Medical Services Ltd." and urging the unwitting

---

[2] 3M only received this correspondence through the Thompson & Knight correspondence from the firm's General Counsel; that correspondence attached and openly disclaimed the three letters prepared regarding Nexus Medical and any involvement in the transactions described therein. *See* Exs. 1-3, Childs Decl.

consumer to "open an Escrow Account with our Nationally recognized Law Firm Thompson & Knight LLP and Hesse and Hesse" as the opportunity to acquire 50 million masks was only available for the next 24 hours. Defendant VinAsia further represented that its procedures including its escrow procedure provides "protection for all parties involved" and that such an arrangement is a "standard PPE practice." Defendants' actions are all in an effort to deceive customers into entering into a sham transaction trading on 3M's good name and products.

In a shameless attempt to rope 3M's good name into its fraudulent operations, Defendant VinAsia repeatedly outlined 3M's supposed involvement in the process, including: "1) 3M manufactures masks; 2) 3M then has an SGS report done to inspect quality and reliability; 3) 3M will ship the product to the customer CIF; 4) 3M notifies the attorneys, customer, and Sellers with an SGS report and shipping report; 5) The attorneys then release payment ONLY for the product being shipped and passed inspection." VinAsia then completely misrepresents 3M's purchasing processes including the involvement of escrowed funds and attorneys and the customers to whom 3M ships product. *See* Ex. 4, Childs Decl. at ¶ 9.

Defendants sought to falsely portray knowledge of and involvement with 3M's production, inspection and shipment procedures in order to garner customer confidence and induce them into a fraudulent transaction. In fact, these supposed steps are simply lies.

### III.    ARGUMENT AND AUTHORITIES

#### A.    Application for Temporary Restraining Order and Temporary Injunction

Under the Fifth Circuit standard for preliminary injunctive relief, 3M can demonstrate: (A) a substantial likelihood of success on the merits; (B) a substantial threat that failure to grant the injunction will result in irreparable injury; (C) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (D) that the injunction will not disserve the public interest. *Miss. Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985);

*Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572-73 (5th Cir. 1974); *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); Fed. R. Civ. P. 65.

A temporary restraining order and preliminary injunction are warranted here. *First,* 3M will succeed on the merits of its claims: Defendants have been using 3M's famous marks, falsely claiming an association with 3M and fraudulently offering for sale 3M-brand respirator products, intentionally creating a likelihood of confusion or deception in consumers. *Second*, 3M will suffer irreparable injury in the absence of the requested relief. Defendants will—in the absence of the requested relief—continue with their fraudulent scheme, incalculably and irreparably harming the goodwill and strong reputation appurtenant to the 3M Trademarks by, among other things, associating 3M in the minds of the public with Defendants' scheme to sell desperately needed protective equipment at grossly inflated prices. *Third*, the balance of the hardships tips in 3M's favor, as Defendants suffer no legitimate hardship in being prevented from continuing with their fraudulent scheme, while its persistence threatens permanent and irreversible harm to the 3M brand. *Fourth*, the public interest favors the prevention of schemes such as this one and the avoidance of confusion and deception, particularly as the conduct at issue here seeks wrongly to capitalize on a national health crisis. In the current environment, 3M has been forced to bring (and the federal courts have granted) a number of similar motions for preliminary relief; this motion should be granted as well.

## B.    3M Can Demonstrate Substantial Likelihood of Success on the Merits

To establish a substantial likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The inquiry focuses solely on the substantive merits of the claim, not on any potential procedural obstacles. *See Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011). To prevail on its trademark and unfair

competition claims, 3M must show: (A) that its 3M Marks are valid and entitled to protection, and (B) that Defendants are using the famous 3M Trademarks in a manner that is likely to create consumer confusion. *See Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 811-813 (5th Cir. 2019).

### 1. 3M will establish the validity of the 3M Trademarks

The 3M Trademarks are valid. Its '329, '036, and '534 Registrations are incontestable; they are conclusive evidence of the validity of the 3M Trademarks. *See* 15 U.S.C. § 1115(b); 15 U.S.C. § 1065. Proof of their registration and incontestable status is submitted with this motion, 3M will establish the first element of its claims. *See* Crist Decl. at Exs., 4, 6, 8.

### 2. Defendants' Use of the 3M Trademarks is Likely to Cause Confusion

To prove trademark infringement, 3M must demonstrate that Defendants' use of its marks "creates a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998) ("Liability for trademark infringement hinges upon whether a likelihood of confusion exists between the marks at issue."); 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A).

The requisite likelihood of confusion element is presumed when a defendant intentionally copies a plaintiff's trademark. *See The Scott Fetzer Co*., 381 F.3d at 486. "Bad faith . . . may, without more, prove infringement." *Fuji Photo*, 754 F.2d at 596; *accord*, *Shakespeare Co. v. Silstar Corp. of America,* 110 F.3d 234, 239 (4th Cir. 1997). "Courts have consistently recognized that the use of the internet exacerbates the likelihood of confusion." *Horseshoe Bay Resort Sales Co*., 53 S.W.3d at 810 (*citing Brookfield Communications v. West Coast Entertainment*, 174 F.3d 1036, 1057 (9th Cir. 1999)).

To prove trademark infringement, 3M must show that Defendants' use of its marks "creates a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or

sponsorship." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998) ("Liability for trademark infringement hinges upon whether a likelihood of confusion exists between the marks at issue."); 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A). "'Likelihood of confusion' is thus the central issue in any suit for trademark infringement." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 594 (5th Cir. 1985).

The infringement of a valid service mark occurs when there is a likelihood of confusion among the relevant class of consumers that is generated by the defendant's use of the plaintiff's mark. *Pebble Beach Co.*, 942 F.Supp. at 1541. The "likelihood of confusion" need not be actual confusion. Rather:

> Courts have consistently applied an expansive interpretation of likelihood of confusion, holding that "'likelihood of confusion' may be found absent confusion as to source; trademark infringement occurs also 'when the use sought to be enjoined is likely to confuse purchasers with respect to … [the products'] endorsement by the plaintiff or its connection with the plaintiff.'"

*Pebble Beach Co.*, 942 F.Supp. at 1541-42 (quoting *Fuji Photo Film v Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985). The "critical question" is whether the defendant's use suggests "affiliation or endorsement" by the plaintiff. *The Scott Fetzer Co. v. House of Vacuums Inc.*, 382 F.3d 477, 484 (5th Cir. 2004). The *Pebble Beach* decision itself noted that golfers in Texas may not come to believe they are on a golf course in California, but might "still be confused into believing Pebble Beach sponsored or approved Tour 18's use of their service marks and golf hole designs or that the parties are otherwise affiliated." *Pebble Beach Co.*, 942 F.Supp. at 1542. "Courts have consistently recognized that the use of the internet exacerbates the likelihood of confusion." *Horseshoe Bay Resort Sales Co.*, 53 S.W.3d at 810 (*citing Brookfield Communications v. West Coast Entertainment*, 174 F.3d 1036, 1057 (9th Cir. 1999).

### 3.    *The "Digits of Confusion" Strongly Favor 3M*

To assess whether use of a mark creates a likelihood of confusion as to affiliation, sponsorship, or source, the Fifth Circuit relies on the so-called "digits of confusion." The digits form a "flexible and non-exhaustive list" that includes the following seven factors: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 192 (5th Cir. 2018).

"The digits are a flexible and non-exhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus." *Id. citing Pebble Beach. Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998). "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley*, 141 F.3d at 194; *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258-59 (5th Cir. 1980); *American Auto. Ass'n v. AAA Ins. Agency, Inc.*, 618 F. Supp. 787, 792 (W.D. Tex. 1985) ("It is sufficient that any of the factors considered demonstrate a likelihood of confusion.").

The balance of relevant factors decisively favors 3M. Defendants do not just use a mark confusingly similar to the 3M Trademarks—Defendants use the 3M Trademarks themselves to trade off 3M's fame and goodwill, and falsely claim a contractual relationship to 3M to bolster that attempt. *See* Ex. 7, Childs Decl. at ¶ 12. Defendants callously do so without care for the confusion it sows, seeking to capitalize on a worldwide pandemic in pursuit of a bad faith scheme to enrich themselves. 3M is likely to succeed on its claims.

(a)    The Strength of 3M's Mark is Undisputable;

"The first digit, the type of mark, refers to the strength of the mark." *Viacom Int'l v. IJR Capital Investments, L.L.C.,* 891 F.3d 178, 193 (5th Cir. 2018). The more distinctive a mark, the stronger the mark. *Id*. Strong marks are entitled to more protection because there is a greater likelihood "that consumers will confuse the junior user's use with that of the senior user." *Id*. The Defendants infringed upon fanciful and arbitrary marks, that were registered with the Patent and Trademark Office, with knowledge of the prior use and ownership of the marks by 3M. The marks do not possess any meaning beyond the identification of 3M and its commercial activities, and consequently the misappropriation of the marks creates confusion in the minds of consumers who believe that upon seeing the marks they have identified services and transactions associated with 3M.

Therefore, the first digit weighs in favor of a likelihood of confusion.

(b)    The Similarity Between the Two Marks. Here, the Marks Used are Identical;

The second digit is the similarity of the marks. Assessing the similarity of the marks "requires consideration of the marks' appearance, sound, and meaning." *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 193 (5th Cir. 2018). Here, the marks used are identical. Defendants directly copied 3M Trademarks for use in within its website (*see* O'Donnell Decl. at Ex. 16) and displays 3M's products, thereby propagating the confusion between the marks representation of 3M and the Defendants' false affiliation with 3M or authorization to use 3M Trademarks and products.

Therefore, the second digit weighs in favor of a likelihood of confusion.

(c)    The Similarity of the Products or Services;

The third digit in the likelihood of confusion analysis is the similarity of the products or services. The more similar the products and services, the greater the likelihood of confusion. *Streamline,* 851 F.3d at 454–55 (5th Cir. 2017) (quoting *Xtreme Lashes*, 576 F.3d at 229).

Furthermore, "[t]he danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998). Here, Defendants are intentionally targeting PPE and using 3M's Trademarks to enter the market and garner consumer confidence.

Therefore, the third digit weighs in favor of a likelihood of confusion.

(d)    The Identity of Retail Outlets and Purchasers;

The fourth digit is the identity of retail outlets and purchasers. The greater the overlap between retail outlets and purchasers, the greater the likelihood of confusion. *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 194 (5th Cir. 2018). Defendants do not provide any 3M products. *See* Childs Decl. The fact that the content of Nexus Medical's website and Defendants' writings deal with 3M's commercial activities leads to confusion as to the source, affiliation, endorsement, or approval of Defendants' misuse of the 3M Trademarks and access to 3M products.

Defendants have used a variety of means to target consumers, including online advertising. *See* Ex. 16, O'Donnell Decl. ¶ 20. There is significant overlap in the purchasers of 3M's PPE products which is further exacerbated by the current health crisis.

Therefore, the fourth digit weighs in favor of a likelihood of confusion.

(e)     <u>The Identity of the Advertising Media Used;</u>

The fifth digit of confusion is the identity of advertising media. "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018).

The Fifth Circuit has held that when "[b]oth companies use print advertisements, direct mailings, and Internet promotion" it "supports an inference that the parties use similar advertising and marketing channels." *Xtreme Lashes*, 576 F.3d at 229.

Internet users are highly likely to reach Nexus Medical's website thinking it is affiliated with 3M, either because of a search engine identifying Nexus Medical's use of the 3M Trademarks or through the listing of 3M's respirator under its list of available products. Consumers are likely to think Nexus Medical's site is sponsored by or affiliated with 3M in some way. In any event, Nexus Medical is misappropriating 3M's goodwill in attracting those customers to its website in the first place. This type of confusion supports a finding of trademark infringement as well. *Brookfield*, 174 F.3d at 1064. Such confusion damages both 3M and the public interest.

Therefore, the fifth digit weighs in favor of a likelihood of confusion.

(f)     <u>The Defendant's Intent;</u>

The sixth digit is the defendant's intent. "Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse ***may alone be sufficient to justify an inference that there is a likelihood of confusion***." *Streamline*, 851 F.3d at 455 (quoting *Smack Apparel Co.*, 550 F.3d at 481). The relevant inquiry is whether Defendants intended to derive benefits from 3M's reputation by using the 3M Trademarks. Evidence that a defendant intends to "pass off" its product as that of another can be found through imitation of packaging, similar distribution methods, and more. *Domino's Pizza*, 615 F.2d at 263. Defendants' scheme is premised on an intentional misrepresentation of affiliation with 3M's name and 3M Trademarks. Defendants' nefarious

attempts to profiteer in the midst of the current unprecedented health crisis are aimed at using 3M's name and 3M's Trademark to lure consumers into fraudulent transactions. Defendants have further intentionally relied on the good name and reputation of others such as Thompson & Knight to gain credibility and bolster their alleged relationship with 3M, however this correspondence has been disavowed by Thompson & Knight. *See* Exs. 1-3, Childs Decl. at ¶ 8.

The requisite likelihood of confusion element is presumed when a defendant intentionally copies a plaintiff's trademark. *See The Scott Fetzer Co.*, 381 F.3d at 486. "In some situations, '[a] showing that the defendant intended to use the allegedly infringing mark with knowledge of the predecessor's mark may give rise to a presumption that the defendant intended to cause public confusion.'" *Id. citing Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 151 n.2 (5th Cir. 1985). "Bad faith . . . may, without more, prove infringement." *Fuji Photo*, 754 F.2d at 596; *accord*, *Shakespeare Co. v. Silstar Corp. of America,*, 110 F.3d 234, 239 (4th Cir. 1997).

In this case, the Defendants intentionally used 3M Trademarks and created a website with the intent to affiliate themselves to 3M Trademarks injuring 3M's business reputation. Defendants' pervasive use of 3M Trademarks in connection with its website name and solicitation correspondence to consumers demonstrates Defendants' undeniable intent to trick consumers into sham transactions through the use of 3M's name and reputation. Moreover, Defendants' explicit representations that they are associated with 3M and false statements that they are authorized distributors compounded with the use of the 3M Trademarks may cause consumers to believe that Nexus Medical's site is either affiliated with, licensed by, or approved by 3M.

Therefore, the sixth digit weighs heavily in favor of a likelihood of confusion.

### (g)    There is Ample Evidence of Actual Confusion.

The seventh digit is evidence of actual confusion. This is the "best evidence of a likelihood of confusion*." Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 203–04 (5th Cir. 1998) (quoting

*Domino's Pizza*, 615 F.2d at 263). Even if initial consumer confusion is quickly dispelled, this initial misunderstanding is evidence of confusion, "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion." *Id.* at 204. 3M became aware of Defendants' fraudulent scheme as a result of fraud reporting through 3M's specialized portal and notification from Thompson & Knight regarding correspondence prepared to further this scheme. *See* Ex. 4, Childs Decl. at ¶ 9. Thus, there is evidence that indicates that consumers were in fact confused as to Defendants' false association with 3M and the 3M Trademarks to the extent that they engaged in negotiations under the false pretenses that they would receive 3M products from Defendants.

Therefore, the seventh digit weighs heavily in favor of a likelihood of confusion.

**C.    3M Will Suffer Irreparable Harm if Preliminary Injunctive Relief is Not Granted**

The Texas Anti-Dilution Statute and the Lanham Act specifically provide injunctive relief to Plaintiffs such as 3M because the harms caused by the Defendants' acts cannot be remedied or repaired. As described, 3M has spent decades establishing and developing the fame and goodwill of the 3M Trademarks. Injunctive relief is an important remedy in trademark actions because the damage to 3M's business reputation and its marks through the infringement is irreparable and not capable of adequate measurement for a remedy at law. 3M cannot reverse the potential injury to its reputation or to its mark when consumers are intentionally misled and confused into thinking that Defendants, over whom 3M has no control, are somehow connected to, or affiliated with 3M or 3M's products. Defendants' continued use of the 3M Trademarks "threatens to undermine the effectiveness of millions of dollars' worth of advertising and decades of goodwill." *Service Merch. Co. v. Service Jewelry Stores, Inc.*, 737 F. Supp. 983, 990 (S.D. Tex. 1990) (issuing injunction). For more than a century, 3M has invested hundreds of millions of dollars in advertising and marketing products under its 3M Trademarks. *See* Crist Decl. at ¶ 10. 3M implements rigorous

quality-control standards to ensure that all products offered under its famous 3M Trademarks are consistent and of the highest quality. *Id*. at ¶ 9. Defendants invoked exactly this reputation when they sought to hold themselves as having direct relationships to 3M. In short, Defendants' actions have been calculated to deceive consumers into believing that Defendants and their scheme are affiliated with 3M and its goodwill.

Moreover, 3M cannot undo the harm to its business reputation that occurs when someone falsely represents to be selling PPE in the middle of a health crisis by relying on 3M's name. The irreparable harm to 3M's goodwill and business reputation and to the public in this unprecedented health crisis cannot be replaced or fixed through monetary awards of damages. 3M's harm is exacerbated by having its marks placed in close proximity to Defendant Nexus's dangerously misleading claims about ordinary surgical masks, claiming that they are "highly comparable to the N95 filters in the marketplace." *See* O'Donnell Decl. at Ex. 16. As other courts have found, a suggestion of affiliation with 3M in the furtherance of such scams causes 3M irreparable harm. *See* O'Donnell Decl. at ¶¶ 9-12, Exs. 5-8.[3]

The irreparable harm to 3M from Defendants' infringement outweighs any inconvenience to Defendants if their use were enjoined. In any event, any claimed harm from being forced to cease infringing activity is not cognizable. *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n. 12 (5th Cir. 1991) (citing *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (stating that "such an argument in defense merits little equitable consideration")). Only impairment of lawful activities deserves the Court's consideration.

---

[3] *3M Company v. RX2Live, LLC and RX2Live, Inc.*, No. 1:20-cv-00523, ECF No. 18 (E.D. Cal. Apr. 30, 2020) (Ex. 5); *3M Company v. Performance Supply, LLC*, No. 1:20-cv-02949, ECF No. 12 (S.D.N.Y. April 24, 2020) (Ex. 6); *3M Company v. Performance Supply, LLC*, No. 1:20-cv-02949, ECF No. 22 (S.D.N.Y. May 4, 2020) (Ex. 7); *3M Company v. Geftico, LLC*, No. 6:20-cv-648, ECF No. 16 (M.D. Fla. Apr. 30, 2020) (Ex. 8); *3M Company v. Matthew Starsiak, et al.*, Case No. 20-cv-1314, ECF No. 37 (D. Minn. June 26, 2020) (Ex. 15).

This Court has repeatedly recognized that loss of control of reputation and goodwill constitutes irreparable harm: *Quantum Fitness*, 83 F. Supp. 2d at 831 (citing *Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387, 1394 (S.D. Tex. 1989)); *Chemlawn Servs. Corp. v. GNC Pumps, Inc.*, 690 F. Supp. 1560, 1569 (S.D. Tex. 1988), *aff'd*, 856 F.2d 202 (Fed. Cir. 1988); *Pro Hardware, Inc. v. Home Ctrs. of Am., Inc.*, 607 F. Supp. 146, 154 (S.D. Tex. 1984)); *see also American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982), *aff'd*, 701 F.2d 408, 412 (5th Cir. 1983) (adopting district court opinion) ("Because plaintiff may not control the quality of defendant's goods, [plaintiff] has lost and faces future loss of its own reputation and goodwill. This loss of control . . . constitutes immediate, irreparable harm."). "An injury is also irreparable when compensatory damages are extremely difficult to calculate." *Quantum Fitness*, 83 F. Supp. 2d at 831 (citing *Chemlawn Servs.*, 690 F. Supp. at 1569; *Pro Hardware*, 607 F. Supp. at 154).

The conclusion of irreparable harm in these cases is based on policy considerations which seek to protect two interests. First, the law protects the ordinary consumer, for whom a trademark designates the source and affiliation of commercial activities, from being misled when confronted by another designation likely to cause deception. Second, the law protects the efforts and goodwill of the owner of the trademarks, allowing the owner to actively promote and hold out to the public its mark as a symbol of its' commercial activities. Accordingly, confusion in any form represents damage resulting to the goodwill attaching to the trademark, and is therefore injury for which compensatory damages will always be inadequate.

Defendants' use of the 3M Trademarks places 3M's reputation in Defendants' hands. 3M is irreparably injured by this loss of control of its reputation and goodwill caused by Defendants' unauthorized use. Moreover, the uses of the 3M Trademarks on Defendant Nexus Medical's

website indicates that the actual harm to 3M is great. Because 3M has demonstrated that Nexus Medical's infringing use of the 3M Trademarks on its website are likely to cause confusion, a temporary restraining order should be issued to prevent such irreparable injury.

Based on the foregoing, 3M has established irreparable harm.

### D.    Defendant Will Suffer No Harm if This Motion is Granted

While 3M is likely to suffer great and irreparable injury to its reputation and the value of its trademarks, if Defendants are not immediately stopped, a temporary restraining order will inflict virtually no harm or expense on Defendants. Given the nature of Defendant Nexus Medical's website, deleting the infringing uses of the 3M Trademarks is as simple as a few clicks of a mouse. Similarly, Defendants need only stop their unauthorized use of 3M Trademarks and products in their letter campaign to comply. Thus, to comply with the restraining order, Defendants merely need to take the simple steps of removing the 3M Trademarks and products from Nexus Medical's website and refrain from engaging in their fraudulent customer solicitation campaign.

### E.    The Public Interest Weighs in Favor of Preliminary Relief

"Infringement and dilution of trademarks are inherently contrary to the public interest." *American Dairy Queen Corp. v. New Line Productions, Inc.*, 35 F. Supp. 2d 727, 733 (D. Minn. 1998) (citing *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 730 (N.D. Ill. 1989)). "There is an overriding public interest in preventing further public confusion, and the granting of a preliminary injunction will satisfy this need." *Long John Silver's, Inc. v. Washington Franchise, Inc.*, 1980 U.S. Dist. LEXIS 16635, *13 (E.D. Va. 1980) (citing *Teledyne Indus., Inc. v. Windmere Prods., Inc.*, 433 F. Supp. 710, 740-41 (S.D. Fla. 1977). Consequently, this factor, too, weights in favor of preliminary injunctive relief. "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum Fitness*, 83 F. Supp. 2d at 810; *see also Sunbeam Prods., Inc. v. West*

*Bend Co.*, 123 F.3d 246, 260 (5th Cir. 1997), *overruled in part on other grounds*, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001) (holding that if a mark is entitled to protection, "it necessarily follows that the preliminary injunction serves the public interest"). An immediate temporary restraining order is imperative to protect the public from further confusion between 3M and Defendants.

In our "new normal," consumers do not have the same ability to ensure that sellers are who they purport to be (*e.g*, authorized distributors of 3M-brand products), and that products are what sellers claim they are (*e.g.*, genuine 3M-brand products). Accordingly, consumers are relying on the 3M Trademarks and standards associated with the 3M brand now more than ever. Defendants and others of their ilk are seeking to exploit this fact by falsely representing themselves as authorized distributors of 3M-brand products. Not only is this unlawful conduct likely to confuse and deceive the public about the source and quality of purported 3M-brand products offered under the 3M Trademarks, but also it creates an overall purchasing environment that is materially different from, and irreparably harms, the carefully curated 3M brand and customer experience.

Accordingly, unless this Court restrains and enjoins Defendants' unlawful conduct, the public will continue suffering harm in the form of confusion and deception about the source and quality of the purported 3M-brand N95 respirators that Defendants are offering to sell for exorbitantly high prices. It is particularly in the public interest to prevent this confusion where the products in question are intended to prevent bodily harm.

The public interest favors 3M's requested relief.

### F.    3M Should Not Be Required to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

3M should not be required to post bond for the issuance of a temporary restraining order because there is no conceivable scenario where such an order would wrongfully result in damages to Defendants. This is not an restraining order sought against a legitimate business competitor; it is to prevent a fraudulent scheme. Defendants have no recognizable financial interest in their scheme, and a bond is not required where no damages would result from the wrongful issuance of a restraining order. In holding that the amount of security required pursuant to Rule 65(c) "is a matter for the discretion of the trial court," the Fifth Circuit has ruled that the court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F. 3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Company v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)); see also *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) *Healthpoint Ltd. v. Stratus Pharms., Inc.*, 273 F. Supp. 2d 769, 816 (W.D. Tex. 2001) (exercising discretion not to order security in false advertising case). Here, any costs of requiring Defendants to stop misleading the public should be borne by Defendants in the first instance and would, in any case, be negligible. Nevertheless, 3M will of course pay any surety ordered by the Court.

## IV.    MOTION FOR EXPEDITED DISCOVERY

3M has a need for expedited discovery, and relief is proper under the circumstances because the requested discovery is directed at Defendants regarding the fraudulent scheme which is the basis of this lawsuit.

3M has made a necessary showing of good cause for expedited discovery, and their request is not prejudicial. The Court has broad authority under the Federal Rules of Civil Procedure to manage the discovery process. *See, e.g.*, Fed. R. Civ. P. 26(d); *id.* 16(b)(3)(B); *id.* 16(c)(2)(F). Rule 26(d)(1) explicitly permits a party to seek discovery from any source before the parties have

conferred when authorized by a court order. *Id.* 26(d)(1). The Court may order expedited discovery if there is "some showing of good cause" to justify the order. *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.,* 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004), *citing* 8A Charles Alan Wright et al., Federal Practice and Procedure: Civil § 2046 .1 (3d ed. 1994).

Expedited discovery is necessary because infringement is ongoing, necessitating immediate relief, and because this suit is largely brought to protect unwitting consumers from Defendants' fraudulent scheme in a time of unprecedented need for 3M's products for which Defendants are falsely advertising. Further, 3M's request does not offend traditional notions of fairness and is not prejudicial to Defendants. Therefore, this Court should grant 3M's Motion.

## A.     The Court Has Authority to Grant 3M's Motion.

The Court has authority to grant this request for expedited discovery. Rule 26(d) gives judges broad power to determine the timing and sequence of discovery. Fed. R. Civ. P. 26(d); *see also Crawford-El v. Britt*on, 523 U.S. 574, 598 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."). The Federal Rules afford trial judges the discretion to tailor the scope, manner, and timing of discovery to the needs of the case and ensure the just and expedient administration of justice. *See, e.g.*, Fed. R. Civ. P. 16(b)(3)(B); *id.* 16(c)(2)(F).

Under the Rules, "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Pretrial discovery is available as to any non-privileged matter relevant to the subject matter of the lawsuit, or to obtain information reasonably calculated to lead to admissible evidence. *Id.* Moreover, the Rules expressly allow the discovery of electronically stored data, permitting the discovery of "electronically stored information–including writings, drawings, graphs, charts,

photographs, sound recordings, images, and other data or data compilations." Fed. R. Civ. P. 34(a)(1)(A).

This court has specifically recognized, "[e]xpedited discovery may be appropriate in cases involving applications for a preliminary injunction." *Intel Corp. v. Rais*, No. 1:19-CV-20-RP, 2019 WL 164958, at *7 (W.D. Tex. Jan. 10, 2019). In such cases, the Court "may grant expedited discovery based on a reasonableness or good cause standard, considering the totality of the circumstances." *Id.* Factors bearing on the Court's evaluation of good cause and reasonableness include "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the [non-movant] to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.* at *1; *see also Intel*, 2019 WL 164958, at *7.

This Court may order expedited discovery upon a showing of good cause. 3M has good cause for expedited discovery, and thus, the Court should grant this motion.

**B.    3M Has Made a Necessary Showing of Good Cause for the Need to Conduct Expedited Discovery**

3M has good cause for the expedited discovery requested herein because infringement is ongoing and continuous, necessitating immediate relief, and because identifying information for all parties involved in this fraudulent scheme is necessary to move this case forward, including proceeding with a temporary restraining order to prevent further harm to 3M.

To determine if there is good cause for expedited discovery, the Court must examine the discovery request "on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances." *Ayyash v. Bank Al–Madina*, 233 F.R.D. 325, 327 (S.D. N.Y. 2005) (quoting *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 624 (N.D. Ill. 2000) (emphasis in original). Good cause is shown "where the need for expedited

discovery in consideration of the administration of justice, outweighs the prejudice to the responding party." *See Energy Prod. Corp. v. Northfield Ins. Co.,* 2010 WL 3184232, at * 3 (E.D. La. 2010) (quoting *Semitool, Inc. v. Tokyo Electron America, Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002) (internal quotations omitted)). In other words, the "good cause" analysis is "akin to a broader and more flexible totality of the circumstances analysis." *St. Louis Grp., Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239–40 (S.D. Tex. 2011) (*citing Dimension Data N. Am., Inc. v. Netstar–1, Inc.,* 226 F.R.D. 528, 531 (E.D. N.C. 2005).

Although a party typically may not seek discovery from any source before conferring with the other parties as required by Federal Rule of Civil Procedure 26(f), a district court has discretion to enter an order allowing expedited discovery pursuant to Rule 26(d)(1). The Court may allow expedited discovery upon "some good showing of good cause to justify the order." *El Pollo Loco S.A. de C.V. v. El Pollo Loco, Inc*., 244 F. Supp. 2d 986, 991 (S.D. Tex. 2004). Good cause is established "'where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party.'" *Energy Prod. Corp. v. Northfield Ins*. Co., No. 10-0933, 2010 U.S. Dist. LEXIS 90881, at *9 (E.D. La. Aug. 5, 2010) (quoting *In re Countrywide Fin. Corp.*, 542 F. Supp. 2d 1160, 1179 (C.D. Cal. 2008)). Good cause is present here because 3M would be seeking to prevent the ongoing infringement of its trademarks and because expedited discovery would allow the Court to hear 3M's motion for a temporary restraining order at the earliest juncture possible.

Hence, good cause for expedited discovery exists. Because infringement is ongoing and continuous, 3M needs to discover the identities and contact information of the extent of Defendants' fraudulent scheme to take swift action to prevent further irreparable harm.

"Good cause" also exists for granting 3M leave to take immediate discovery prior to the Rule 26(f) conference in order to proceed with a temporary restraining order. The evidence at this point indicates there is a vast and extensive network of operations in which Defendants are involved which are being utilized to mislead consumers in a variety of platforms. Expedited discovery is necessary to establish the breadth of Defendants' fraudulent operations and to prevent them from operating their unlawful scheme.

"Good cause" also exists for granting 3M leave to take immediate discovery prior to the Rule 26(f) conference in order to determine the actual identities and whereabouts of all those involved in the scheme because neither Defendants nor the third-parties to be subpoenaed will be prejudiced and because expedited discovery will move this litigation forward. Notably, courts have frequently found good cause in cases involving claims of infringement and unfair competition. *Semitool, Inc.*, 208 F.R.D. at 276 (*citing Benham Jewelry Corp. v. Aron Basha Corp.*, 1997 WL 639037, at *20 (S.D. N.Y. 1997)). Here, 3M brings claims of trademark infringement, unfair competition, counterfeiting, and dilution. *See generally* Compl. Additionally, courts regularly permit early discovery where such discovery will "substantially contribute to moving th[e] case forward." *Semitool,* 208 F.R.D. at 277. Identifying the extent of Defendants' scheme, those affected and potential additional defendants will allow this case to advance. Courts regularly grant expedited discovery where such discovery will "substantially contribute to moving th[e] case forward." *Semitool,* 208 F.R.D. at 277. Here, 3M needs expedited discovery to proceed with an injunction hearing and ascertain the extent of Defendants' fraudulent scheme. Expedited discovery is also necessary to ascertain the identity of additional defendants' contact information in order to communicate with them and name them in this lawsuit.

Further, 3M's request is specific, particularized, and cannot be characterized as a "fishing expedition." Additionally, 3M is seeking documentation from the third-party service providers for the limited purpose of identifying and locating Defendants and potential victims to Defendants' fraud as well as assessing the extent of Defendants' fraudulent operations. 3M is seeking information to which they would otherwise be entitled to after the Rule 26(f) conference. As alleged in the Complaint, Defendants have conducted an illegal enterprise, purporting to sell 3M's products bearing 3M's intellectual property through Nexus Medical's website and Defendants' letter writing campaigns. Defendants have orchestrated a detailed operation that includes alleged formation of escrow accounts and representations by reputable law firms, banks, and other service providers. 3M would be entitled to these records in discovery. *See Semitool*, 208 F.R.D. at *276 (allowing expedited discovery where "the requested information is relevant and will be produced in the normal course of discovery.").

Moreover, 3M's particularized and narrowly tailored requests will not prejudice Defendants or third-parties. The subpoenaed third-parties will have the opportunity to move this Court for an Order quashing the subpoena, will be able to give notice to Defendants that this information is being sought, and Defendants will have the opportunity to raise any objections before this Court prior to the return date of the subpoena. Therefore, 3M respectfully requests that this Court exercise its power under the Rules and allow discovery to proceed at a pace tailored to the expedited nature of this case in the interest of the swift administration of justice.

### C.    Time is of the Essence

Time is of the essence here because Defendants continue to represent an affiliation to 3M and to be 3M authorized distributors in their website, the attempted unauthorized sale of 3M products is ongoing, and the records kept by the unwitting consumers and third-parties will not be kept indefinitely. There is an added sense of urgency as Defendants are relying on the COVID-19

pandemic to pressure unwitting consumers into fraudulent transactions by representing to sell 3M's products. Courts have permitted expedited discovery under similar circumstances, where "physical evidence may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties to the litigation." *See, e.g., Living Scriptures v. Doe(s)*, No. 10-cv-0182-DB, 2010 WL 4687679, at *1 (D. Utah 2010); *Interscope Records v. Does 1-14*, No. 07-4107-RD, 2007 WL 2900210, at *1 (D. Kan. 2007) (granting immediate discovery from ISPs because "the physical evidence of the alleged infringers' identity and incidents of infringement could be destroyed to the disadvantage of Plaintiffs").

If discovery is delayed, Defendants' infringement on 3M Trademarks and continued deceit of consumers would cause irreparable harm to 3M and the public. 3M would be harmed because it would suffer continued violations of its exclusive rights and erosion of its valuable distinctiveness in the market. Expedited discovery now will enable 3M to take early action to stop the infringing activity before it becomes pervasive and established and results in further injury to the public and its consumers.

Expediting these proceedings would inure to the benefit of Defendants as well. Courts have recognized that it may be less prejudicial to enjoin a defendant that has invested fewer resources in an infringing product than to wait until the defendant has invested more resources in it, and then later enjoin its use. *See, e.g., Trak. Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1078 (D. Mass. 1979) (holding that enjoining defendant at commencement of sales campaign would "nip[] the operation in the bud" whereas denial of preliminary relief would result in defendant's entrenchment, "making permanent relief more problematical"). Thus, there is no cause to delay discovery, and ample cause to expedite it.

### D.    Discovery Sought from Defendants

The discovery sought by 3M is narrowly tailored and specifically targeted to obtain information regarding (i) the extent of Defendants' fraudulent operations; (ii) potential consumers harmed by Defendants' misappropriation and fraud; and (iii) additional parties involved in Defendants' fraudulent scheme. For example the requests seek:

1.    Each written communication (including email and text messages) among the Defendants that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

2.    Each written communication (including email and text messages) between either Defendant and any third-party that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

3.    Defendants' documents concerning whether an attorney client relationship exists, or has existed, between either Defendant, or either Defendants' principals, owners, officers or employees, and Thompson & Knight LLP.

4.    Each written communication (including email and text messages) between either Defendant and Thompson & Knight LLP concerning the preparation or use of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

5.    Each written communication (including email and text messages) between either Defendant and any third-party concerning the purchase sale or other disposition of 3M products, including N95 respirators.

6.     Defendants' written communications (including email and test messages) with Shlomot Medical Services, Ltd., Mark J. Nussbaum & Associates, PLLC, Instadose Pharma Ltd. and/or Phoenix Endoscopy Products, LLC concerning the sale, purchase or offer of 3M's products including the N95 respirator mask.

7.     Each document wherein either Defendant, separately or in combination, identify themselves as a 3M authorized distributor, or a 3M authorized sub-distributor.

8.     Each document wherein Defendants have represented to have an association or contractual relationship with 3M.

9.     Each written communication (including email and text messages) amongst Defendants concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

10.     Each document that in any evidence any prior dealings or transactions between either Defendant and 3M.

11.     Each document concerning any deposit or escrow of any funds with any intermediary or institution, including Chicago Title, Marc Hesse, Hesse and Hesse, Plains Capital Bank, Thompson & Knight LLP, or the Temple Law Firm, in any way related to 3M products.

12.     All documents in which Defendants have used, in any manner, the 3M Trademarks as defined in the Complaint.

13.     Documents sufficient to identify any party with which Defendants communicated concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

14.    Each purchase order, or any document concerning a purchase order, for 3M Products including 3M N95 respirators.

15.    Documents sufficient to identify all individuals or entities who have been involved with the operations of Nexus Medical and VinAsia.

These Requests are narrowly tailored. *See* Exs. C and D (RFPs to Nexus Medical & VinAsia). Defendants will suffer no undue burden in responding to them. As set forth in the Proposed Order accompanying this motion, 3M requests that Defendants produce these specific documents and things within two weeks of the anticipated date of the order. If expedited discovery is not ordered, then no discovery will begin until after the Rule 26(f) conference, which is yet to be scheduled. In that time, Defendants could take even further steps to infringe upon 3M's intellectual property and defraud unwitting consumers in times of an increased demand for PPE protective gear.

### E.    Discovery Sought from Third-Parties

3M further requests that the Court allow discovery to proceed under an exception to the Rule 26(f) conference requirement and that 3M be authorized to immediately serve subpoenas to third parties under the Federal Rules of Civil Procedure, providing all third parties full opportunity for objections and assertions of privilege.

## V.    PRAYER

WHEREFORE, PREMISES CONSIDERED, 3M respectfully requests that this Court, as soon as possible, temporarily restrain and enjoin Defendants, and all persons and entities in active concert and participation with them, from using the 3M Trademarks to suggest an affiliation with 3M, or in any other way, in connection with the offer for sale or sale of respirator products. 3M prays that the Court set a hearing to require Defendants to show cause as to why a preliminary

injunction should not be entered enjoining Defendants conduct, as described herein, until the time of trial.

3M further prays that the Court grant this Motion for Expedited Discovery and enter an order consisted with the foregoing requests permitting 3M to obtain the specified and limited discovery requests herein on an expedited basis. 3M also prays that the Court grant it all other relief to which it is entitled, at law or in equity.

Dated: July 2, 2020

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Michael W. O'Donnell*
Michael W. O'Donnell
State Bar No. 24002705
mike.odonnell@nortonrosefulbright.com
Aimeé Vidaurri
State Bar No. 24098550
aimee.vidaurri@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Paul Trahan
State Bar No. 24003075
Paul.trahan@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone:  (512) 536-5288
Facsimile:  (512) 536-4598

*Attorneys for Plaintiff 3M Company*

## CERTIFICATE OF SERVICE

On July 2, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served a copy of the foregoing on the following via e-mail and overnight courier to the following:

VinAsia Che Tao LLC
Mario Gasca
30 N. Gould Street, Suite 9364
Sheridan, Wyoming 82801
EAS@VinAsiaCheTao.com
Mario.Gasca@VinAsiaCheTao.com

Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
info@nexusmedicalproducts.com

Jim Fultz
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
jim@nexusmedicalproducts.com

David Schiller
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
david@nexusmedicalproducts.com

Vicky Lynn Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
vicky.burl@gmail.com
vicky.outlaw1@gmail.com
vicky.outlaw@yahoo.com
vickyjohnson2@aol.com
burloutlaw@aol.com

David Schiller
4108 Kirkmeadow Lane
Dallas, Texas 75287
davids1071@yahoo.com

George Burl Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
burloutlaw@gmail.com

*/s/ Michael W. O'Donnell*
Michael W. O'Donnell

# EXHIBIT A



## State of Delaware
The Official Website of the First State

**Department of State: Division of Corporations**

Allowable Characters

| Entity Details | |
|---|---|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

| File Number: | 7919131 | Incorporation Date / Formation Date: | 3/30/2020 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | NEXUS MEDICAL LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | UNITED STATES CORPORATION AGENTS, INC. |
|---|---|
| Address: | 221 N BROAD ST, SUITE 3A |
| City: | MIDDLETOWN | County: | New Castle |
| State: | DE | Postal Code: | 19709 |
| Phone: | 302-777-0538 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like  ◯ Status  ◯ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

# EXHIBIT B

# STATE OF WYOMING ✻ SECRETARY OF STATE
## EDWARD A. BUCHANAN
## BUSINESS DIVISION

Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
Phone 307-777-7311
Website: https://sos.wyo.gov · Email: business@wyo.gov

## Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| Name | **VinAsia Che Tao LLC** | | |
|---|---|---|---|
| **Filing ID** | **2020-000910707** | | |
| Type | Limited Liability Company | Status | Active |

## General Information

| | | | |
|---|---|---|---|
| Old Name | | Sub Status | Current |
| Fictitious Name | | Standing - Tax | Good |
| | | Standing - RA | Good |
| Sub Type | | Standing - Other | Good |
| Formed in | Wyoming | Filing Date | 04/13/2020 2:24 PM |
| Term of Duration | Perpetual | Delayed Effective Date | |
| | | Inactive Date | |

**Principal Address**

30 N Gould St Ste R
Sheridan, WY 82801

**Mailing Address**

30 N Gould St Ste R
Sheridan, WY 82801

**Registered Agent Address**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**Parties**

| Type | Name / Organization / Address |
|---|---|
| Organizer | GG IInternational 6210 N Jones Blvd. Ste. 751986, Las Vegas, NV 89136 |

**Notes**

| Date | Recorded By | Note |
|---|---|---|

## Annual Report History

| Num | Status | Date | Year | Tax |
|---|---|---|---|---|

## Amendment History

| ID | Description | Date |
|---|---|---|

# Filing Information

 **Please note that this form CANNOT be submitted in place of your Annual Report.**

| Name | **VinAsia Che Tao LLC** | | |
|---|---|---|---|
| **Filing ID** | **2020-000910707** | | |
| Type | Limited Liability Company | Status | Active |

---

| 2020-002809388 | RA Name/Address Change | 04/21/2020 |
|---|---|---|

Registered Agent # Changed  From: 0173386  To: 0185352

Registered Agent Organization Name Changed  From: Corporation Service Company  To: Registered Agents Inc.

Registered Agent Physical Address 1 Changed  From: 1821 Logan Ave  To: 30 N Gould St Ste R

Registered Agent Physical City Changed  From: Cheyenne  To: Sheridan

Registered Agent Physical County Changed  From: Laramie  To: Sheridan

Registered Agent Physical Postal Code Changed  From: 82001  To: 82801

Principal Address 1 Changed  From: 1993 Dewar  To: 30 N Gould St Ste R

Principal City Changed  From: Rock Springs  To: Sheridan

Principal Postal Code Changed  From: 82901  To: 82801

| See Filing ID | Initial Filing | 04/13/2020 |
|---|---|---|

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| 3M COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 1:20-cv-00697-LY |
| NEXUS MEDICAL LLC, | § | |
| VINASIA CHE TAO LLC, AND | § | |
| DOES 1-10, | § | |
| | § | |
| Defendants. | | |

---

**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO**
**DEFENDANT NEXUS MEDICAL LLC**

---

To:    Defendant Nexus Medical LLC.

Plaintiff 3M Company ("3M" ) serves the following First Set of Requests for Production to Defendant Nexus Medical LLC, as follows:

Dated:  July 2, 2020

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Michael W. O'Donnell*
Michael W. O'Donnell
State Bar No. 24002705
mike.odonnell@nortonrosefulbright.com
Aimeé Vidaurri
State Bar No. 24098550
aimee.vidaurri@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Paul Trahan
State Bar No. 24003075
Paul.trahan@nortonrosefulbright.com

98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone:  (512) 536-5288
Facsimile:  (512) 536-4598
*Attorneys for Plaintiff 3M Company*

## CERTIFICATE OF SERVICE

On July 2, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served a copy of the foregoing on the following via e-mail and overnight courier:

VinAsia Che Tao LLC
Mario Gasca
30 N. Gould Street, Suite 9364
Sheridan, Wyoming 82801
EAS@VinAsiaCheTao.com
Mario.Gasca@VinAsiaCheTao.com

Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
info@nexusmedicalproducts.com

Jim Fultz
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
jim@nexusmedicalproducts.com

David Schiller
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78824
david@nexusmedicalproducts.com

Vicky Lynn Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
vicky.burl@gmail.com
vicky.outlaw1@gmail.com
vicky.outlaw@yahoo.com
vickyjohnson2@aol.com
burloutlaw@aol.com

David Schiller
4108 Kirkmeadow Lane
Dallas, Texas 75287
davids1071@yahoo.com

George Burl Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
burloutlaw@gmail.com

/s/ Michael W. O'Donnell
Michael W. O'Donnell

## INSTRUCTIONS

1.  If you or your lawyers find any of these requests vague, confusing, hard to understand, or if you just want to talk through issues relating to these requests, please call Aimee Vidaurri at (210) 270-7136. Please do not wait and object instead of attempting to resolve the issue with a telephone call.

2.  These requests require you to produce all responsive documents that are in your actual or constructive possession, custody, or control.

3.  In the event you claim that a request is overly broad, unduly burdensome, or objectionable, you shall respond to that portion of the request which is not objectionable and specifically identify the respect in which the request is allegedly overbroad, unduly burdensome, or objectionable.

4.  In the event that multiple copies of a document exist, produce every copy on which appear any notations or markings of any sort not appearing on another copy.

5.  The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of this request any document which might otherwise be considered beyond its scope.

6.  Each request for production includes all e-mail, text messages, and other electronic data. All responsive spreadsheets, electronic presentations, or multimedia files (including, for example, voicemails, audio files, and video files) shall be produced in their native format with related searchable text. All other electronic data should be produced as searchable TIF images. A load file identifying at least the following fields must also be produced: Author; To; From; CC; BCC; Subject; and Date and Time Sent, Received, or Created.

7.  The documents produced in response to this request shall be: (i) organized and designated to correspond to the categories in this request or, if not, (ii) produced as they are maintained in the normal course of business, and either case: all associated file labels, file headings, and file folders shall be produced together with the responsive documents from each file and each file shall be identified as to its owner or custodian; and each page shall be given a discrete production number.

8.  Unless otherwise stated in a particular document request, each document request is limited to the time period from February 1, 2020 through the present.

9.  These Requests for Production of documents and tangible items are continuing so as to require supplemental responses and supplemental production if information or documentation is obtained upon the basis of which you learn that any of the respective responses were incorrect or incomplete when made or that the response, though correct and complete when made, is no longer true and complete.

**DEFINITIONS**

For purposes of these documents requests the terms as defined in the pleadings apply, further following definitions are also applicable:

<u>You, Your, Nexus Medical</u>. The terms "you", "your" or "Nexus Medical" mean Nexus Medical LLC, including all partners, agents, attorneys, managers, affiliates and representatives of Nexus Medical LLC.

<u>Lawsuit</u>. The term "Lawsuit" means Civil Action No. 1:20-cv-00697-LV, *3M Company v. Nexus Medical LLC, VinAsia Che Tao LLC, and Does 1-10*, in the United States District Court for the Western District of Texas.

<u>Complaint.</u> The term "Complaint" refers to the live pleading filed in Civil Action No. 1:20-cv-00697-LV, *3M Company v. Nexus Medical LLC, VinAsia Che Tao LLC, and Does 1-10*, in the United States District Court for the Western District of Texas.

<u>VinAsia</u>. The term "VinAsia" means VinAsia Che Tao LLC including all partners, agents, attorneys, managers, affiliates and representatives of VinAsia Che Tao LLC.

<u>Document or Documents</u>. The terms "document" and "documents" is employed in its most comprehensive sense and as used herein shall mean writings of every kind, source and authorship, both originals and all non-identical copies thereof, in your possession, custody or control, or known by you to exist, irrespective of whether the writing is one intended for or transmitted internally by you, or intended for or transmitted to any other person or entity, including without limitation any government agency, department, administrative entity, or personnel. The term shall mean all written, magnetic, recorded, or graphic matter, including but not limited to papers, books, accounts, drawings, graphs, records, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports and recordings of telephone or other conversations, or of interviews, or of conferences, or of other meetings, affidavits, statements, summaries opinions, reports, data and data compilations, studies, analyses, evaluations, contracts, agreements, jottings, agenda, bulletins, notices and announcements.

<u>Electronic or Magnetic Data</u>. "Electronic or magnetic data" means electronic information that is stored in a medium from which it can be retrieved and examined. The term refers to the original (or identical duplicate when the original is not available) and any other copies of the data that may have attached comments, notes, marks, or highlighting of any kind. Electronic or magnetic data includes, but is not limited to, the following: computer programs; operating systems; computer activity logs; programming notes or instructions; e-mail receipts, messages, or transmissions; output resulting from the use of any software program, including word-processing documents, spreadsheets, database files, charts, graphs, and outlines; metadata; PIF and PDF files; batch files; deleted files; temporary files; Internet- or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; and any miscellaneous files or file fragments. Electronic or magnetic data includes, but is not limited to, any items stored on magnetic, optical, digital, or other electronic-storage media, such as hard drives, floppy disks, CD-ROMs, DVDs, tapes, smart cards, integrated-circuit cards (e.g., SIM cards), removable media

(e.g., Zip drives, Jaz cartridges), microfiche, punched cards,. Electronic or magnetic data also includes the file, folder, tabs, containers, and labels attached to or associated with any physical storage device with each original or copy.

Communication. The term "communication" means any oral or written utterance, notation, or statement of any nature whatsoever, including, but not limited to: documents (as that word is defined herein), correspondence, personal conversations, telephone calls, facsimiles, email or other electronic communications, dialogues, discussions, interviews, consultations, telegrams, memoranda, agreements, or other understandings.

Concerning. The term "concerning" means relating to, referring to, reflecting, describing, evidencing, regarding, or constituting.

Including. The term "including" means including without limitation.

The word "and" means "and/or. "

The word "or" means "or/and."

## FIRST SET OF REQUESTS FOR PRODUCTION

REQUEST NO. 1:  Each written communication (including email and text messages) between you and VinAsia that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 2:  Each written communication (including email and text messages) between you and any third-party that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 3:  Defendants' documents concerning whether an attorney-client relationship exists, or has existed, between either Defendant, or either Defendants' principals, owners, officers or employees, and Thompson & Knight LLP.

REQUEST NO. 4:  Each written communication (including email and text messages) between you and Thompson & Knight LLP concerning the preparation or use of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 5:  Each written communication (including email and text messages) between you and any third-party concerning the purchase sale or other disposition of 3M products, including N95 respirator masks.

REQUEST NO. 6:  Your written communications (including email and test messages) with Shlomot Medical Services, Ltd., Mark J. Nussbaum & Associates, PLLC, Instadose Pharma Ltd. and/or Phoenix Endoscopy Products, LLC concerning the sale, purchase or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 7:  Each document wherein you and VinAsia, separately or in combination, have identified as a 3M authorized distributor, or a 3M authorized sub-distributor.

REQUEST NO. 8:  Each document wherein you have represented to have an association or contractual relationship with 3M.

REQUEST NO. 9:  Each written communication (including email and text messages) between you and VinAsia concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 10:  Each document that in any evidence any prior dealings or transactions between You and 3M.

REQUEST NO. 11:  Each document concerning any deposit or escrow of any funds with any intermediary or institution, including Chicago Title, Marc Hesse, Hesse and Hesse, Plains Capital Bank, Thompson & Knight LLP, or the Temple Law Firm, in any way related to 3M products.

REQUEST NO. 12:  All documents in which you have used, in any manner, the 3M Trademarks as defined in the Complaint.

REQUEST NO. 13:  Documents sufficient to identify any party with which you communicated concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 14:  Each purchase order, or any document concerning a purchase order, for 3M Products including 3M N95 respirator masks.

REQUEST NO. 15:  Documents sufficient to identify all individuals or entities who have been involved with the operations of Nexus Medical and VinAsia.

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| 3M COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 1:20-cv-00697-LY |
| NEXUS MEDICAL LLC, | § | |
| VINASIA CHE TAO LLC, AND | § | |
| DOES 1-10, | § | |
| | § | |
| Defendants. | § | |

---

**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO
DEFENDANT VINASIA CHE TAO LLC**

---

To:     Defendant VinAsia Che Tao LLC.

Plaintiff 3M Company ("3M") serves the following First Set of Requests for Production to Defendant VinAsia Che Tao LLC, as follows:

Dated:  July 2, 2020

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Michael W. O'Donnell*

Michael W. O'Donnell
State Bar No. 24002705
mike.odonnell@nortonrosefulbright.com
Aimeé Vidaurri
State Bar No. 24098550
aimee.vidaurri@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone:  (210) 224-5575
Facsimile:  (210) 270-7205

Paul Trahan
State Bar No. 24003075
Paul.trahan@nortonrosefulbright.com

98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone:  (512) 536-5288
Facsimile:  (512) 536-4598
*Attorneys for Plaintiff 3M Company*

## CERTIFICATE OF SERVICE

On July 2, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served a copy of the foregoing on the following via e-mail and via overnight courier:

VinAsia Che Tao LLC
Mario Gasca
30 N. Gould Street, Suite 9364
Sheridan, Wyoming 82801
EAS@VinAsiaCheTao.com

Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
info@nexusmedicalproducts.com

Jim Fultz
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 76824
jim@nexusmedicalproducts.com

David Schiller
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
david@nexusmedicalproducts.com

Vicky Lynn Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
vicky.burl@gmail.com
vicky.outlaw1@gmail.com
vicky.outlaw@yahoo.com
vickyjohnson2@aol.com
burloutlaw@aol.com

David Schiller
4108 Kirkmeadow Lane
Dallas, Texas 75287
davids1071@yahoo.com

George Burl Outlaw
Nexus Medical LLC
108 E. Trailmoor, Suite 6
Fredericksburg, Texas 78624
burloutlaw@gmail.com

/s/ Michael W. O'Donnell
Michael W. O'Donnell

## INSTRUCTIONS

1.  If you or your lawyers find any of these requests vague, confusing, hard to understand, or if you just want to talk through issues relating to these requests, please call Aimee Vidaurri at (210) 270-7136. Please do not wait and object instead of attempting to resolve the issue with a telephone call.

2.  These requests require you to produce all responsive documents that are in your actual or constructive possession, custody, or control.

3.  In the event you claim that a request is overly broad, unduly burdensome, or objectionable, you shall respond to that portion of the request which is not objectionable and specifically identify the respect in which the request is allegedly overbroad, unduly burdensome, or objectionable.

4.  In the event that multiple copies of a document exist, produce every copy on which appear any notations or markings of any sort not appearing on another copy.

5.  The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of this request any document which might otherwise be considered beyond its scope.

6.  Each request for production includes all e-mail, text messages, and other electronic data. All responsive spreadsheets, electronic presentations, or multimedia files (including, for example, voicemails, audio files, and video files) shall be produced in their native format with related searchable text. All other electronic data should be produced as searchable TIF images. A load file identifying at least the following fields must also be produced: Author; To; From; CC; BCC; Subject; and Date and Time Sent, Received, or Created.

7.  The documents produced in response to this request shall be: (i) organized and designated to correspond to the categories in this request or, if not, (ii) produced as they are maintained in the normal course of business, and either case: all associated file labels, file headings, and file folders shall be produced together with the responsive documents from each file and each file shall be identified as to its owner or custodian; and each page shall be given a discrete production number.

8.  Unless otherwise stated in a particular document request, each document request is limited to the time period from February 1, 2020 through the present.

9.  These Requests for Production of documents and tangible items are continuing so as to require supplemental responses and supplemental production if information or documentation is obtained upon the basis of which you learn that any of the respective responses were incorrect or incomplete when made or that the response, though correct and complete when made, is no longer true and complete.

## DEFINITIONS

For purposes of these documents requests the terms as defined in the pleadings apply, further following definitions are also applicable:

<u>You, Your, VinAsia</u>. The terms "you", "your" or "VinAsia" mean VinAsia Che Tao LLC, including all partners, agents, attorneys, managers, affiliates and representatives of VinAsia Che Tao LLC.

<u>Lawsuit</u>. The term "Lawsuit" means Civil Action No. 1:20-cv-00697-LV, *3M Company v. Nexus Medical LLC, VinAsia Che Tao LLC, and Does 1-10*, in the United States District Court for the Western District of Texas.

<u>Complaint.</u> The term "Complaint" refers to the live pleading filed in Civil Action No. 1:20-cv-00697-LV, *3M Company v. Nexus Medical LLC, VinAsia Che Tao LLC, and Does 1-10*, in the United States District Court for the Western District of Texas.

<u>Nexus Medical</u>. The term "Nexus Medical" means Nexus Medical LLC including all partners, agents, attorneys, managers, affiliates and representatives of Nexus Medical LLC.

<u>Document or Documents</u>. The terms "document" and "documents" is employed in its most comprehensive sense and as used herein shall mean writings of every kind, source and authorship, both originals and all non-identical copies thereof, in your possession, custody or control, or known by you to exist, irrespective of whether the writing is one intended for or transmitted internally by you, or intended for or transmitted to any other person or entity, including without limitation any government agency, department, administrative entity, or personnel. The term shall mean all written, magnetic, recorded, or graphic matter, including but not limited to papers, books, accounts, drawings, graphs, records, letters, photographs, tangible things, correspondence, communications, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports and recordings of telephone or other conversations, or of interviews, or of conferences, or of other meetings, affidavits, statements, summaries opinions, reports, data and data compilations, studies, analyses, evaluations, contracts, agreements, jottings, agenda, bulletins, notices and announcements.

<u>Electronic or Magnetic Data</u>. "Electronic or magnetic data" means electronic information that is stored in a medium from which it can be retrieved and examined. The term refers to the original (or identical duplicate when the original is not available) and any other copies of the data that may have attached comments, notes, marks, or highlighting of any kind. Electronic or magnetic data includes, but is not limited to, the following: computer programs; operating systems; computer activity logs; programming notes or instructions; e-mail receipts, messages, or transmissions; output resulting from the use of any software program, including word-processing documents, spreadsheets, database files, charts, graphs, and outlines; metadata; PIF and PDF files; batch files; deleted files; temporary files; Internet- or web-browser-generated information stored in textual, graphical, or audio format, including history files, caches, and cookies; and any miscellaneous files or file fragments. Electronic or magnetic data includes, but is not limited to, any items stored on magnetic, optical, digital, or other electronic-storage media, such as hard drives, floppy disks, CD-ROMs, DVDs, tapes, smart cards, integrated-circuit cards (e.g., SIM cards), removable media

(e.g., Zip drives, Jaz cartridges), microfiche, punched cards,. Electronic or magnetic data also includes the file, folder, tabs, containers, and labels attached to or associated with any physical storage device with each original or copy.

Communication. The term "communication" means any oral or written utterance, notation, or statement of any nature whatsoever, including, but not limited to: documents (as that word is defined herein), correspondence, personal conversations, telephone calls, facsimiles, email or other electronic communications, dialogues, discussions, interviews, consultations, telegrams, memoranda, agreements, or other understandings.

Concerning. The term "concerning" means relating to, referring to, reflecting, describing, evidencing, regarding, or constituting.

Including. The term "including" means including without limitation.

The word "and" means "and/or. "

The word "or" means "or/and."

## FIRST SET OF REQUESTS FOR PRODUCTION

REQUEST NO. 1:  Each written communication (including email and text messages) between you and Nexus Medical that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 2:  Each written communication (including email and text messages) between you and any third-party that attaches or makes any reference to any of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 3:  Defendants' documents concerning whether an attorney-client relationship exists, or has existed, between either Defendant, or either Defendants' principals, owners, officers or employees, and Thompson & Knight LLP.

REQUEST NO. 4:  Each written communication (including email and text messages) between you and Thompson & Knight LLP concerning the preparation or use of the Thompson & Knight LLP letters attached to the Complaint as Exhibits 8, 9, 10, 13 and 14.

REQUEST NO. 5:  Each written communication (including email and text messages) between you and any third-party concerning the purchase sale or other disposition of 3M products, including N95 respirator masks.

REQUEST NO. 6:  Your written communications (including email and test messages) with Shlomot Medical Services, Ltd., Mark J. Nussbaum & Associates, PLLC, Instadose Pharma Ltd. and/or Phoenix Endoscopy Products, LLC concerning the sale, purchase or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 7:  Each document wherein you and Nexus Medical, separately or in combination, have identified as a 3M authorized distributor, or a 3M authorized sub-distributor.

REQUEST NO. 8:  Each document wherein you have represented to have an association or contractual relationship with 3M.

REQUEST NO. 9:  Each written communication (including email and text messages) between you and Nexus Medical concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 10:  Each document that in any evidence any prior dealings or transactions between You and 3M.

REQUEST NO. 11:  Each document concerning any deposit or escrow of any funds with any intermediary or institution, including Chicago Title, Marc Hesse, Hesse and Hesse, Plains Capital Bank, Thompson & Knight LLP, or the Temple Law Firm, in any way related to 3M products.

REQUEST NO. 12:  All documents in which you have used, in any manner, the 3M Trademarks as defined in the Complaint.

REQUEST NO. 13:  Documents sufficient to identify any party with which you communicated concerning the sale, purchase, or offer of 3M's products including the N95 respirator mask.

REQUEST NO. 14:  Each purchase order, or any document concerning a purchase order, for 3M Products including 3M N95 respirator masks.

REQUEST NO. 15:  Documents sufficient to identify all individuals or entities who have been involved with the operations of Nexus Medical and VinAsia.